UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA FORT WAYNE DIVISION

| | | |
|---|---|---|
| Ms. Butler Simpson, individually; and | ) | |
| behalf of all others similarly situated: | ) | Cause No. __1:18CV  52__ |
| including: | ) | |
| Kayla Simpson; | ) | |
| Merrah Salyer; Merritt Salyer; | ) | Jury Trial Requested |
| Prestin Salyer; and | ) | |
| Lawrence Butler | ) | |
| PLAINTIFFS, | ) | |
|     v. | ) | |

Allen County, IN, Larry Brown President Allen Co. Council;                      )
Allen County Commissioners, Theresa Brown President                           )
Indiana Division of Child Services, Child Support Bureau                        )
Cynthia Longest, Deputy Director;                                             )
Allen County IV-D Prosecuting Attorney's Office: IV-D Deputy Prosecutors:      )
David Brown; Andrew Schweller; Traci Smith                                     )
Allen County Board of Judges;                                                 )
Honorable Daniel Heath; Honorable Charles Pratt;                              )
Temporary Judge Stephen Rothberg;                                            )
Temporary Judge Martin Hillary;                                              )
Allen County Clerk Of Court Lizebeth A. Borgmann;                            )
Court Reporters: Marie Coomer, Lisa Porter, Catherine Stiebeling              )
Allen County Public Defender Board                                           )
Allen County Public Defenders: Stephen Miller, Mark Thoma,                   )
Robert Gevers: IN THEIR OFFICIAL AND INDIVIDUAL CAPACITIES; and  )
Donald Simpson                                                               )
DEFENDANTS.                                                                  )

## CIVIL RIGHTS COMPLAINT

18 U.S.C. §§ 1595 & 93A; and 18 USC §§ 1983 & 85; and 42 U.S.C. § 2000d; and

Indiana Code 35-42-3.5-4 (2006)

1

## I. **INTRODUCTION**

*Request for Judicial Notice*

1. According to the Federal Rules of Evidence, Rule 201, Plaintiffs request the Court to take judicial notice of the following Adjudicative Facts that are filed as Exhibits and incorporated herein by reference, as evidence to the truth of the Plaintiff's Claims. Please also take notice of the Allen County court cases, as cited herein, that regard Allen County's involvement with the Plaintiffs via the Allen County court system. Plaintiffs request this Court to instruct the jury to accept the noticed facts as conclusive. A Chronological Index of Adjudicative Facts, a Chronological Adjudicative Facts Exhibit Appendix and an Exhibit List is included.

2. All underlined text is linked to online facts, for your convenience.

*Monell v. Department of Soc. Svcs.,436 U.S. 658 (1978)*

3. This is a highly complex civil rights Complaint filed to remedy the defendants' wide spread policy of unconstitutionally positioning judges, who are not neutral decision makers, to carry out the defendants' pervasive, unconstitutional policy of intentionally denying targeted Hoosiers (juveniles, incompetents and the poor) equal access to the court; court services; and due process; and equal protection of the law; as a method to generate income for Allen County; and to generate the defendants' jobs and status in the community.

4. The Defendants unconstitutional policy created the danger for and did cause the Plaintiffs Ms. Butler a/k/a/ Ms. Butler Simpson (Ms. Butler) and her father, Lawrence Butler, who represent two generations subject to the defendants' unconstitutional policy, to be held in a modern-day system of peonage; involuntary servitude; and forced labor, or rather forced participation in court programs to unlawfully financially benefit the defendants.

5. While the abuse is not limited to these programs, for many years, the Defendants all knew Title IV-D Beneficiary Defendants issued and enforced high child support payment orders

that poor noncustodial parents did not have an ability to pay one hundred percent of.

Thereby, defendants unlawfully indebted poor noncustodial parents with child support debt

they did not have an ability to pay. Thereby, defendants generated a need for Title IV-D child

support enforcement services that generate Seventy-Six Million Dollars a year for Indiana.

Allen County receives almost Four Million Dollars of that from the IV-D Program.

6. In 1998, Defendant Donald Simpson obtained one of these high default child support

payment orders against Ms. Butler, a known incompetent. In 2008, he came after Ms. Butler

for over $40,000.00 in back child support. Ms. Butler is a crime victim and the child for

whom the support order is for is a product of that crime. Ms. Butler nearly went to prison for

ten years for being a crime victim and her three young children who were 1,3 and 4 years old

when this nightmare began would have been forced into the foster care system.

7. By intentionally issuing and enforcing child support payment orders that poor noncustodial

parents could not pay fabricated evidence for felony nonsupport arrests, prosecutions and

convictions.

8. Defendants denied the targeted poor noncustodial parents equal access to the court and court

services; and thereby ran them through the Title IV-D Child Support Enforcement Program,

the Public Defender Program, and Community Corrections Programs and then sends 60

parents a year to prison without due process or equal protection of the law. Most poor

noncustodial parents will never be able to pay and will therefore be forced to participate in

the child support Program until the death of the 'deadbeat parent'. Then the Title IV-D

Beneficiary Defendants will seize any assets they may have to satisfy the unconstitutional

debt.

3

9. Thereby, defendants obtained their job by generating federal and state funding and program user fees that the defendants otherwise would not have obtained. Not only are defendants violating poor noncustodial parents clearly established constitutional rights to generate this income; they are not monitoring and spending the money as required by law.

10. The pervasiveness of the unconstitutional policy; the sheer power of the defendants; the complexity of the legal matters; the compounding, continuing constitutional violations; and the low socioeconomic class of the poor noncustodial parents preclude any state remedy; and make it nearly impossible for a victim to file a lucid civil rights Complaint.

11. However, with this unconstitutional policy, Allen County and many other counties across Indiana, usurped the Indiana judiciary and have unlawfully shifted the judiciary's powers to counties and their agencies. The counties and their agencies committed fraud upon the court, by causing judges to violate classes of Hoosiers' clearly established rights. Thereby, the defendants created this modern-day system of peonage, involuntary servitude and forced labor. The trial court's, the counties and the county agencies, including the Title IV-D, Child Support Prosecutor, and Public Defender Agencies' actions are fraud upon the court.

12. "Fraud upon the court" has been defined by the 7th Circuit Court of Appeals to "embrace that species of fraud which does, or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery can not perform in the usual manner its impartial task of adjudging cases that are presented for adjudication." Kenner v. C.I.R., 387 F. 2d 689 (7th Cir1968), 7 Moore's Federal Practice, 2d ed., p. 512, paragraph 60.23.  The 7th Circuit further stated, "a decision produced by fraud upon the court is not in essence a decision at all, and never becomes final."

13. Indiana county governments usurping trial courts and committing fraud upon the court by causing judges to deny classes of Hoosiers equal access to the court, court services and due process and equal protection of the law is an unconstitutional policy that is so pervasive in 2007 the Indiana Commission on Government Reform (ICGR) recommended: "the state assume funding for the state's trial court system, including probation officers and public defenders, so that the Indiana courts can meet the needs of the people they serve; conflicts with local government be eliminated; equal access can be assured". *Id.* Streamlining Local Government: We've got to stop governing like this". 2007 ICGR Report Recommendation #7 p.23 available at  https:  indianalocalgovreform.iu.edu assets docs Report_12-10-07.pdf. See Exhibit 1.

14. The defendants' fraud upon the court and unconstitutional policy is further detailed in the ICGR Report Recommendation #7, other government publications and agency meeting minutes that are incorporated herein as adjudicative facts. Yet, nothing was done to remedy the unconstitutional policy.

15. It's a published pervasive policy that: "Judicial selection processes in Indiana have been altered or created in an ad hoc fashion, particularly when individuals or *special interest* groups disapprove of a specific judicial decision or individual judicial philosophy.". And that:  'In reality, the public may not have a meaningful choice in counties where direct election of judges takes place. In approximately 70% of all recent judicial elections, a judge runs for a specific court with no opposition or runs in a multiple court selection process where the judge is guaranteed to win.' See the Complaint p. ___.

16. Allen County is one of five exceptions to state judicial election standards which are governed by Indiana Code Title 33 and Indiana Code 33-33-2. Judgeships are filled by election, like in

5

other counties, although it is nonpartisan. However, the interim vacancies are chosen by a local nominating committee pursuant to Indiana Code § 33-33-2-39. rather than the state nominating committee. The Allen County Judicial Nomination Committee selects 3 names from interested candidates from which the governor appoints one as judge.

17.  After interim judicial appointment, the public will have opportunity to elect or rather retain the judge during the next election cycle and most of the time they do – there is very little possibility of defeating a judge who is already in place.

18. Allen County judges, named as defendants in this Complaint run in elections with no opposition, and they are guaranteed to win. However, there are plenty of judicial candidates interested in becoming an Allen County judge. But they do not run against these judges, instead they apply to the nominating Committee.

19. The Allen County electoral scheme interferes with the marketplace by causing interested judicial candidates to seek appointment to the bench from the Allen County Judicial Nominating Committee, rather than the election process; and thus hinders electoral choice by which voters would have the opportunity to choose between competing alternatives that would have otherwise existed; and thereby unconstitutionally positions judges, who are not neutral decision makers to carry out Allen County's unconstitutional policy.

20. The Ind. Constitution Article 7 Section 7 (11/3/1970) guarantees Hoosiers that a Judge for each circuit shall be *elected by the voters* thereof." Allen County has severely burdened the voter's ability to cast a meaningful and effective vote for the judge of their circuit and Indiana Code § 33-33-2-32 et al' is unconstitutional. (Judicial nominating commission; establishment and appointing a judge).

21. The Allen superior court is governed and operated by a board of judges composed of all the judges of the superior court. Six (6) judges are required for a quorum for conducting business and as a majority for taking action. The board is responsible for: matters of administration, budget, expenditures, policy, and procedure affecting the entire superior court shall be determined by a majority of the board of judges. Any determination binds the entire board of judges and each judge of the board. All Allen county judges participate in the unconstitutional policy,

22. Since the decision of the United States Supreme Court in Gideon v. Wainwright (1963), 372 U.S. 335, the issue of judicial control of indigent defense counsel has been addressed by a majority of states through the enactment of legislation creating indigent defense delivery systems that are independent of the judiciary. Indiana, however, continues to rely heavily upon the inherent authority of the courts to provide these constitutionally mandated services and independence of the defense function has not been assured.

   This state is one of the few states where an accused may be represented by an at-will employee of the judge before whom the accused stands charged. (Quoting the Indiana Public Defender Commission's STANDARDS FOR INDIGENT DEFENSE SERVICES IN NON-CAPITAL CASES, available at: http: www.in.gov publicdefender files indigent-defense-non-cap.pdf.

23. In 2009, the Public Defender Commission created a new Standard requiring public defenders be paid about sixty percent of the prosecutors' salary. Allen County Councilman Tom Harris wanted to know if, "Our Public Defender is working in a way that 60% makes sense?" Councilman Harris's question simply begs the question: Just who do the Allen County Public defenders work for? It certainly isn't their clients? Larry Landis of the Indiana Public

Defender Commission, who pays the Allen County General fund over One-Million Dollars a year for participating in the Public Defender Program stated in the 2009 Public Defender Commission Meeting Minutes, available at: http: www.in.gov publicdefender files pdc-minutes-2009 pdf: "the State Court Administration keeps details on pleas. He believes the percentages are around 1% of cases decided by jury trial, 3% by bench trial and the remainder is guilty pleas". That was in response to: "Vernon Smith asked if the Commission had ever conducted a quality-of-representation study regarding plea agreements. In his experience, there seems to be an unusually high number of pleas entered, perhaps because the client does not understand the situation, or the public defender does not have time to adequately prepare a case. Mark Rutherford said a study would be difficult because whether to accept a plea is up to the defendant."

24. An Indy Star online article *The average amount of time spent on a client's case: 45 minutes, available at:* https: www.indystar.com story news 2016 10 24 indianas-public-defender-system-flawed-study-says 92691546

Shows the public that: "Lack of oversight of the public defense system, inconsistent funding and subpar representation contribute to the problems," […] "Public defenders in Indiana are burdened with so many cases— at roughly 1,200 cases each per year — that the average amount of time spent on a client's case is roughly 45 minutes, said Larry Landis, executive director of the Indiana Public Defenders Council. That includes client interviews, discovery and legal research."

25. Ms. Butler's case shows, as will the records of the parents in prison for felony nonsupport, that the unconstitutional indigent defense system, prevents this class of parents from pleading their defenses. And the unconstitutional indigent defense system is not a matter of

insufficient funding, or poor over worked attorneys. Ms. Butler's public defenders conspired

against her clearly established constitutional rights. The first public defender, Stephen Miller,

tendered back her entire defense with a signed note, then he prepared a jury trial for her to

lose at. See Exhibit. ___. She had to fire two Allen County public defenders to be able to file

her own Motion To Dismiss and the felony case was dismissed. See Exhibit. ___.

26. Remarkably, although numerous contempt transcripts show Ms. Butler testifying that she

was tricked into believing she terminated her parental rights; and KS was conceived from sex

crimes occurring when Ms. Butler was a child, held in custody of DS's parents and that she

has three young children and doesn't have the ability to pay child support; the State's Motion

To Dismiss is the only document finding that Ms. Butler terminated her parental rights. It's

the first document of two that has findings regarding her three *other* children.

27. The Plaintiff, Ms. Butler risked being convicted of a class c and class d felony that carried a

ten-year prison sentence, that is after being ran through the probation, and work release

programs. Had she not had the courage and capacity to fight for her constitutional rights Ms.

Butler surely would have been convicted and her three children who were 1, 3 and 4 years

old when this nightmare began, would have been forced into the foster care program that also

generates income for the state. Thereby Ms. Butler's children would have been the third

generation in her family to be directly, affected by this unconstitutional policy and thereby

unlawfully forced to participate in court programs to financially benefit the state.

28. The "Thirteenth Amendment which the [peonage], involuntary-servitude and forced labor

statutes implement --was intended to abolish all forms of compulsory servitude and incidents

of slavery, those statutes "apply to, coerced acts other than work in an economic sense." -

(quoting Bailey v. Alabama, 219 U.S. 219, 241 (1911)) Id. Kaufman, 546 F.3d 1242 (2008).

29. "It is the compulsion of service that the antipeonage, involuntary servitude and forced labor statutes inhibit, for when that occurs, the condition of servitude is created, which would be not less involuntary because of the original agreement to work [or fulfill the obligation] . . . .Id. Bailey, 219 U.S. at 242; Accord Pollock, 322 U.S". at 7–9." Id. Quoting "A New Peonage?: Pay, Work Or Go To Jail In Contemporary Child Support And Beyond" p. 936 Seattle University Law Review [Vol. 39:927] (2016).

30. Since May 8, 1991, the Defendants' unconstitutional policy created the danger for; and did cause Ms. Butler to be held in a condition of involuntary servitude to Defendant Donald Simpson (DS) and his parents when she was a child; and the policy caused Ms. Butler to be a human trafficking victim in violation of the Trafficking Victims Protection Act, 22 U.S. Code Chapter 78(2000); and   Indiana Code § 35-42-3.5 (2006); (2017).

31. Ms. Butler's circumstance track IC 35-42-3.5 verbatim. The current version states in relevant part:

IC 35-42-3.5-1 Promotion of human trafficking; sexual trafficking of a minor; human trafficking

Sec. 1. (a) A person who, by force, threat of force, or fraud, knowingly or intentionally recruits, harbors, or transports another person:
    (1) to engage the other person in:
    (A) forced labor; or
    (B) involuntary servitude; or
    (2) to force the other person into:
    (A) marriage;
    (B) prostitution; or
    (C) participating in sexual conduct (as defined by IC 35-42-4-4);
        commits promotion of human trafficking, a Level 4 felony.
(b) A person who knowingly or intentionally recruits, harbors, or transports a child less than:
(1) eighteen (18) years of age with the intent of:
    (A) engaging the child in:
    (i) forced labor; or
    (ii) involuntary servitude; or
    (B) inducing or causing the child to:
    (i) engage in prostitution or juvenile prostitution; or

(ii) engage in a performance or incident that includes sexual conduct in violation
omplaint. P, of IC 35-42-4-4(b) or IC 35-42-4-4(c) (child exploitation); or

(2) sixteen (16) years of age with the intent of inducing or causing the child to participate
in sexual conduct (as defined by IC 35-42-4-4);

commits promotion of human trafficking of a minor, a Level 3 felony.

Except as provided in subsection (e), *it is not a defense to a prosecution under this subsection that the child consented to engage in prostitution or juvenile prostitution or to participate in sexual conduct.*

(c) A person who is at least eighteen (18) years of age who knowingly or intentionally sells or transfers custody of a child less than eighteen (18) years of age for the purpose of prostitution, juvenile prostitution, or participating in sexual conduct (as defined by IC 35-42-4-4) commits sexual trafficking of a minor, a Level 2 felony.

32. Indiana Code § 35-42-3.5-4 (2006) Rights of *alleged* victims states in relevant part:

Sec. 4. (a) An alleged victim of an offense under section 1 of this chapter:

(1) may not be detained in a facility that is inappropriate to the victim's status as a crime victim;

(2) may not be jailed, fined, or otherwise penalized due to having been the victim of the offense; and

(3) shall be provided protection if the victim's safety is at risk or if there is danger of additional harm by recapture of the victim by the person who allegedly committed the offense, including:

(A) taking measures to protect the alleged victim and the victim's family members from intimidation and threats of reprisals and reprisals from the person who allegedly committed the offense or the person's agent; and

33. The Plaintiff, Lawrence Butler was targeted for the unconstitutional policy in 1982 when the court issued a high child support payment Order in accord to the unconstitutional policy. Among other constitutional violations, he was forced to participate in the child support enforcement program until 2015, for years after the statute of limitation ran on the 1982 Order.

34. In 1989, Defendant Donald Simpson (DS), and his deceased parents solicited Ms. Butler for sex. She was 12 years old. In 1991 DS and his parents obtained sole custody of Ms. Butler. In 1992, the court unlawfully modified Mr. Butler's 1982 custody order, when the court

transferred custody of Ms. Butler, his daughter, to Defendant Donald Simpson's parents, without any due process or equal protection of the law.

35. Among other things that constitute involuntary servitude, Ms. Butler was forced to sleep-in-bed with DS, her illegitimate foster brother, and participate in sexual conduct with him for the remainder of her adolescence. A timeline of police reports and juvenile delinquency records prove Ms. Butler tried to run away from DS and that she was a Child In Need Of Services. However, in accord to the unconstitutional policy, Ms. Butler was arrested, denied services and ran through court programs, like probation [1] and she was detained for weeks and then months in the Allen county Wood Youth Center; and then the court forced MS. Butler back into DS's parent's custody when they had no lawful authority to have custody of her. She was immediately impregnated, by her illegitimate foster brother, upon her return. Two impregnations that occurred before Ms. Butler reached majority and immediately when returned to DS's custody are in the record.

36. The manner of which Ms. Butler was held in DS's custody, the length of time she was abused, the nature of the abuse and the position of the people abusing her fraudulently concealed material facts from Ms. Butler that would cause her to know she was a crime victim; and caused her to be mentally ill and gravely disabled by the time she turned 18 years old. Thereafter, Ms. Butler suffered severe psychological injuries, including repressed memories that prevented her from knowing she was a crime victim. Now defendants say she suffered no crimes.

---

[1] See the Complaint p. ___ and ___. The Honorable Daniel Heath and the Allen Co. Council. discuss denying Children in Need of Service their clearly established constitutional rights and abusing juvenile probation user fees for decades.

37. The 1998 default is outrageous: The default award for $83.00 a week in child support against Ms. Butler, a known incompetent who was without a representative. Indiana Trial Rule 55(B) mandated the court to find out the truth of the default when the court carried the Order into effect. Among other issues that create a genuine issue of material fact that Ms. Butler was incompetent; the Decree states finding: Ms. Butler was emotionally unstable, she had attempted to suicide two times in the past and would reasonable attempt to kill herself in the future. See the Complaint p. __

With that finding alone surely Ms. Butler deserved the protection of the law: Indiana Trial Rule 55 (B) and Ind. Tr. Rule 4.2 and

38. Ms. Butler was held in a condition of involuntary servitude in violation of her 13th Amendment U.S. Constitutional Rights. Kayla Simpson (KS) is a product of that condition and was only born because Ms. Butler was denied equal access to the court, court services and due process and equal protection of the law. And was thereby held in DS's custody and forced to participate in sexual conduct with him.

39. DS stole KS from Ms. Butler by tricking her into believing she terminated her parental rights and that ended her relationship with him and his family. Thereby DS destroyed the mother daughter bond and relationship; all while he used a default child support Order from the Allen County Court, that was issued *and enforced* in accord to the unconstitutional policy, without any due process or equal protection of the law; to unlawfully indebt Ms. Butler to DS for over $50,000.00 in back child support.

40. Ms. Butler had particular rights to KS and was defrauded of her rights established by Mullis v. Kinder, 568 N.E.2d 1087 (Ind.Ct.App.1991) Pena v. Mattox, 84 F. 3d 894 - Court of Appeals, 7th Circuit 1996; and Pena v. Mattox, 880 F. Supp. 567 - Dist. Court, ND Illinois

1995. In that, Under Mullis, and Pena and Indiana Code 31-35-1-6(c) (2)(A)1 and Indiana

Code 31-19-9-8-(a) 4 (A);(B);(C ) (formerly, Ind. Code § 31-3-1-6(g)(2)(B))  Ms. Butler can

terminate her parental rights without DS's consent because he admitted to committing sex

crimes against the her since she was 14 years old and that his parents permitted him to

engage her in sexual conduct. See the Complaint p. ___.

41. This policy is so outrageous after the following testimony, the Honorable Charles Pratt, who

issued the default in 1998 when he was a magistrate and currently runs in elections

unopposed so he is guaranteed to win violated Ms. Butler's right to counsel and had Ms.

Butler leave the courthouse and come back with $400.00 to pay DS. The the child support

prosecutor, David Brown emailed the plaintiff and conspired to go to her home every See the

3/18/2009 Tr.  In the Allen Superior Court, DS admitted facts that show, DS, his parents and

the Ms. Butler's own mother violated Indiana's trafficking statute and 18 USC 1584.  DS

admitted that his parents took Ms. Butler into their home, got custody of her and that his

parents let him engage her in sexual conduct since she was 14 years old, but they were in a

relationship and she consented just the same. Ms. Butler states that the legal age to consent to

sex in Indiana is 16 years old. DS responded that is was funny that I knew the law now.   See

the 3/18/2009 TR.p.12

42. In a court hearing on 10/16/2009 Tr.p. 22-27, 30-32. DS testified that KS did not know who

Ms. Butler is; and that KS did not know she had a biological mother other than her

stepmother and for all purposes KS viewed DS's wife as her mother. When the court asked

why KS did not know who her mother is DS testified:

> "It's a bad analogy but let's say during childbirth she [Ms. Butler] would have died. I
>
> might have talked about your mother then, but that's not the case. She walked away. I'm

not going to keep that memory alive in my child. Do you see what I'm saying?"

10/16/2009 Tr.p. 30-31

43. On 10/16/2009 Tr.p. 34. This transcript was changed a bit but shows DS testified that he "contacted the prosecutors a couple of different times about the Title IV-D Program". He "never followed through with it." He got a letter and they said this was his "last shot for the IV-D program for 25 bucks". If he wanted to recoup support at a later date, he would have to hire a private attorney. So, he thought for 25 dollars he would give it a shot. DS said he "wasn't thinking monetarily". He "didn't care about the money". DS "was more interest in" … Ms. Butler cut him off and said revenge. He said "it's not even a revenge thing. It's just, if it was going to happen, why not let it happen for $25 instead of paying a private attorney".

44. They fraudulently concealed Ms. Butler rights to pauper counsel. Judge Heath told Ms. Butler they couldn't appoint counsel because it was civil. Allen County IV-D Deputy Prosecuting Attorney David Brown prosecuted the first two contempt hearings. Then he was showing up to Ms. Butler's home before he went to work and having coffees with her. Then he would guide her to her knees, in her kitchen, she would orally copulate him and perform criminal deviate conduct. She waited for him every morning too.

45. She risked being arrested at the next contempt hearing, that was set about five weeks apart, and having her child taken by child protective agents.  And it being highly problematic for her to get them back. Ms.  Butler's mental health counselor called the sheriff to report what was happening to her. See Exhibit (May 2010 Police report)

46. Ms. Butler did not see IV-D Prosecutor for a while and the day after Ms. Butler's birthday the Prosecutor emailed her the following and attached an email she sent him.

From: David Brown
To: Ms. Jennifer simpson

15

I hope you had a happy birthday. I was out of town. Does your offer for a cup of coffee still stand?

David A. Brown

-----Original Message-----

From: Jennifer simpson [mailto:makeitcustomclean@yahoo.com] Sent: Friday, March 12, 2010 4:53 AM

To: David Brown

Subject: Hi

Perhaps, stopping over in the early morning will work out better. You can leave 45 minutes earlier and just take exit 102 to my place. I know you don't like to wake up early, but it will be fun and I make the prettiest cup of coffee... giggle, really.

Do you like to eat breakfast?


David A. Brown

-----Original Message-----

From: Jennifer Simpson [mailto:makeitcustomclean@yahoo.com]

Sent: Monday, July 26, 2010 2:26 PM

To: David Brown

Subject: Re: Hi

Of coarse it does, David, any time... with a little notice.

Oh, I got a beautiful, purple bike for my birthday, a 21 speed, lots of fun-----Original Message-----

From: Ms. Butler Simpson [mailto:makeitcustomclean@yahoo.com]

Sent: Monday, July 26, 2010 2:26 PM

To: David Brown

Subject: Re: Hi


Of coarse it does, David, any time... with a little notice.

Oh, I got a beautiful, purple bike for my birthday, a 21 speed, lots of fun

Jul 27, 2010 at 3:47 PM

From David Brown

To Ms. Butler Simpson

I shouldn't.

I just wanted to wish you happy birthday.


Wed, Jul 28, 2010 at 4:54 AM

From Ms. Butler Simpson

To David Brown

Thanks and I knew you wouldn't :) I'm actually in the process of moving, to Florida. I'll be around for a little while longer, a couple of weeks and then back and forth for court dates.

This address will always be checked often enough, so keep in touch, okay.

Bye Bye.

See Exhibit ___.

47. The prosecutor gave Ms. Butler some time and she did not contact him. So, on 8/9/2010, eleven days after the email telling him "bye bye", the felony information was signed. See Exhibit ___He was probably pretty upset; to receive Ms. Butler's response to his birthday wish. Normally, she would have thanked him and begged him to come see her. He would show up to Ms. Butler's home and "kid" her about arresting her.

48. They held the warrant until Labor Day weekend: and held her in jail for five nights and six days waiting for a bond; and she had to pay $2500.00 to get out to her children.

49. In 2008, DS came back after Ms. Butler to hold her in the condition of servitude she is held in today. Indiana's promotion of human trafficking statue IC § 35-42.-3.5-4 (2006) rights of alleged victims was enacted in 2006. 2006 Indiana House Bill 1414 available at, http://www.in.gov/legislative/bills/2006/IN/IN1414.1.html required all law enforcement

officers be trained on the incidents of human trafficking. However, no one in Allen County,

or Indiana for that matter was trained; or they denied the Plaintiff protective services because

she is a child support debtor. See the Complaint p. __ and Exhibit ___ (a May 2010 Police

report where Ms. Butler's mental health counselor called the Sherriff to make a police report

regarding the crimes causing KS's birth.)

50. Instead of being protected as required by Indiana Code 35-42.3.5-4 (2006), in accord to the

unconstitutional policy, the defendants denied Ms. Butler equal access the court, court

services and due process and equal protection of the law and unlawfully indebted  her to DS

for over $50,000.00 in back child support.

51.  Aside from all the other issues in Ms. Butler's case: at any time, the Title IV-D Beneficiary

Defendants can apply an 8 percent per annum interest rate and the child support arrearages

accrue, under Ind. Code § 24-4.6-1-101 (Interest on Money Judgments Statute). Post-

judgment interest is statutorily mandated for money judgments, including back child support.

See *Caldwell v. Black,* 727 N.E.2d 1097, 1100 (Ind. Ct. App. 2000). There have never even

been any income documents submitted to the court or an ability to pay determination as

required by law.

**Sexual coercion and subordination have been among the worst indicia of involuntary
servitude. *United States v. Udeozor*, 515 F.3d 260 (4th Cir.2008) Id. at 266.**

52. This unconstitutional policy is so outrageous: From 2009 until 2010 Allen County Title IV-D

Deputy Prosecuting Attorney David Brown (Prosecutor Brown) forced Ms. Butler to

participate in sexual conduct with him; or risk going to jail at the next contempt hearing;

being charged with felony nonsupport; and having her three children taken by child

protective agents; and it being highly problematic for her to get them back. See the

Complaint p.. __ Eleven days after Ms. Butler ended the sexual relationship with the child support prosecutor, by email, the felony nonsupport of a dependent information was signed.

53. Instead of the judges or attorneys in this case recommending the prosecutor David Brown to the Ind. Disciplinary Commission for investigation, as required by the Indiana Rules of Professional Conduct, Rule 8.3. Reporting Professional Misconduct; and or instead filing criminal charges against the prosecutor for violating Indiana Code § :  he was made a pro tempore judge in the Allen County Small Claims court. See Exhibit 1. (Prosecutor Brown's 11/7/2011 Facebook post). Now, he is at the Steuben County Prosecutor's Office; and training child support prosecutors at Indiana Prosecuting Attorney's Council Child Support Enforcement Conferences regarding child support payment Order statute of limitations. See Exhibit 2 The Indiana Prosecutor 2017 3rd Qtr.pdf p.4 available at: https://www.in.gov/ipac/files/The%20Indiana%20Prosecutor%202017%203rd%20Qtr.pdf.

54. 18 U.S.C. §1593 A - Benefitting financially from peonage, slavery, and trafficking in persons states: "Whoever knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in any act in violation of section 1581(a), 1592, or 1595(a), knowing or in reckless disregard of the fact that the venture has engaged in such violation, shall be fined under this title or imprisoned in the same manner as a completed violation of such section.(Added Pub. L. 110–457, title II, § 222(d)(1), Dec. 23, 2008, 122 Stat. 5070.)"

55. Not only are the defendants violating poor noncustodial parents clearly established constitutional rights in effort to force participation in court programs that generates income for Allen County, it's agencies and to generate the defendants' jobs and status in the community, they are not tracking and spending the money as required by law.

**56.** Among other things, they are allocating non-IV-D costs to the IV-D Budget and charging 66

percent reimbursement from the federal government. The most egregious example of this is:

45 CFR 304.21 - Federal financial participation in the costs of cooperative arrangements with

courts and law enforcement officials section (b) limitations does not provide IV-D funding

for judges.  45 CFR 304.21 (b) states:

"**(b)***Limitations.* Federal financial participation is not available in:

**(2)** Costs of compensation (salary and fringe benefits) of judges;

**(3)** Costs of travel and training related to the judicial determination process incurred by judges;

**(4)** Office-related costs, such as space, equipment, furnishings and supplies, incurred by judges;

**(5)** Compensation (salary and fringe benefits), travel and training, and office-related costs incurred by administrative and support staffs of judges"

57. However, the June 2005 Allen County Council Meeting Minutes show:

"Judge Tom Felts and Tim Miller, Circuit Court Administrator requested an allocation

increase; four (4) Probation Officers should be moved back into County General due to a

change in statute. They would move them into their IV-D Program budget and then be

eligible for a 2/3rd reimbursement. The Magistrate/Hearing Officer falls under the judicial

increase; that position is also in the IV-D Program budget so would be 2/3rd reimbursed.

In the IV-D Program budget they also requested additional allocation in Translator

Services and Per Diem Judges."

Id.  Allen County Council Meeting Minutes  6/1 & 6/2/05 p. 4, available at

http: webcache.googleusercontent.com search?q cache:KbR1rrLvigIJ:www.allencounty.as

index.php°3Foption°3Dcom_content°26view°3Darticle°26id°3D42°26Itemid°3D53

6°26jsmalltib°3D1°26dir°3DJSROOT_council_minutes_2005°26download_file°3DJS

ROOT_council_minutes_2005-06-1°2526amp°253B2-

05.pdf &cd 2&hl en&ct clnk&gl us See also the Complaint p. ___

58. The doctrine of fraudulent concealment was established in <u>Doe v.Shult-Lewis Child &</u>
<u>Family Svcs. Inc., 718 NE 2d 738 - Ind: Supreme Court 1999</u> and <u>Fager v. Hundt, 610 NE 2d</u>
<u>246 - Ind: Supreme Court 1993</u>  (Established the doctrine of fraudulent concealment in
regard to childhood sex crimes and should be available to estop a defendant from asserting
the statute of limitations "when he has, either by deception or by a violation of duty,
concealed from the plaintiff material facts thereby preventing the plaintiff from discovering a
potential cause of action.)

59. There is no statute of limitations to toll in this case. However, the doctrine of fraudulent
concealment is relevant to show how defendants created this modern-day system of peonage,
involuntary servitude and forced labor; and how Ms. Butler was held in servitude as a child
and to the child support prosecutor.

60. The term "involuntary servitude" includes a condition of servitude induced by means of—
(A) any scheme, plan, or pattern intended to cause a person to believe that, if the person did
not enter into or continue in such condition, that person or another person would suffer
serious harm or physical restraint; or
(B) the abuse or threatened abuse of the legal process. See 22 USC § 7102(6).  (The term
"abuse or threatened abuse of the legal process" means the use or threatened use of a law or
legal process, whether administrative, civil, or criminal, in any manner or for any purpose for
which the law was not designed, in order to exert pressure on another person to cause that
person to take some action or refrain from taking some action

61. 18 U.S. Code § 1595 - Civil remedy states in relevant part:

(a)  An individual who is a victim of a violation of this chapter may bring a civil action
against the perpetrator (or whoever knowingly benefits, financially or by receiving

anything of <u>value</u> from participation in a venture which that <u>person</u> knew or should have

known has engaged in an act in violation of this chapter) in an appropriate district <u>court</u>

<u>of the United States</u> and may recover damages and reasonable attorneys fees.

**(c)**No action may be maintained under this section unless it is commenced not later than

the later of— **(1)**10 years after the cause of action arose

1. under Trial Rule 60.5 and Indiana Code § 34-10-1-2 ***Sholes v. Sholes***; 760 N.E.2d 156,

   164 (Ind. 2001); and *Zimmerman v. Hanks,* 766 N.E.2d 752, 755,56 (Ind. Ct. App. 2002).

# I JURISDICTION AND VENUE

62. This Court has original jurisdiction pursuant to 18 U.S.C. § 1595; 42 U.S.C. §§ 1983 and 85;

28 U.S.C. §§ 1331 and 1343 over Plaintiff's cause(s) of action arising under the Constitution

of the United States for violation of the 13th and 14th Amendments of the United States

Constitution and; violations of Article 1 §§ 12 and; 37 of the Indiana Constitution and;

violations of 18 U.S.C. §§§§§ 1581; 1584; 1589; 1590; 1593A; 42 U.S.C. § 667 (b)(2) and

45 C.F. R. § 302.56(f) and (g)(2) and; violations of the Indiana Code 35-42-3.5-4.  This

Court has original jurisdiction pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201

and 2202. This Court has supplemental jurisdiction over Plaintiffs' causes of action arising

under Indiana state law pursuant to 28 U.S.C. § 1367; including but not limited to Indiana

Tort Claim Act in each of her children's name for loss of services and

63. Venue lies in the United States District Court for the Northern District of Indiana because the events and or omissions giving rise to Plaintiff's claims occurred in Fort Wayne, Indiana and the Plaintiff and Defendants live and or work in Fort Wayne, Indiana. 28 U.S.C. § 1391(b)(2).

## II PARTIES

**PLAINTIFFS**

### *Ms. Butler*

1. The Plaintiff Ms. Butler a/k/a Ms. Butler Simpson, (Plaintiff) resides at 7704 Aboite Center Road Fort Wayne Indiana, 46804. Her phone number is (260)498-0533. The Plaintiff is the daughter of Mr. Butler and was a party to his 1982 custody and child support order contained in his dissolution decree.   Without any due process in 1992, the Allen Superior Court modified Mr. Butler's default order when the court transferred custody of the Plaintiff Ms. Butler to Defendant Donald Simpson's deceased parents. Therefore, Ms. Butler lived with Donald Simpson as his foster sister.  Donald Simpson's parents forced the Plaintiff to sleep with Defendant Donald Simpson and participate in sexual conduct with her foster brother. On November 18, 1994 the forced her to marry defendant Donald Simpson.

See. Exhibits.  A severe form of traffic hearing. king victim as defined by 22 U.S.C. § 7102 (9) (B) of the Trafficking Victims Protection Act (TVPA).  The term "severe form of trafficking victim" means— Ms. Butler is the victim of the recruitment, harboring, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage. Due to this Complaint she is a poor single mother of three children ages 10, 12, and 13 years-old, who

are not involved in any child support case. She has a formal 8th grade education and very

little work experience.  She has been diagnosed and treated for Post-Traumatic Stress

disorder due to the issues in this Complaint and suffers repressed memories. At times, she

suffers an inability to care for herself and her children due to the issues in this Complaint and

the harm the unconstitutional policy causes as described in the DOL Letter.

Ms. Butler's four children individually.

2. The unconstitutional policy otherwise violated Ms. Butler's children's right to their mother's

services. Her children are joinder herein as Title IV-D Beneficiary Defendants have a duty to

consider the child's best interest in carrying out their official duties. The defendants acted in

knowing and reckless disregard and outrageous deliberate indifference to Ms. Butler's

Children's clearly established Constitutional rights; and intentionally violated them; and

attempted to force her children to participate in the Indiana Foster Care Program.

3. The Defendants' unconstitutional policy intentionally caused her children to be homeless in

2011. They then lived with their mother, at their grandparent's home; and in 2013 the

Defendants forced Ms. Butler's children to live in a homeless shelter, which is part of the

unconstitutional policy. See the Complaint p. ___.

4. Due to the unconstitutional policy Ms. Butler's child Kayla Simpson has lost all services

from her mother.

***Lawrence Butler***

5. Lawrence Butler is joinder herein under FRCP he is an indispensable party to the Complaint.

On 1985 the Allen Circuit Court issued an order of dissolution of marriage that dissolved Mr.

24

Butler's marriage to Cynthia Butler. The Order granted Cynthia Butler sole custody of the Plaintiff Ms. Butler and Her brothers. On 3/2/1992 the Allen Circuit court modified the 1985 default order when it transferred custody of the Plaintiff Ms. Butler to Defendant Donald Simpson's parents. There was no service of process attempted at for the 1992 custody proceeding. Defendant Donald Simpson's parents lawyer filed a forged Consent To Change Custody that was purported to be signed by Lawrence Butler and waived an evidentiary hearing. The Allen Circuit Court's child support order expired on 2005. However, the Allen County IV-D Prosecuting attorney's office enforced the child support order until 2015. They forced him to pay thousands of dollars he did not lawfully owe when they attached liens on Mr. Butler's property, threatened to suspend his driver's license and garnished his Social Security Retirement income. In 2015, Mr. Butler learned of the statute of limitations and called the Allen County IV-D Office and they stopped enforcing the order.

**DEFENDANTS**

### *Donald Simpson*

6. Donald Simpson can be served at 306 East Forest Street Monroeville, Indiana 46773. Donald Simpson (DS) and his deceased parents solicited the Plaintiff for sex in 1989, when she was 12 years-old. He sexually molested her. Mullis v. Kinder,

7. His parents would take the Plaintiff to their home and have her sleep-in bed with DS and participate in sexual conduct. In 1991, his parents obtained sole custody of the Plaintiff. Beginning in 1992 his parents abused the legal process to hold the Plaintiff, in their custody, in a condition of involuntary servitude, to Donald Simpson and a condition of peonage and forced labor. From 1998 until 2008 DS abused the legal process to hold the Plaintiff in the

condition of servitude she is held in today. Beginning in 2008 DS abused the legal process to

hold the plaintiff in the condition(s) of servitude she is held in today.

## TITLE IV-D BENEFICIARY DEFENDANTS

8. Title IV-D Beneficiary Defendants are contracted by the Indiana Child Support Bureau to

establish, enforce and or maintain child support payment orders under Title IV-D of the

Social Security Act. Defendants. They are p aid cost reimbursements (federal financial

participation payments) and incentive payments under 42 U.S. Code Part D - Security Act

(42 U.S.C. 651 et seq.) and include the following defendants:

***Cynthia Longest, Deputy Director of the Indiana Child Support Bureau***
Indiana Code § 31-25-4-7 Duties of bureau

9. Cynthia Longest, Deputy Director of the Indiana Child Support Bureau, Division of child

Services, can be served at 402 W. Washington St. Indianapolis, IN 46204. She is sued in her

official and individual capacities.

Ms. Longest has over 20 years of child support experience. Currently, she contracts prosecuting

attorneys, clerks of courts, courts, private entities and counties to establish and enforce child

support payment orders under the state's plan. Her core duties include: program administration,

oversight and support; financial management, monitoring, reporting*; payment of reimbursement

to counties* & distribution of incentive funds to the following, counties, prosecutors, clerks and,

processing & distribution of child support; location of non-custodial parents, ISETS; policy,

training & consultation *Id.* IPAC training available at http: in.gov ipac files Mantia - Title IV-

D Basics.pdf.

The Deputy Director of the Child Support Enforcement Bureau also gives testimony in Indiana

Child Custody and Support Advisory Committee meetings which are held, according to Ind..

Code § 33-24-11-6, to determine, in part, whether it is appropriate to base child support payment order amounts on some idea of a life the child would have had if the parents lived together rather than solely upon the noncustodial parents' ability to pay.

### *Larry Brown President Allen County Council*

10. Larry Brown President Allen County Council, can be served at Edwin J. Rouseau Centre, Rm 102 1 East Main Street Fort Wayne, IN 46802. He is sued in his official and individual capacities. Allen County Council is a constitutional body and is responsible for establishing the annual budget for county government. Allen County Council meets with Courts and County and State Agency heads to establish and appropriate funds to pay expenses to run Allen County's courts and agencies.

Allen County is paid to enforce and collect child support rights that have been assigned to the state pursuant to Indiana Code § 31-25-4-23. Title IV-D Federal financial participation payments or "child support expenditures" are a major revenue source for the general operating budget of Allen County, Indiana.

### *Theresa Brown, Allen County Board of Commissioners*

11. Theresa Brown, Allen County Board of Commissioners can be served at Citizens Square, Suite 410 200 E. Berry Street #410  Fort Wayne, IN 46802  260.449.7555. She is sued in her official and individual capacities. She has more than 30 years of experience in Allen County Government.  Prior to becoming Commissioner, Ms. Brown served two terms each as the Allen County Clerk of the Circuit and Superior Courts and as the Allen County Auditor. The three-member Allen County Board of Commissioners serves as both the executive and legislative branches of County government.  They authorize all claims on county budgets and is the decision-making authority over planning in the county. The board enters into all

contracts for Allen County, including contracts with the Ind. Child Support Bureau and the Ind. Public Defender Commission.

### Allen County IV-D Prosecuting Attorney's Office

12. Title IV-D is the Indiana prosecutor's biggest caseload *Id.* Title IV-D Child Support DCS Child Support Bureau - Prosecuting Attorney Collaboration IPAC Winter Conference December 12, 2014 Cynthia Longest PowerPoint presentation slide 6 available at, http: slideplayer.com slide 6279334 . By statute, IV-D Prosecutors are contracted by the Indiana Child Support **B**ureau to establish and enforce child support payment orders. In that, they perform the same functions as parents seeking child support. IV-D Prosecutors are also responsible for the investigation and prosecution of criminal nonsupport of a defendant child cases.

### Andrew Schweller Allen County IV-D Deputy Prosecuting Attorney

13. Andrew Schweller Deputy Prosecuting Attorney can be served at the Allen County Child Support Division 602 S. Calhoun 602 S. Calhoun Road, 1ˢᵗ Floor, Fort Wayne, Indiana 46802. (260) 449-136. He is sued in his official and individual capacities. He also gives testimony in Indiana Child Custody and Support Advisory Committee meetings. He prosecuted the Plaintiff for felony nonsupport and contempt after the felony was dismissed.

### Tracy Smith Allen County IV-D Deputy Prosecuting Attorney

14. Tracy Smith Deputy Prosecuting Attorney can be served at the Child Support Division 602 S. Calhoun Road, 1ˢᵗ Floor, Fort Wayne, Indiana 46802. Telephone; 260-449-136. She has the same duties as Andrew Schweller. Tracy Smith also trains prosecutors on how to issue and

enforce child support payment orders at the Indiana Prosecuting Attorneys Council (IPAC)

meetings. She prosecuted the Plaintiff for felony nonsupport of a dependent child.

### *David A. Brown, former IV-D Deputy Prosecuting Attorney Allen County*

15. David A. Brown, former IV-D Deputy Prosecuting Attorney for Allen County can be served

    at Steuben County Prosecutor's Office 205 S. Martha Street Suite 107 Angola, IN 46703

    Telephone: (260)668-1000 Ext 2400 Fax: (260)665-2320. Mr. Brown is a former Deputy

    Prosecuting Attorney for the Allen County Prosecutor's office Child Support division. He is

    sued in his official and individual capacities. By statute he is contracted by the Indiana Child

    Support to establish and enforce child support payment orders. He prosecuted the Plaintiff for

    contempt, obtained her juvenile delinquency records from the Allen County Juvenile Court,

    went to her home and had a sexual relationship with her.

### *Allen County Board of Judges*

16. Allen County Board of Judges can be served at Chief Judge Craig J. Bobay: Allen County

    Board of Judges Allen County Court House Rm. 208 317 South Calhoun Street Fort Wayne,

    IN 46802  260.449.7245.

The Allen superior court is governed and operated by a board of judges composed of all the

judges of the superior court. Six (6) judges are required for a quorum for conducting business

and as a majority for taking action. The board is responsible for: matters of administration,

budget, expenditures, policy, and procedure affecting the entire superior court shall be

determined by a majority of the board of judges. Any determination binds the entire board of

judges and each judge of the board. Also, one budget covering all the divisions of the superior

court shall be prepared for the superior court and submitted to the county fiscal body. However,

each division shall prepare its own budget as a component of the superior court's total budget. (Indiana Code § *33-33-2-30.*)

Judicial Defendants are responsible for following the Indiana Judicial Code of Conduct and adjudicating cases under the rule of law. They are administratively responsible for the integrity of the judicial records of the court and must ensure that measures and procedures are employed to protect such records from mutilation, *false entry*, theft, alienation, and any unauthorized alteration, addition, *deletion,* or replacement of item. Id.  Indiana Rules Of Court Administrative Rule 10. Judges are further responsible for appointing and training: temporary judges under Ind. Code § 33-38-11-1; Judges pro tempore under Ind. Code § 33-38-15.2-1; magistrates under Ind. Code § 33-33-2-3. Pursuant to the Indiana Code § 31-25-4-15, judges appoint assistants to make recommendations for the judge's approval in actions arising under Title IV-D of the Social Security Act (42 U.S.C. 651 et seq.)

### *The Honorable Daniel Heath*

17. The Honorable Daniel Heath can be served at the Allen County Court House Rm. 316 317 South Calhoun Street Fort Wayne, IN 46802. Telephone; 260.449.7245. He is sued in his individual and official capacities. He was a regular sitting judge in the Allen Superior Court. In 2013, he became the regular sitting judge in the Allen County Juvenile Justice Center. He has overseen the Allen County Child Support Program for years and is a former Allen County Councilman. . In 2008, Judge Heath presided over the Plaintiff's first contempt hearing.

### *Honorable Charles F. Pratt*

18. The Honorable Charles F. Pratt can be served at the Allen County Court House Rm. 208 317 South Calhoun Street Fort Wayne, IN 46802 260.449.7245. He is a regular sitting judge in the Allen Superior Court and is sued in his official and individual capacities. The Honorable Charles Pratt issued a 1998 default dissolution against the Plaintiff that included an award for child support. He presided over contempt hearings occurring in 2009 and the Motion For Relief From Judgment hearing in 2012.

### *Stephen Rothberg Temporary Judge*

19. Stephen Rothberg Temporary Judge address unknown. He can be served at: The Honorable Charles F. Pratt  RE: Stephen Rothberg  Allen County Court House Rm. 208 317 South Calhoun Street  Fort Wayne, IN 46802  260.449.724. He is sued in his individual and official capacities. He is an attorney who was appointed to temporary judge under IC§ 33-38-11-1. He presided over contempt hearings the Plaintiff was engaged in.

### *Martin Hillary Temporary Judge*

20. Martin Hillary Temporary Judge, address unknown. He can be served at: The Honorable Charles F. Pratt  RE: Martin Hillary Allen County Court House Rm. 208 317 South Calhoun Street  Fort Wayne, IN 46802  260.449.7245. He is sued in his individual and official capacities. He is a temporary judge appointed under IC § 33-38-11-1. He presided over contempt hearings the Plaintiff was engaged in.

### *Lizabeth A. Borgmann Allen County Clerk of Courts*

21. Lizabeth A. Borgmann Allen County Clerk Of Courts can be served at the Allen County Court House Rm. 200A 317 South Calhoun Street Fort Wayne, IN 46802 260.449.7245. She is sued in her individual and official capacities. She is contracted by the Ind. Child Support Bureau under Indiana Code § 31-25-4-11.  Ms. Borgmann is the custodian of all court

records and is responsible for the maintenance of court records pursuant to the directives of

the Supreme Court of Indiana, and the judges of the trial courts directly served by the Clerk.

The Clerks of the court must safeguard the integrity and security of all court records in their

custody and *diligently guard documents against any prohibited practice*. See Ind. Rules of

Court Administrative Rule 10 (B).

### *Allen County Court Reporters*

22.  Allen County Court Reporter are sued in their individual and official capacity. They are

responsible for typing and preparing transcripts and all evidence, verbatim, as it occurred in

the court hearings.  Court Reporters are possibly contracted by the Indiana Child Support

Bureau pursuant to an agreement with the courts for services associated with cases arising

under Title IV-D of the Social Security Act under Indiana Code § 31-25-4-15. They prepared

the Plaintiff's transcripts of  IV-D contempt hearings and a Motion For Relief From

Judgment hearing for appeal from the denial of the Plaintiff's 2011 Motion For Relief From

Judgment.

### *Marie Coomer, Allen County Court Reporter*

23.  Marie Coomer, Allen County Court Reporter can be served at the Allen County Court House

Rm. 200A Fort Wayne, IN 46802 260.449.7245.

### *Lisa Porter, Allen County Court Reporter*

24. Lisa Porter, Allen County Court Reporter can be served at the Allen County Court House

Rm. 200A Fort Wayne, IN 46802 260.449.7245.

### *Catherine Stiebeling, Allen County Court Reporter*

25.  Catherine Stiebeling, Allen County Court Reporter Allen County Court House Rm. 200A

Fort Wayne, IN 46802 260.449.7245.

### Indiana Public Defender Program Defendants

### Allen County Public Defender Board,

26.  Allen County Public Defender Board, unknown members, can be served at, Allen County

Public Defender Board, 1 E Main St #102, Fort Wayne, IN 46802. The unknown members of

the board are sued in their individual and official capacities.

The Allen County Public Defender Board (Board) is established by Indiana Code § 33-40-7

and Allen County, Ind. Code § 1-17-1 et seq.  Out of the three-member board, two members

of the board are appointed by two Allen County judges under Indiana Code § 33-40-7-3.

The board is responsible for providing legal representation to indigent

defendants/respondents in criminal, juvenile, probation violation, extradition, child support,

civil commitments and other proceedings where the right to counsel has been established by

law.  Among other things, the board prepares a comprehensive plan for providing legal

defense services to indigent persons. The plan establishes the County Public Defender's

Office. They appoint the Chief Public Defender, establish the operating budget, and submit

an annual report to the county executive, the county fiscal body, and the judges described in

IC 33-40-7-3, regarding the operation of the county public defender's office, including

information relating to caseloads and expenditures. (IC 33-40-7-6).  The board submits

written requests for reimbursement to the county auditor. The request must set forth the total

of the county's expenditures for indigent defense services to the county auditor … The

county auditor shall review the request and certify the total of the county's expenditures for

indigent defense services to the Indiana public defender commission. Apparently, the board is to guard against conflict of interest described in IC 33-40-7-12.

### Randall Hammond, Allen County Chief Public Defender

27. Randall Hammond, Allen County Chief Public Defender can be served at, Allen County Public Defender's Office Edwin J. Rouseau Centre, 1 East Main Street Fort Wayne, IN 46802 Mr. Hammond is sued in his official and individual capacities. He is responsible for assigning, training and supervising all public defenders. He is responsible for making sure his public defenders provide indigent defendants and respondents adequate legal defense.

### P. Stephen Miller, Allen County Public Defender

28. P. Stephen Miller, Allen County Public Defender can be served at, Allen County Public Defender's Office Edwin J. Rouseau Centre, 1 East Main Street Fort Wayne, IN 46802 Mr. Miller is sued in his individual and official capacity (as an officer of the court). He is contracted by the Allen County Public Defender's office to provide effective legal counsel to indigent defendants/respondents in Allen County. He represented the Plaintiff for felony nonsupport.

### Mark A. Thoma Allen County Public Defender

29. Mark A. Thoma Allen County Public Defender can be served at the Allen County Public Defender's Office Edwin J. Rouseau Centre, 1 East Main Street Fort Wayne, IN 46802. He is sued in his individual and official capacity (if has any). He is responsible for providing effective legal counsel to indigent defendants/respondents in Allen County. He represented the Plaintiff for felony nonsupport.

### Robert Gevers

30. Robert Gevers can be served at 809 S. Calhoun Street Ste 600 Fort Wayne, IN 46802. 260-407-7071. He is contracted by Allen County judges to provide effective legal counsel to indigent defendants/respondents in Allen County. Mr. Gevers is a former Assistant United States Attorney and a former elected Allen County Prosecutor, Public Defender and Senior Special Prosecuting Attorney. On 3/20/2012 he was appointed to perfect an appeal from the denial of the Plaintiff's Motion For Relief From Judgment. However, he refused to participate on appeal and instead entered his appearance for the sole purpose of contempt. He was appointed on 3/20/2012 and represented the Plaintiff in IV-D contempt actions occurring from 7/13/2013 until 2/4/2014.

## IV FEDERAL QUESTIONS

31. What is sufficient to show state created danger and liability under the13th and 14th Amendments of the US Constitution for deprivation of equal access to the court, court services and due process, equal protection of the?

32. Whether it is constitutional for the Indiana Child Support Guidelines to base child support payment orders upon some idea of a life the child would have enjoyed if the parents lived together rather than solely upon the noncustodial parent's ability to pay?

33. Whether a Judge has absolute immunity when by local rule each Judge is administratively responsible for the integrity of the judicial records of the court and must ensure that measures and procedures are employed to protect such records from mutilation, *false entry*, theft, alienation, and any *unauthorized alteration, addition, deletion*, or replacement of item; and the judge, in a scheme to generate income for county government and it's agencies, enters

false findings of facts and conclusions of law in his orders and the transcript and record are altered when produced for the party to seek redress from the government?

Facts Overview of the unconstitutional policy

34. In 2016, Indiana Prosecuting Attorney's Council (IPAC) began training child support prosecutors on due process and how to handles child support payment Orders that are expired or no longer enforceable due to the statute of limitations. See the June 14-17 2016 Indiana Child Support Conference: Welch Statute of Limitations PDF available at: http:/www.state.in.us/ipac/files/8-WkshpA-1100-1200_Welch-Statute_of_Limitations.pdf, Exhibit 2. On the PDF p. 5

IPAC considers this due process issue regarding statute of limitations an "Oh Crap moment". They bring up "lost files" on p.13 by stating: "I know I left that file at home…but why couldn't I find it??" and show a picture of a dog destroying the file. On p. 39 the take away is "Don't lose files"; "(I really hate file gremlins)". Then on pages 35-42 IPAC trains prosecutors to file/ / enforce the expired child support payment orders anyway and that the noncustodial parent has the burden of raising the statute of limitations defense and that they must plead it, or the defense is waived. See Exhibit 2.

35. It is concerning that "lost files" and dogs destroying the elderly noncustodial parent's files and "file gremlins" are associated with the child support prosecutors' training, especially after what Ms. Butler went through. The June 14-17 2016 Indiana Child Support Conference: Welch Statute of Limitations PDF simply begs the question: why are "lost files" that have been destroyed by a dog and "file gremlins" part of the IPAC training for child support payment order statute of limitations?

36. On March 14, 2016 the United States Department of Justice issued a Dear Colleague Letter (DOJ Letter), available at, https:,,r chardzc·za f es.wordpress.com/2016/03,fees_dearcolleague_3-14-16.pdf_ Exhibit 2, to address some of the most common *court practices* that run afoul of the United States Constitution and/or other federal laws [when courts issue and enforce fines/fees] and to assist court leadership in ensuring that courts at every level of the justice system operate fairly and lawfully, as well as to suggest alternative practices that can address legitimate public safety needs while also protecting the rights of participants in the justice system.

37. The DOJ Letter shows that unconstitutional court practices exist and is intended to "help judicial actors protect individuals' rights and avoid unnecessary harm". "To help judicial actors protect individuals' rights and avoid unnecessary harm, [the DOJ discussed] below a set of basic constitutional principles relevant to the enforcement of fines and fees. These principles, grounded in the rights to due process and equal protection, require the following:

(1) Courts must not incarcerate a person for nonpayment of fines or fees without first conducting an indigency determination and establishing that the failure to pay was willful;

(2) Courts must consider alternatives to incarceration for indigent defendants unable to pay fines and fees;

(3) Courts must not condition access to a judicial hearing on the prepayment of fines or fees;

(4) Courts must provide meaningful notice and, in appropriate cases, counsel, when enforcing fines and fees;

(5) Courts must not use arrest warrants or license suspensions as a means of coercing the payment of court debt when individuals have not been afforded constitutionally adequate procedural protections;

(6) Courts must not employ bail or bond practices that cause indigent defendants to remain incarcerated solely because they cannot afford to pay for their release; and

(7) Courts must safeguard against unconstitutional practices by court staff and private contractors." DOJ Letter p. 1-2.

38. On September 7, 2016 the Indiana Supreme Court issued an Order Adopting Criminal Rule 26, available at, http://www.in.gov/judiciary/files/order-rules-2016-0907-criminal.pdf It was adopted to remedy Indiana's unconstitutional court bail practices described in the DOJ Letter.

39. Although the DOJ Letter did not specifically address child support enforcement, it relies on *Turner v. Rogers*, 131 S. Ct. 2507 (2011), holding that:

[A] "court violates due process when it finds a parent in civil contempt and jails the parent for failure to pay child support, without first inquiring into the parent's ability to pay. Id. at 2518-19. To comply with this constitutional guarantee, state and local courts must inquire as to a person's ability to pay prior to imposing incarceration for nonpayment. Courts have an affirmative duty to conduct these inquiries and should do so sua sponte. Bearden, 461 U.S. at 671. **Further, a court's obligation to conduct indigency inquiries endures throughout the life of a case. See id. at 662-63.**

*Id.* DOJ Letter p. 3.

**Defendants unconstitutional policy violates Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d.**

40. Page 2 of the DOJ Letter states, "In court systems receiving federal funds, these [unconstitutional court] practices may also violate Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, when they unnecessarily impose disparate harm on the basis of race or national origin." That is the case with this Complaint. 42 U.S.C. § 2000d prohibits discrimination of any type.

41. Four years *before* the DOJ Letter was issued, on June 18, 2012 the Office of Child Support Enforcement Transmittal: Turner v. Rogers Guidance, available at,

https://www.acf.hhs.gov/css/resource/turner-v-rogers-guidance PDF p.    It is directed to state and local IV-D agencies and prosecuting attorneys funded with IV-D matching funds: compliance was mandated immediately and says:

"Title IV-D agencies are bound to ensure that noncustodial parents receive due process protections. The federal government has an interest in ensuring that the constitutional principles articulated in Turner are carried out in the child support program, that child support case outcomes are just and comport with due process, and that enforcement proceedings are cost-effective and in the best interest of children."

The OCSE 2012 Turner Guidance explains constitutionally mandated due process in the following and mandated immediate compliance.

II. State Contempt Practices

III. Distinguishing Between Civil and Criminal Contempt

IV. Using Civil Contempt in Child Support Cases in Which Ability to Pay is at Issue

A.  Screening Cases Before Referring or Initiating Civil Contempt Proceedings that Can Lead to Incarceration

    1. Cases Should Be Individually Reviewed

    2. The Individual Review Should Examine Actual and Present Ability to Comply

B.  Notice Should Be Provided to the Obligor that "Ability to Pay" is a Critical Issue in the Contempt Proceeding

C.  Judicial Procedures Should Provide an Opportunity to Be Heard on the Issue of Ability to Pay and Result in Express Court Findings

    V. Using Civil Contempt in Child Support Cases in Which Ability to Comply is at Issue.

42. The 2016 Office of Child Support Enforcement Turner v. Rogers Guidance, available at,

https: www.acf.hhs.gov sites default files programs css june_2016_child_support_report.pdf

Exhibit 2A. states: "To satisfy the due process clause of the Constitution, procedural

safeguards must be in place. Without them, no parent can be jailed for nonpayment of support." "These procedural safeguards include at a minimum:

- Notice to the parent in advance of the hearing that ability to pay will be an issue;
- Use of a form to elicit financial information;
- The opportunity at the hearing for the parent to demonstrate that they do not have the ability to pay because, for example, the original order was set too high or because circumstances have changed such as the loss of a job, a rent increase, a medical emergency, or any of the myriad other events that can cause financial stress; and
- The judge has to make an express finding — on the record — that the parent has the ability to pay. "

43. However, Allen County, it's IV-D agencies, and other agencies, along with other counties in Indiana have a policy of violating the Constitutional principles of Turner. For many years, Title IV-D Beneficiary Defendants, (Allen County, IV-D Prosecutors, the Clerk of Courts, and the Child Support Bureau) had judges *intentionally* issue and enforce high child support payment orders that poor noncustodial parents did not have an ability to pay one hundred percent of. Thereby the defendants unlawfully indebted poor noncustodial parents with thousands of dollars in back child support they could never pay, to force participation in the Title IV-D, Public Defender and Community Corrections Programs that generate income for Allen County and the defendants' jobs and status in the community. See the Complaint p. ___.

**Law regarding ICCSAC and the issuing of child support payment orders.**

44. The Indiana Child Custody and Support Advisory Committee (ICCSAC) is established by Ind. Code § 33-24-11-6 to hold meetings and make recommendations concerning any amendments to the Indiana Child Support Guidelines. "In reviewing the guidelines and formulating recommendations, the committee shall consider all relevant matters, including", among other things: "(3) Whether it is appropriate to calculate child support guideline amounts based primarily upon the ability of the parent to pay rather than the financial needs

40

of the child"; and "(10) Whether it is appropriate to base child support guidelines upon the premise that the child should enjoy the same standard of living that the child would have enjoyed if the family remained intact."

45. Pursuant to Article 1 § 12 of the Ind. Const. and 14th Amendment of the U.S. Constitution Child Support Payment Orders are to be issued pursuant to Indiana Code § 31-16-6-1, 42 U.S. Code § 654- 667, 45 CFR § 302.56, for the best interest of children and to alleviate the taxpayers' burden of welfare costs.

46. 42 U.S. Code § 667 - State guidelines for child support awards required:

(a)Establishment of guidelines; method Each State, as a condition for having its State plan approved under this part, must establish guidelines for child support award amounts within the State. The guidelines may be established by law or by judicial or administrative action, and shall be reviewed at least once every 4 years to ensure that their application results in the determination of *appropriate* child support award amounts.

47. The Rebuttable Presumption is mandated under 42 U.S Code § 667 (b)(2) and 45 C.F. R. § 302.56(f) and (g)(2) and the ICSG ) which state:

> There shall be a rebuttable presumption, in any judicial or administrative
>
> proceeding for the award of child support, that the amount of the award
>
> which would result from the application of such guidelines is the correct
>
> amount of child support to be awarded. A written finding or specific finding
>
> on the record that the application of the guidelines would be unjust or
>
> inappropriate in a particular case, as determined under criteria established
>
> by the State, shall be sufficient to rebut the presumption in that case.

48. IC 31-16-6-1, formerly IC 31-1-11.5-12, states in relevant part:

"[T]he court may order either parent or both parents to pay any amount *reasonable* for

support of a child, without regard to marital misconduct, after considering all relevant

factors, including:

(1) the financial resources of the custodial parent;

(2) the standard of living the child would have enjoyed if: (A) the marriage had not been

dissolved; (B) the separation had not been ordered; or (C) in the case of a paternity

action, the parents had been married and remained married to each other;

(3) the physical or mental condition of the child and the child's educational needs; and

(4) *the financial resources and needs of the noncustodial parent.*

**The Indiana Child Support Guidelines and Work Sheet are unconstitutional on their face and as applied to poor noncustodial parents.**

**Defendants abused the legal process in 1998 when the Indiana Child Support Guidelines were changed to fraudulently conceal state law from poor noncustodial parents and people responsible for setting child support payment awards.**

49. The ICSG and Worksheet are unconstitutional because they do not notify noncustodial

parents and the people responsible for issuing child support orders that the noncustodial

parents needs must be considered, independently. See ¶ ___ and ¶____.

In 1998, the ICSG were amended to fraudulently conceal the law, IC § 31-16-6-1 from

poor noncustodial parents and people responsible for setting child support payment

awards. Fraudulent concealment occurs when a defendant "has, either by deception or by

a violation of duty, concealed from the plaintiff material facts thereby preventing the

plaintiff from discovering a potential cause of action." See *Fager v. Hundt,* 610 N.E.2d

246, 251 (1993). See the 1998 Indiana Supreme Court Order Amending the ICSG

available at, http: www.in.gov judiciary opinions archive 052701.ad.html.

In 1998, the full text of IC 31-16-6-1, formerly IC 31-1-11.5-12, was stricken from the

Commentary to Guideline Preface 1 in the ICSG as shown:

> **Compliance With State Law.** ~~While t~~ The Child Support Guidelines were developed
> specifically to comply with federal requirements, as well as Indiana law. ~~, it was also
> necessary, of course, to comply with the requirements of Indiana law. Consequently, care
> was taken to see that the Guidelines comply with IC 31_1_11.5_12(a) and (b), which
> reads as follows:~~
>
> ~~"(a) In an action pursuant to section 3(a), 3(b), or 3(c) of this chapter, the court may
> order either parent or both parents to pay any amount reasonable for support of a child,
> without regard to marital misconduct, after considering all relevant factors including: (1)
> the financial resources of the custodial parent; (2) the standard of living the child would
> have enjoyed had the marriage not been dissolved or had the separation not been ordered;
> (3) the physical or mental condition of the child and the child's educational needs; and (4)
> the financial resources and needs of the noncustodial parent.~~

50. Yet, the ICSG go on and on about income share models and economic data which has

    nothing to do with state law mandating the factors the court must consider to arrive at a child

    support payment order amount.

51. . Although, the statute later appears and the language of IC 31-16-6-1, formerly Indiana Code

    31-1-11.5-12, still appears in the ICSG, it's out of context as shown in the following excerpt

    of the 1998 Indiana Supreme Court Order Amending ICSG; and does not notify people that

    the noncustodial parent's needs must be considered, independently. Id.

> Guideline 1. Preface states:

> "The guidelines are consistent with the provisions of Indiana Code ~~31_1_11.5_12~~ Title 31
> which places a duty for child support upon ~~either or both~~ parents based upon ~~the~~ their
> financial resources and needs, ~~of the custodial parent;~~ the standard of living the child
> would have enjoyed had the marriage not been dissolved or had the separation not been
> ordered~~;~~. , the physical or mental condition of the child , and the child's educational needs~~;~~
> . ~~and financial resources and needs of the noncustodial parent~~" Id.

52.  Additionally, case law establishing that all factors, required by IC 31-16-6-1, must be considered and how those factors can be considered, to determine a child support payment order amount, was stricken from the 1998 ICSG. The following excerpt of the 1998 Indiana Supreme Court Order Amending ICSG states:

> ~~Recent Indiana appellate cases have made it clear that the four factors set forth in IC 31_1_11.5_12(a) are each to be considered in every child support case. Tucker v. Tucker (1980), Ind.App., 406 N.E.2d 321; Lepper v. Lepper (1987), Ind., 509 N.E.2d 818; and Hunter v.~~
>
> ~~Hunter (1986), Ind.App., 498 N.E.2d 1278. It is not adequate to consider only the income of a noncustodial parent, a practice all too common in Indiana courts before adoption of the Guidelines. While that approach is a simple and often consistent approach to establishing support, it considers only one statutorily mandated factor and, most importantly, it totally ignores the best interests of the child or children.~~

53. Fraudulently concealing and striking, IC 31-16-6-1 from the ICSG and Defendants' use of the Worksheet not only arrives at an unconstitutionally high child support payment amount poor noncustodial parents, cannot reasonably pay 100% of, it also waives issues for an appeal from a new child support payment order or Modification of an order.

**The Indiana Child Support Guidelines (ICSG) are unconstitutional and create a condition of peonage, servitude, forced labor or rather forced participation in the IV-D Program by which the defendants unlawfully profited from.**

54. State "guidelines are unconstitutional wherein they create an irrebuttable minimum payment due to imputation of income. Matter of Marriage of Gilbert, 88 Wn. App. 362 (Wash. Ct App. 1997) The Federal statutes relating to child support and the Supremacy Clause of the U.S. Constitution do not authorize a judgment based upon a non-rebuttable mandatory minimum child support order (due to an imputation of income), and they forbid it. 42 U.S.C. 667(b)(2); In re Marriage of Gilbert, 88 Wash.App. 362, 945 P.2d 238, 242 (1997) (The Federal mandate gives

the prisoner and parent the right to rebut any presumed support amount all the way

down to zero, by showing a lack of income with which to pay.)

As shown below, the ICSG authorized violation of the 13th Amendment with the

following statement found in the ICSG, before being amended, inferably in 2016.

See the 1998 Ind. Child Supp. G. 2 in the 1998 Ind. Supreme Court Order

Amending the ICSG

> **Minimum Support.** The Guideline's schedules for weekly support payments do not
> provide an amount of support for couples with combined weekly adjusted income of
> less than $100.00. Consequently the Guidelines do not establish a minimum support
> obligation. Instead the facts of each individual case must be examined and support
> set in such a manner that the obligor is not denied a means of self-support at a
> subsistence level. It is, however, recommended that a specific amount of support be
> set. *Even in situations where the noncustodial parent has no income, courts have*
> *routinely established a child support obligation at some minimum level. An obligor*
> *cannot be held in contempt for failure to pay support when there is no means to pay,*
> *but the obligation accrues and serves as a reimbursement if the obligor later*
> *acquires the ability to meet the obligation.*

**The ICSG and the Worksheet do not track state and federal law requiring financial**
**resources and all earnings and income be considered to determine a child support payment**
**amount.**

55. "The Family Support Act of 1988 requires that a written finding be made when establishing

support." " In Indiana, this is accomplished by submission of a child support worksheet.

Submission of the worksheet became a requirement in 1989 when use of the Guidelines

became mandatory."  Id. Commentary to Guideline 3B.

A. The ICSG and the Worksheet are unconstitutional because they fail to track IC 31-16-6-1

and 45 CFR 302.46. The ICSG do not require the court to consider, verify or memorialize

any financial resources and all earnings and income of the parties as required by state and

federal law.

B.  Guideline 3. A  Determination of Support Amount Worksheet Documentation

Commentary states,

> "The requirement of income verification is not a change in law but
> merely a suggestion to judges that they take care in determining the
> income of each party."

C.  The Worksheet, which " memorializes the basis upon which the support order is

established" violates state and federal law because it only contain spaces for fill in the

blank numbers, without any verifications, therefore, the court cannot reasonably consider

the financial resources, all earnings and income of either parent or attest to the validity of

said financial resources, earnings and income. The ICSG state:

> "The Child Support Obligation Worksheet does not include space to
> calculate Weekly Gross Income.  It must be calculated separately
> and the result entered on the worksheet."

Id. ICSG Guideline 3 Commentary A.

D.  Indiana Code § 31-16-6-1 (1997) requires child support orders to be reasonable and  the

court to consider "all relevant factors, including:  (4) the financial resources and needs of

the noncustodial parent" There is no space on the worksheet to elicit, consider or

memorialize and noncustodial parent's needs or financial resources.

The Worksheet unconstitutional because does not have space to elicit or obtain

information regarding the noncustodial parents' need to maintain basic necessities such as

food, hygiene, clothing, shelter and transportation.  Therefore, many noncustodial parents

had high child support orders issued that prevented them from maintaining basic

necessities and paying the child support payment order.  Id. Defendant Longest's

statement in the 9/14/2010 Indiana Child Custody Support Advisory Committee meeting.

E.   45 CFR § 302.56 (c)(1)   Guidelines for setting child support awards adds that state

guidelines" must at a minimum" "take into consideration *all earnings and income* of the

noncustodial parent."

F.   Fill in the blank numbers on a piece of paper is not enough to comport with due process.

56. The 1998 ICSG, which were not modified until 2010, defined income in the following ways.

The worksheet is unconstitutional because the worksheet has no way to differentiate between

actual income, potential income or imputed income. Therefore, there is no way to look at the

Worksheet to determine if the judge abused his discretion in using potential or imputed

income to arrive at the child support payment amount or to tell what the parents actual,

earnings, income and financial resources were when the order issued.

The 1998 ICSG define income:

"2. *Determination of Weekly Gross Income.* Weekly gross income is the
starting point in determining the child support obligation, and it must be
calculated for both parents. If one or both parents have no income, then
potential income may be calculated and used as weekly gross income.
Likewise, imputed income may be substituted for, or added to, other income
in arriving at weekly gross income. It includes and includes such items as
free housing, a company car that may be used for personal travel, and
reimbursed meals or other items that are received by the obligor that reduce
his or her living expenses.

Judges and practitioners should be innovative in finding ways to include
income that would have benefited the family had it remained intact, but be
receptive to deviations where articulate reasons justify them. The foregoing
discussion should not be interpreted to exclude consideration of irregular
income of the custodial parent.

c. Potential Income. *Potential income may be determined if a parent has no
income, or only means-tested income,* and is capable of earning income or
capable of earning more. Obviously, a great deal of discretion will have to
be used in this determination. One purpose of potential income is to
discourage a parent from taking a lower paying job to avoid the payment of

47

significant support. Another purpose is to fairly allocate the support obligation when one parent remarries and, because of the income of the new spouse, chooses not to be employed. When potential income is attributed to a spouse, the court should not also attribute child care expense which is not actually incurred. The four examples which follow illustrate some of the considerations affecting attributing ~~the attribution of~~ potential income to an unemployed or underemployed parent.

(2) When a parent has some history of working and is capable of entering the work force, but voluntarily fails or refuses to work or to be employed in a capacity in keeping with his or her capabilities, such a parent's potential income should be determined to be a part of the gross income of that parent. The amount to be attributed as potential income in such a case would be the amount that the evidence demonstrates he or she was capable of earning in the past. If for example the custodial parent had been a nurse or a licensed engineer, it is unreasonable to determine his or her potential at the minimum wage level.

(3) Even though an unemployed parent has never worked before, potential income should be considered for that parent if he or she voluntarily remains unemployed without justification. Absent any other evidence of potential earnings of such a parent, the federal minimum wage should be used in calculating potential income for that parent. However, the court should not add child care expense that is not actually incurred."

57. In 2010 the ICSG "c. Potential Income" set forth above was amended by adding the following to the end of the last paragraph. "However, attributing potential income that results in an unrealistic child support obligation may cause the accumulation of an excessive arrearage, and be contrary to the best interests of the child(ren). Research shows that on average more noncustodial parental involvement is associated with greater child educational attainment and lower juvenile delinquency. Ordering support for low-income parents at levels they can reasonably pay may improve noncustodial parent-child contact; and in turn, the outcomes for their children."

58. However, the 2010 ICSG Amendments are unconstitutional because the ICSG acknowledges that attributing potential income that results in an unrealistic child support obligation, may cause accumulation of an excessive arrearage. However, the Worksheet was not changed by

adding a space to elicit, consider or memorialize a parent's actual, potential income, or

imputed income.

.

**E.  The  Indiana Child Support Guidelines and Child Support Worksheet both fail to track IC § 31-16-6-1 (1997), therefore, the ICSG consistently arrived at unconstitutionally high child support payment order amounts poor noncustodial parents could not pay 100 percent of.**

59. The ICSG and Worksheet are unconstitutional because the Worksheet does not have a space

to elicit and memorialize information to determine the "financial resources" and "needs" of

poor noncustodial parents as required by IC 31-16-6-1-(4).

Many poor noncustodial parents have verifiable, means-tested needs that are also substantial

financial resources, that often necessary for poor noncustodial parents to sustain minimal

subsistence. If the parent met state and federal income standards for food stamps, health

insurance, child care, or even free lunch for their children, housing or utility assistance that

would be a material fact raising the question of ability to pay a child support amount

determined by application of the ICSG because the parents didn't have an ability to support

themselves without assistance. However, the ICSG authorize imputing income to a parent

who receives means tested assistance. But excludes the consideration of a parents means

tested resources.

60. Finally, The ICSG and worksheet are unconstitutional as both violate the 2017 Flexibility,

Efficiency, and Modernization in Child Support Enforcement Programs, which among other

things states: "302.56(c) indicates the minimum requirements for child support guidelines.

Paragraph (c)(1) indicates that child support guidelines must provide the child support order

is based on the noncustodial parent's earnings, income, and other evidence of ability to pay".

However, the ICSG are based on some false idea of the life a child would have had if the

parents lived together. See Child Supp. G. 1. *Schwartz v. Heeter, 994 N.E.2d 1102, 1105*

(Ind. 2013) ("The Guidelines' goal is to ensure that children "receive the same proportion of parental income that [they] would have received if the parents lived together.") See also the current ICSG available at, http: www.in.gov judiciary rules child_support .

61. **In** 1998 the internet was not like it is today and people could not hop online to research law. Nowadays, unless someone knows exactly what law they are looking for it is difficult to find and almost impossible for a lay person let alone an uneducated person to understand.

62. Page 8 of the 52 page PDF which is page 6 of the Indiana Supreme Court Annual Report of 2007-2008 available at, http: www.in.gov judiciary supreme files 0708report.pdf shows that, '[w]hile millions of pages of documents were viewed online, child support and parenting time guidelines were one of the most-viewed features on the Court's website."

63. Now, Indiana's self - help judiciary website, Indiana's Supreme Court Website, the prosecuting attorney's websites and attorneys in Indiana all direct people to the child support the Worksheet and the ICSG to obtain a child support payment order.

However, these websites also fraudulently conceal the law from poor noncustodial parents as these sites do not include a direct link to IC 31-16-6-1. [2]

Yet, these sites contain a direct link to Indiana Codes for modification of the support order under IC 31-16-8- and IC 31-14-11 for dissolution and paternity child support modifications

---

[2] Calculate child support online - http:/ mycourts.in.gov/csc/parents/ : Calculator - http://mycourts.in.gov/csc/parents/default.aspx ; Agreement for calculator - http: mycourts.in.gov/csc/parents/default.aspx Self service center - http://www.in.gov/judiciary,selfservice/2333.htm: Child Support: http://www.in.gov/judiciary/selfservice/2483.htm: What does it mean to have an emancipated child? See IC 31-16-6-6: http //ga.in.gov/ That is not the link for IC 31-16-6-6 because they fraudulently conceal the law from poor noncustodial parents. The Child Support Form Packets direct parents to IC-31-16-6 however the links go to http://iga.in.gov/legislative/ aws/2016/ic/#IC31-16-8 and poor parents have to figure the rest out from there and they do not have the capacity to do that.

which do not state what factors the court must consider to determine a child support payment

amount under the law.

64. This prejudices poor noncustodial parents. Often, when a court modifies a child support

payment order, the court relies on the factors mandated for consideration under IC 31-16-6-1

to see is modification is just. See *Kinsey v. Kinsey,* 640 N.E.2d 42 (1994).

65. While Kinsey had the benefit of counsel, poor noncustodial parents cannot hire counsel and

the law is fraudulently concealed from these parents. Furthermore, if a poor noncustodial

parent can find the law, they are prejudiced because they are often uneducated and do not

have the capacity to understand the language of the ICSG and search the state code and case

law to find out:

A. What the Title IV-D Beneficiaries must consider when issuing a child support

payment order amount to and to rebut that presumption.

B. What evidence to present to the court to obtain a correct child support

payment order.

C. Whether a child support payment order comports with the law mandating the

process and factors the court must consider to determine a child support

payment amount.

**Title IV-D Beneficiary Defendants' use of Child Support Enforcement Program is
unconstitutional as defendants issued and enforced child support orders they knew the
parents did not have an ability; to pay to generate income for themselves and Allen County.**

66. Peonage is a condition of compulsory service based upon the indebtedness of the peon to the

master. The basal fact is indebtedness. *Clyatt v. United States,* 197 U. S. 207; United States

v. Reynolds, 235 U .S. 133 (1914)

**67.** Cynthia Longest, Deputy Director of the Indiana Child Support Bureau, Department of Child

Services describes the unconstitutional policy best. On 9/14/2010, in the Indiana Child

Custody and Support Advisory Committee (ICCSAC) meeting, that was dominated with

discussion about incarcerating parents for the failure to pay court ordered child support,

[3]Defendant Longest said:

> "[A]bout $1B annually is processed through ISETS with the federal government paying
> 66% of the Title IV-D operating costs. Of the incentive money collected from the
> federal government 1/3 goes to county prosecutors with the remainder split equally
> among three other beneficiaries including the county general fund which receives 22%
> by statute.
>
> That means, in essence, that a county can increase their income by having more
> and greater child support payment orders issued by judges.
>
> For many years there was a mind-set that breaking families apart and issuing high
> child support payment orders was a good method for generating income for local
> government.
>
> However, that attitude is now being shown to be a fallacy and some *counties* and
> prosecutors are making efforts to reduce child support payment orders.
>
> With support payments often being set at 1/3 or more of a parent's income many
> have been placed in the position of facing repossession of a car, eviction from a home
> or paying the court ordered child support. Given that some prosecutors and judges go
> after parents who pay 75% just as intensely and those who pay 0% many of those
> paying 75% found that it was better to pay none and use the money towards
> maintaining basic necessities.:

---

[3] Remarkably, although the 2010 ICCSAC meetings showed poor noncustodial parents were
unlawfully indebted with child support arrearages they could not pay and therefore suffered harm
described in the DOJ Letter; and that the Title IV-D Beneficiaries did that to generate income for
local governments, no recommendations were made to change the ICSG or Worksheet.

> If a parent who could pay 50% gets their support order cut in half then the same
> dollar amount would become 100% in compliance with the support order. This will
> increase the state's ranking and federal incentive payments."

Id. The 9/14/10 ICCSAC meeting was broadcast. A recording of the meeting and Longest's

testimony should be available in the ICCSAC archives. *See*

http: www.in.gov legislative interim committee 2010 committee notices CCSAD9E.pdf. See

also, ICCSAC 9/14/10 meeting minutes available at

http: www.in.gov legislative interim committee 2010 committee minutes CCSAD9E.pdf See

also, Exhibit 1 - ICCSAC meeting witness, Custodial Rights Activist, Stuart Showalter's,

10/4/2010 law blog post: Indiana Seeks Alternative To Incarceration For Child Support detailing

Defendant Longest's testimony available at

http: bccnildadvocates.blogspot.com 2010 10 indiana-seeks-alternative-to.htm l

68. Indiana's "County Title IV-D Prosecuting Attorney's offices are 100 percent funded by the

state". So, running Indiana's Child Support Offices costs the counties nothing. Also, "almost

every dollar spent directly on the Title IV-D Child Support Enforcement Program is eligible

for Federal Financial Participation at 66 percent reimbursement" of every dollar "spent" on

child support enforcement going straight into the county general funds.

Id. 5/27/2015 Title IV-D Program Overview & Funding Basics Karla Mantia, Title IV-D

Policy Liaison Prosecuting Attorneys Council p. 3 available at

http: in.gov ipac files Mantia_-_Title_IV-D_Basics.pdf See also the Child Support Bureau

(CSB) County Auditors State Board of Accounts County Auditor's Spring State Called

Conference, May 16, 2013, available at

http: www.ai.org sboa files Longest_Child_Support_Auditor_Conference_Handout_May_2

013_final.pdf which shows federal financial participation payments go into the county general funds.

69. In 2010, Indiana received approximately 76 million dollars from the federal government for Indiana's child support enforcement and family support programs.  Id Payments to States for Child Support Enforcement and Family Support Programs, page 23 of the 24 page pdf, available at,  https://www.acf.hhs.gov/sites/default/files/olab/cse.pdf . Only 12 million of that was federal incentive payments leaving 64 million generated from federal financial participation payments. Id. See page 3 of Longest's 2012 Newly Elected Clerk Training available at,

https:.www.in.gov sboa files Longest Newly_Elected_Clerk_Training_December_2012_fin al.pdf for the amount of incentive payments received in 2010.

70. On top of federal funding, each noncustodial parent must pay an annual $55.00 user fee, per IV-D case. If the parents do not pay, the debt just accumulates, with interest.  This fee usually goes to the Indiana Child Support Bureau, unless collected locally. In 2012, Indiana had approximately 340,000 active IV-D Cases. That's $18,700,000 generated from just the annual user fee. In 2012, only 3 percent of Active IV-D cases were TANF. In Non TANF cases, someone paid $25.00 to initiate Title IV-D Services.  See page 2 of the foregoing hyperlink to see these facts. Id.

71. Pursuant to 42 USC§ 657 and 1396b and 45 CFR 304.20 - Availability and rate of federal financial participation and 45 CFR 304.21- Federal financial participation in the costs of cooperative arrangements with courts and law enforcement officials, the following allowable expenses are reimbursed at 66% of every dollar spent on the following:

1.  Costs of Cooperative Agreements; Establishment of paternity activities;

Locate activities; Investigation; Development of evidence; Pre-trial discovery;

Cooperation with other states/UIFSA; Establishment and enforcement of support orders;

Costs of obtaining financial information for orders;

2. Enforcement of orders

Contempt proceedings; Issuance of warrants; Investigations; Income withholding

processing; Enforcement through criminal or civil proceedings [community correction

program participation for contempt and felony nonsupport actions]; Administrative

enforcement activities [liens on property, suspension of driver's license, credit reporting,

tax intercept]; Establishment and maintenance of case records; Required medical support

activities; Reasonable/essential short-term training of Title IV-D program staff

Id. 5/27/2015 Title IV-D Program Overview & Funding Basics Karla Mantia, Title IV-D

Policy Liaison Prosecuting Attorneys Council p. 5-6 available at

http: in.gov ipac files Mantia_-_Title_IV-D_Basics.pdf

72. "In 2002 Chief Deputy Prosecutor for the Marion County Child Support Division reported

that out of 80,000 to 100,000 open child support cases **each year**, **about 3%, or 2,400 to

3,300, result in incarceration for nonpayment**. Roughly 15 – 20 of these are criminal

charges, and the rest are civil contempt. According to the child support prosecutor, "Civil

enforcement is typically a more efficient way to collect a child support arrearage." " Indiana

Child Custody and Support Advisory Committee, Meeting Minutes, September 30, 2002,

http://www.in.gov/legislative/interim/ committee/ccsa.html." *Id.* "Quoting: Center For

Policy and Practice: The Effect of Child Support and Criminal Justice Systems on Low-

Income Noncustodial Parents When You Need a Safety Net, but There's Only a Dragnet"

(2004) available at,

http: www.cffpp.org publications Effect%20of%20Child%20Support.pdf. (last accessed 5/11/2017.)

73. The foregoing Title IV-D Child Support Enforcement Services, that generate 76 million dollars a year for Indiana, would not be necessary, to the current scale, if the poor noncustodial parents could pay 100 percent of the orders, from the onset of the orders, or if poor noncustodial parents were granted equal access to the court and court services and due process and equal protection of the law when the orders were enforced.

74. Indiana has long held that, "contempt is *not* available in every case where a child support delinquency arises. Only upon a finding by the court that the delinquency was the result of a willful failure by the parent to comply with the support order and that the delinquent parent has the financial ability to comply is contempt available. Brown v. Brown (1933), 205 Ind. 664, 668, 187 N.E. 836, 838; Whitman v. Whitman (1980), Ind. App., 405 N.E.2d 608, 614." *Pettit v. Pettit,* 626 N.E.2d 444 (1993).

75. Defendant Longest's testimony in the 2010 ICCSAC meeting established that the Child Support Bureau, Counties, IV-D Prosecutors, judges and even the ICCSAC all knew counties and IV-D prosecutors had judges issue the orders so poor noncustodial parents could not pay and that the parents did not have an ability to pay 100 percent of the orders, from the onset of the orders and;

76. Defendant Longest's testimony shows the counties, IV-D Agencies, judges and even the ICCSAC all knew parents suffered extreme hardship, that is explained in the DOJ Letter. Defendant Longest said, "many parents have been placed in the position of facing repossession of a car, eviction from a home or paying the court ordered child support. Given that some prosecutors and judges *go after* parents who pay 75% just as intensely and those

who pay 0% many of those paying 75% found that it was better to pay none and use the money towards maintaining basic necessities." Id. ¶_____

77. Indiana has long recognized, that implicit in the constitutional right to bring a civil action is the right to present one's claim to the trial court. *Zimmerman v. Hanks,* 766 N.E.2d 752, 757 (Ind. Ct. App. 2002). In *Murfitt v. Murfitt*, 809 N.E.2d 332 (Ind. Ct. App. 2004), *Henderson v. Henderson,* 919N.E.2d 1213(Ind. Ct. App. 2010).

78. Indiana Code § 34-47-3-6 requires judges to make certain findings of facts and conclusions of law regarding the parents' defenses against contempt; and requires the court to discharge and acquit parents from contempt, if they confess and explain that no contempt was intended.

79. In Indiana, if there is a possibility that an indigent defendant may be incarcerated for contempt for failure to pay child support, he or she has a right to be appointed counsel and to be advised of that right and appointed counsel prior to the conduct of the contempt hearings. *In re Marriage of* Stariha, 509 N.E. 2d 1117,1121 (Ind. Ct.App. 1987); *Paternity of C.N.S.,* 901 N.E. 2d 1102, 1105 (Ind. Ct App. 2009); and *Marks v. Tolliver,* 839 N.E.2d 703,706 (Ind. Ct. App. 2005). See also, Branum v. State, 822 N.E.2d 1102 (2005)

80. When Allen County child support payment orders are enforced, the law is fraudulently concealed from poor noncustodial parents. In IV-D child support enforcement contempt actions the right to court appointed counsel is fraudulently concealed and violated. No accurate findings of facts and conclusions of law are ever made; and the records are all void of facts showing why the child support was not paid. The judges use generic findings of willful failure and ability to pay to make the child support enforcement records and Chronological Case Summaries (CCS) look lawful.

81. In some cases, like Ms. Butler's the judges used false entries on their orders and the CCS's, saying the poor noncustodial parent was "advised of their rights, including right to counsel and consented to proceed without counsel".  However, the contempt transcript clearly shows the regular sitting judge Daniel Heath and child support prosecutor David Brown having undue influence on temporary judge Stephen Rothberg and Rothberg fraudulently concealing and violating Ms. Butler's right to counsel. See the Complaint p. ___. Ms. Butler had a right to be advised of her right to counsel and to be appointed counsel prior to the conduct of every single contempt hearing; as did the parents incarcerated for contempt in Marion County, Indiana shown in ¶ 126 of this Complaint.

82. In Indiana, "[i]f there is a possibility of an indigent losing his or her liberty as a result of the trial court's contempt finding, then the indigent is entitled to have counsel to represent him at that hearing, not just at the subsequent compliance hearing(s)." *Moore v. Kristy L. Moore,* 49A04-1310-DR-499 (Ind. Ct. App. 2014) (reversed, remanded)

83. However, Indiana Counties and IV-D Agencies commit fraud upon the court by causing judges to fraudulently conceal targeted poor noncustodial parent's right to court appointed counsel in contempt hearings. This denial of access to the court and court services and due process and equal protection of the law is the cause of the ICGR report recommendation #7 and demonstrated in the NWF p. 16-17 as shown in ¶¶ and what happens when the prosecutors and judges "go after" the parents as defendant Longest stated in paragraph of as shown in Paragraph __ of this Complaint.

84. In *Moore v. Kristy L. Moore,* 49A04-1310-DR-499 (Ind. Ct. App. 2014) Brian Moore appealed a contempt finding and suspended sentence to jail. He showed his right to counsel was fraudulently concealed and violated, although he didn't use that language. Brian Moore

argued the following in his brief which resulted in a published opinion and the finding in

paragraph 136:

> **"In denying Father's motion the court stated "we don't appoint pauper counsel on**
> **civil matters"** Father contends that the court erred as a matter of law.  In civil contempt
> proceedings if an alleged contemnor cannot afford an attorney the court must appoint one
> to represent him. In re Marriage of Stariha, 509 N.E.2d 1117 (Ind.App. 1987). In the civil
> matter of Lassiter v Department of Social Services, 452 U.S. 18 (1981), the United States
> Supreme Court held that "an indigent litigant has a right to appointment of counsel . . .
> when, if he loses, he may be deprived of physical liberty." The Indiana Court of Appeals
> held "that where the possibility exists that an indigent defendant may be incarcerated for
> contempt for failure to pay child support he or she has a right to appointed counsel and to
> be informed of that right prior to commencement of the contempt hearing."  In re Marriage
> of Stariha, 509 N.E.2d 1117, at 1121 (Ind. App. 1987).
> **The Court did not inform father of his right to counsel but instead said that it does**
> **not appoint counsel in civil matters and that "I'm ready to proceed, and I'm going to**
> **proceed."** In this instance Father's liberty was in jeopardy on the day of the hearing based
> upon the careful presentation of evidence, defenses or objections, and other procedures of
> court more aptly navigated by a trained professional – competent legal counsel.
> **The Court premised the denial on the position that he would not be subject to**
> **execution of the sentence without further hearing at which time the Court expressed**
> **its view that "it's probably appropriate that I have somebody sit with you." Tr. p. 56**
> The future hearing was termed a "compliance hearing" Tr. p. 54 The extent of the hearing
> will be to determine if father has complied with the court's 06 June 2013 order."

*Id.* Quoting Custodial Right's Advocate, Stuart Showalter's 6/16/2014  Law Blog post

Indiana Court of Appeals Issues Published Opinion on When the Right to Counsel Applies in

Child Support Contempt Hearings detailing the appeal available at,

http:  bcchildadvocates.blogspot.com 2014 06 indiana-court-of-appeals-issues.html

85.    It's important to note that the trial court judge shouldn't have held the contempt hearing

without Moore being represented by counsel. Instead of granting Moore equal access to the

court, court services and due process and equal protection of the law, the judge acted according to the pervasive, unconstitutional policy. The judge fraudulently concealed Moore's right to counsel, unlawfully issued a finding of contempt and suspended a sentence to jail. At the next hearing, the trial court judge unlawfully decided having "somebody" arbitrarily "sit" with Mr. Moore during the contempt hearing was sufficient to grant Mr. Moore equal access to the court, court services, due process and equal protection of effective counsel as mandated by both the US and Indiana Constitutions and the foregoing case law.

86. While Brian Moore had sufficient means to remedy this gross violation of his clearly established constitutional rights with appeal, most parents targeted by the defendants' unconstitutional policy do not know what an appeal is, that it is an option or even that they have a right to court appointed counsel. The targeted classes of poor noncustodial parents do not know what constitutes due process and equal protection of the law or what rights they have under the law. That is the reason appointed counsel is a right in these proceedings, in Indiana.

**Abuse of the Title IV-D Child Support Program fabricates evidence for felony nonsupport of a dependent arrest.**

87. Title IV-D is the Indiana prosecutor's biggest caseload *Id.* Title IV-D Child Support DCS Child Support Bureau - Prosecuting Attorney Collaboration IPAC Winter Conference December 12, 2014 Cynthia Longest PowerPoint presentation slide 6 available at, http: slideplayer.com slide 62 9334 . Exhibit 3.

88. Absolute prosecutorial immunity is not available for all investigative activities related to the ultimate decision to prosecute but is restricted to the prosecutor's role in judicial proceedings. Burns v. Reed , 500 U.S. 478 (1991). In Buckley v. Fitzsimmons, 509 U.S. 259 (1993), because the plaintiff alleged that the prosecutor fabricated evidence before probable cause

existed to make an arrest or initiate judicial proceedings, the actions in issue were

investigative and not shielded by absolute immunity. In *Kalina v. Fletcher*, 522 U.S.

118(1997), the Court denied absolute immunity to a deputy prosecuting attorney for falsely

certifying, under penalty of perjury, the factual allegations underlying an application for an

arrest warrant.

89. Child Support prosecutors are contracted under Indiana Code § 31-25-4-13.1 Agreements

with local government officials; contracting; attorney-client relationship; informing

applicant; service level stipulation, to establish and enforce child support payment order.

They perform the same functions as parents and private entities.

> (b) The bureau shall make the agreements necessary for the effective administration of the plan with local governmental officials within Indiana. The bureau shall contract with:
>     (1) a prosecuting attorney;
>  (2) a private attorney or private entity if the bureau determines that a reasonable contract cannot be entered into with a prosecuting attorney and the determination is approved by at least two-thirds (2/3) of the Indiana child custody and support advisory committee (established by IC 33-24-11-1); or
> (3) a collection agency licensed under IC 25-11 to collect arrearages on child support orders under which collections have not been made on arrearages for at least two (2) years;
> in each judicial circuit to undertake activities required to be performed under Title IV-D of the federal Social Security Act (42 U.S.C. 651), including establishment of paternity, establishment, enforcement, and modification of child support orders, activities under the Uniform Reciprocal Enforcement of Support Act (IC 31-2-1, before its repeal) or the Uniform Interstate Family Support Act (IC 31-18, or IC 31-1.5 before its repeal), and if the contract is with a prosecuting attorney, prosecutions of welfare fraud.
>  (c) The hiring of a private attorney or private entity by an agreement or a contract made under this section is not subject to the approval of the attorney general under IC 4-6-5-3. An agreement or a contract made under this section is not subject to IC 4-13-2-14.3 or IC 5-22.
>  (d) Subject to section 14.1 of this chapter, a prosecuting attorney with which the bureau contracts under subsection (b):
>     (1) may contract with a collection agency licensed under IC 25-11 to provide child support enforcement services; and
>     (2) shall contract with a collection agency licensed under IC 25-11 to collect arrearages on child support orders under which collections have not been made on arrearages for at least two (2) years.
>  (e) A prosecuting attorney or private attorney entering into an agreement or a contract with the bureau under this section enters into an attorney-client relationship with the state to represent the interests of the state in the effective administration of the plan and not the

interests of any other person. An attorney-client relationship is not created with any other person by reason of an agreement or contract with the bureau.

(f) At the time that an application for child support services is made, the applicant must be informed that:

(1) an attorney who provides services for the child support bureau is the attorney for the state and is not providing legal representation to the applicant; and

(2) communications made by the applicant to the attorney and the advice given by the attorney to the applicant are not confidential communications protected by the privilege provided under IC 34-46-3-1.

(g) A prosecuting attorney or private attorney who contracts or agrees under this section to undertake activities required to be performed under Title IV-D is not required to mediate, resolve, or litigate a dispute between the parties relating to the amount of parenting time or parenting time credit.

(h) An agreement made under subsection (b) must contain requirements stipulating service levels a prosecuting attorney or private entity is expected to meet. The bureau shall disburse incentive money based on whether a prosecuting attorney or private entity meets service levels stipulated in an agreement made under subsection (b). As added by P.L.146-2006, SEC.20.

90. The unlawful IV-D Enforcement actions fabricate evidence for felony nonsupport of a dependent child arrests under Indiana Code § 35-46-1-5, which was modified in 2014 by having all monetary language removed from the statute. The former nonsupport statute made owing *up to* $15000.00 in back support, for one child, a class d felony. Owing over $15,000.00 in back child support, for one child was a c felony.  Also, if a parent owes over $15000.00 they are convicted of the D and C felony.

91. However, pursuant to Indiana Code § 35-46-1-5(d)  it is a defense if the parent was unable to provide support. Yet, that defense is rarely, if ever, raised and the Title IV-D Beneficiary Defendants admitted to having judges issue high child support payment orders poor noncustodial parents could not pay 100 percent of in order to generate income for Indiana counties; and to generate the defendants jobs and status in the community.

92. The Title IV-D Beneficiary Defendants policy of setting unrealistic high child support orders; that poor noncustodial parents could not pay 100 percent of; and then burying the poor

noncustodial parent in the child support debt is demonstrated in the following excerpt of the

"Prosecutor's Budget: A Guide to **Keep Your Office Running** and Demonstrating

Leadership to Your Community" shows the unconstitutional policy of setting high,

unrealistic, child support orders and letting arrearages accumulate before enforcing the orders

on slides 15 and 16, available at,

https: webcache.googleusercontent.com search?q=cache:kS5QlDntdVUJ:www.in.gov ipac fi

les 2__Sonnega_Mantia_McAlexander_Prosecutors_Budgets_css_2.pptx+&cd=5&hl=en&ct

=clnk&gl=us See also Exhibit 5.


Paradigm Shift for IV-D Program:
**The past:**

> *Focus on cost recovery*
> ***Set orders high – the higher the better – collect what you can***
> ***Wait till arrears accumulate before enforcement***
> Program was seen as representing the custodial party

**Today:**

> More holistic family-centered approach
> Current focus of program – income to families
> ***Use of early intervention to prevent arrears***
> ***Setting more realistic orders***
> Expedited modification
> We serve both parents

93. See Exhibit 10 - page 5 of the Indiana Prosecuting Attorneys Council's June 2016 Child

Support Conference Felony Non Support Charging PDF available at,

http: www.state in.us ipac files 7-WkshpF-1000-1100_Bishop.Keppler-Felony_Non-

Support.pdf **Initial Case Investigation** shows the defendants unconstitutional policy of

denying poor noncustodial parents due process in the contempt hearings and thereby

fabricating evidence for the felony nonsupport arrests. The child support Prosecutors are

trained to start their felony **"investigation"** in *contempt hearings* and to "note stupid respondent statements" made in contempt hearings. The judges back them up by never making accurate findings regarding the parents' ability to pay or their defenses against contempt.

94. On page 18, of IPAC's Child Support Conference Felony Non Support Charging PDF the IV-D Prosecutors are trained that: "Inability to pay is not an element. It is a defense to be proven by Defendant."

95. However, that defense is rarely if ever, raised. As Ms. Butler's case clearly shows, she had to fire the public defenders in order to access the court with her defenses and then the case was dismissed.   She even had a jury trial vacated.

96. However, Indiana Code § 35-46-1-5(d)  it is a defense if the parent was unable to provide support is supposed to negate and arrest when the parent has a questionable ability to pay. Tthe DOJ Letter and Office Of Child Support Enforcement Turner v. Rogers Guidance which began in 2012 mandates an ability to pay determination before a parent is arrested for failure to pay child support. See ¶ ¶¶¶ 90; 93; 95 ; 96. Bearden, 461 U.S. at 671. Further, a court's [and IV-D agents] obligation to conduct indigency inquiries endures throughout the life of a case. See id. at 662-63.

97. Ms. Butler was arrested for felony nonsupport 9/3/2010 which was an unlawful arrest. Defendants violated her clearly established rights and used the unlawful contempt hearings to fabricate evidence for the felony. Although, *Taylor v. State,* 659 N.E.2d 535, 539 (Ind.1995), probable cause requires only that the information available to the officer would lead a person of reasonable caution to believe the items could be useful as evidence of a crime.".

In *Franks v. Delaware,* 438 U.S. 154, 171-72, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978), the U.S. Supreme Court held that a warrant is invalid where the defendant can show by a preponderance of the evidence that the affidavits used to obtain the warrant contain perjury by the affiant, or a reckless disregard for the truth by him, and the rest of the affidavit does not contain materials sufficient to constitute probable cause.. 42 U.S. Code § 667 - State guidelines for child support awards mandates review of both the state guidelines and individual child support payment orders. The 2010 ICCSAC Meetings established that the that the parents did not have an ability to pay the child support orders, from the onset of the order. See ¶ ¶ 121; Paragraph 165,

98. The 10/6/2010 ICCSAC meeting continued discussion about alternatives to incarcerating parents for failure to pay child support. Allen County Deputy Prosecuting Attorney, Andrew Schweller (Schweller), who prosecuted Ms. Butler for felony nonsupport, admitted that the Allen County's IV-D Prosecuting Attorney's office and Allen County judges issued high child support orders poor noncustodial parents could not pay 100 percent of. He said:

"[I]t had been the goal of prosecutors and judges to get the highest child support payment order possible but that *attitude* is now changing. This is in part due to new federal incentive payment regulations that base payments on five performance standards  These include the compliance rate; that is the total percent of payments collected *instead* of the total amount ordered. Collecting 100% of an order that is cut in half provides the state with more money than collecting 50% of an order twice the size even though both are the same amount of money."

Defendant Schweller went on to testify:

" [I]n Allen County very rarely does a person go to jail the first time for failure to pay

child support." He stated that a "person would usually go through two probation

hearings and work release before being incarcerated for failure to pay child support."

He said that "usually around sixty individuals go to *prison* each year in Allen county

for failing to pay child support.

Id.This ICCSAC meeting was broadcast. See
http: www.in.gov legislative interim committee 2010 committee notices CCSADAK.pd See
also the 10/6/2010 ICCSAC Meeting minutes available at
http: www.in.gov legislative interim committee 2010 committee minutes CCSADA6.pdf
and ICCSAC meeting witness Custodial Rights Activist Stuart Showalter's law blog
10/20/2010 post: Prosecutors Help Reduce Child Support Payment Orders detailing Andrew
Schweller's testimony available at
https: stuartshowalterindianalawblog.wordpress.com 2010 10 20 indiana-prosecutors-help-
reduce-child-support-payment-orders

99. On page 34, IPAC Nonsupport charging PDF the prosecutors are trained to:" "Give enough

Rope" for the parents to hang themselves. The pleas agreement conditions are intentionally

unattainable, just as the initial child support payment order amounts were.

100.    Ms. Butler's case shows, as will all the record of the parents in prison for felony

nonsupport, that the unconstitutional indigent defense system, prevents this class of parents

from pleading their defenses.

101.    The unconstitutional indigent defense system is not a matter of insufficient funding, or

poor over worked attorneys. Ms. Butler's public defender(s) conspired against her clearly

established constitutional rights. The first public defender, Stephen Miller tendered back her

entire defense with a signed note, then he prepared a jury trial for her to lose at.

102.    The Allen county public defense system is operated by the three-member Allen County

Public Defender Board. Two members of the board are appointed by *Allen County judges*.

The Public Defender Board has not established a mechanism for accused child support

debtors to be appointed counsel in contempt proceedings. Unless the judge advises these parents of their rights, there is no way for the poor noncustodial parents to know they have a right to counsel.

103.    The Allen County Board of Judges has an unconstitutional policy. The only way for a poor noncustodial parent accused of contempt to obtain appointed counsel is by appointment from the judge, and the judges fraudulently conceal and violate the right to counsel. These parents cannot perfect an appeal either because they don't know what that is, or what their rights are to know the order was not lawful.

104.    Since the decision of the United States Supreme Court in Gideon v. Wainwright (1963), 372 U.S. 335, the issue of judicial control of indigent defense counsel has been addressed by a majority of states through the enactment of legislation creating indigent defense delivery systems that are independent of the judiciary. Indiana, however, continues to rely heavily upon the inherent authority of the courts to provide these constitutionally mandated services and independence of the defense function has not been assured.

This state is one of the few states where an accused may be represented by an at-will employee of the judge before whom the accused stands charged. (Quoting the Indiana Public Defender Commission's STANDARDS FOR INDIGENT DEFENSE SERVICES IN NON-CAPITAL CASES, available at: http://www.in.gov/publicdefender/files/indigent-defense-non-cap.pdf

E.  When counsel is appointed for contempt, or felony nonsupport they join in the unconstitutional policy by refusing to raise the poor noncustodial parent's defenses, including the inability to pay, in order to force participation in the IV-D Program. See page ___ of this Complaint.

F. Allen County financially benefits from the unconstitutional indigent defense system. Abuse of the IV-D Program generates felony nonsupport defendants. Allen County participates in a Public Defender Program where the Public Defender Commission reimburses 40 percent of County's "cost" spent on public defenders who defend people charged with felonies, including felony nonsupport.

105.    Page 21 of 24 August 15, 2013 Allen County Meeting Minutes show Tera Klutz county auditor explaining to the Council that they need to increase their public defender's salary to be 60% of the prosecutor's salary.

106.    Darren Vogt:  said "That is the struggle that I have with the State." […] They are now going to create a standard and you are going to increase our costs."

On p. 22 Tom Harris: Our Public Defender is working in a way that 60% makes sense?

107.    On p. 23 Tera Klutz: We budget about $1 million a year for reimbursement. Darren Vogt: Think of it this way, we would be paying an additional… Tera Klutz: And I want to clarify that this is not a grant. This body, at some point, decided that we wanted to represent the defendant as well as we can or at least give them do process. That was the decision then as far as hiring enough Public Defenders to handle the caseloads in the County. I think it says that if you have a Public Defender, they can only have this many caseloads. Maybe in another County they say that they are only going to have two Public Defenders and that's all they are going to have. They may have thousands and thousands of caseloads but that is all they are spending to it. The Fiscal Body made a decision to adhere to some kind of manageable caseload standards. Then they felt like it wasn't a waste of time for the Public Defenders to go out and represent these defendants. That was the decision that was made to

be a part of this program. That is the decision that you would decide against to get out of this program. It's not a grant.

See the August 15, 2013 Allen County Meeting Minutes, available at:

http: webcache.googleusercontent.com search?q_cache:Iz39VAQ_OB0J:www.allencounty.
us index.php"o3Foption'o3Decom_content"o26view"o3Darticle'o26id_o3D42'o26Itemid'o3D
639_o26jsmallfib_o3D_o26dir_o3DJSROOT council_minutes_2013_o26download_file_o3DJ
SROOT council_minutes_2013 August'o2B15"o2B2013"o2Bminutes.pdf-&ed_1&hl_en&ct
_cmk&gl_us

108.     The 2009 Public Defender Commission Meeting Minutes regarding Allen County public defender caseloads Larry Landis said the caseload maximums in Standard J were never meant to apply to public defenders paid by the hour; only to salaried and contract public defenders. Deborah Neal stated if that is correct, if the county only uses hourly public defenders, they can take as many cases as they want and never be out of compliance? Larry Landis said yes but public defenders have the ethical obligation to say no to new cases if they are overloaded.

Peter Nugent asked what prevents a public defender from saying to a judge, I'm at my maximum caseload limit but then the court offers to pay the case by the hour. Is it acceptable that the attorney takes more cases as long as the attorney self monitors? Is an attorney much more likely to say I cannot take this as a public defender case but if you pay me by the hour, I can? I do not think there is a good answer for this situation. We do not want to tell part time public defenders that we could potentially limit your private practice. So to get part time public defenders you tell them we are not going to ask about your private practice. The end around bothers me a little. Larry Landis asked if the public defender is willing to sell part of

their private practice to the county and is self-monitoring, why does that bother you? Peter Nugent said because if our concern is for quality representation no matter how many cases I have, there are only so many hours in a day. Id.

109.     Allen County Councilman Tom Harris wanted to know if, "Our Public Defender is working in a way that 60% makes sense?" Just who do the Allen Public County Public defenders work for? It certainly isn't their clients? Larry Landis of the Indiana Public Defender Commission, who pays the Allen County General fund over One-Million Dollars a year for participating in the Public Defender Program stated in the 2009 Public Defender Commission Meeting Minutes, available at: http: www.in.gov publicdefender files pdc-minutes-2009.pdf: "the State Court Administration keeps details on pleas. He believes the percentages are around 1% of cases decided by jury trial, 3% by bench trial and the remainder is guilty pleas". That was in response to: "Vernon Smith asked if the Commission had ever conducted a quality-of-representation study regarding plea agreements. In his experience, there seems to be an unusually high number of pleas entered, perhaps because the client does not understand the situation, or the public defender does not have time to adequately prepare a case. Mark Rutherford said a study would be difficult because whether to accept a plea is up to the defendant."

110.     An Indy Star online article *The average amount of time spent on a client's case: 45 minutes, available at:* https: www.indystar.com story news 2016 10 24 indianas-public-defender-system-flawed-study-says 92691546

"Lack of oversight of the public defense system, inconsistent funding and subpar representation contribute to the problems," […] "Public defenders in Indiana are burdened with so many cases— at roughly 1,200 cases each per year — that the average amount of

time spent on a client's case is roughly 45 minutes, said Larry Landis, executive director of the Indiana Public Defenders Council. That includes client interviews, discovery and legal research.

111.    In Allen County, approximately, sixty parents a year are ran through the "civil" IV-D courts, arrested for felony nonsupport, convicted, placed on probation, and then work release before they go to prison for failure to pay child support. The re-offend rate for felony nonsupport is approximately 40 percent higher than the general population. See page ___ of this Complaint.

**TITLE IV-D BENEFICIARY DEFENDANTS (counties, clerks of courts, county IV-D prosecutors, the child support bureau) ABUSED IV-D INCENTIVE PAYMENTS THAT WERE GENERATED FROM THE UNCONSTITUTIONAL POLICY**

112.    Ms. Butler was one of the one of the 60 poor noncustodial parents Allen County Title IV-D Deputy Prosecuting Attorney Andrew Schweller (Schweller) tried to send to probation, work release and then to prison.

113.    From that Allen County stood to generate a lot of money. Allen County Council try to get The Honorable Fan Gul to fund the entire criminal division with User Fees. Guardian Ad Litem. Allen Superior Court. Jerry Noble and he Honorable Charles Pratt was there Judge Gull identified the class of people who are targeted for the unconstitutional policy. Judge Heath identified the class and policy in ¶¶_____.

114.    From March 5.2008 to September 2010 they ran Ms. Butler through approximately 15 contempt hearings where two and three IV-D Prosecutors would show up, a court reporter, judge, DS and Ms. Butler. They were generating federal financial participation payment and incentive payments. That they otherwise would not have received.

115.    They fraudulently concealed Ms. Butler rights to pauper counsel. Judge heath told Ms.

Butler they couldn't appoint counsel because it was civil. Allen County Allen County IV-D

Deputy Prosecuting Attorney David Brown prosecuted the first two contempt hearings. Then

he was showing up to Ms. Butler's home before he went to work and having coffees with

her. Then he would guide her to her knees, in her kitchen, she would orally copulate him and

perform criminal deviate conduct. She waited for him every morning too.

116.    She risked arrested at the next contempt hearing, that was set about five weeks apart, and

having her child taken by child protective agents.  And it being highly problematic for her to

get them back. Ms.  Butler's mental health counselor called the sheriff to report what was

happening to her. See Exhibit (May 2010 Police report)

117.    Ms. Butler did not see IV-D Prosecutor for a while and the day after Ms. Butler's

birthday the Prosecutor emailed her the following and attached an email she sent him.

From: David Brown
To: Ms. Butler simpson

I hope you had a happy birthday. I was out of town. Does your offer for a cup of coffee still

stand?

David A. Brown

-----Original Message-----
From: Ms. Butler simpson [mailto:makeitcustomclean@yahoo.com] Sent: Friday, March 12,
    2010 4:53 AM
To: David Brown
Subject: Hi
Perhaps, stopping over in the early morning will work out better. You can leave 45 minutes
    earlier and just take exit 102 to my place. I know you don't like to wake up early, but it will
    be fun and I make the prettiest cup of coffee... giggle, really.
Do you like to eat breakfast?

From: Ms. Butler Simpson [mailto:makeitcustomclean@yahoo.com]
Sent: Monday, July 26, 2010 2:26 PM
To: David Brown

Subject: Re: Hi

Of coarse it does, David, any time... with a little notice.
Oh, I got a beautiful, purple bike for my birthday, a 21 speed, lots of fun


Jul 27, 2010 at 3:47 PM
From David Brown
To Ms. Butler Simpson
I shouldn't.
I just wanted to wish you happy birthday.


Wed, Jul 28, 2010 at 4:54 AM

From Ms. Butler Simpson

To David Brown

Thanks and I knew you wouldn't :) I'm actually in the process of moving, to Florida. I'll
be around for a little while longer, a couple of weeks and then back and forth for court
dates.

This address will always be checked often enough, so keep in touch, okay.

Bye Bye.

See Exhibit ___.


118.    The prosecutor gave Ms. Butler some time and she did not contact him. So, on 8/9/2010,

eleven days after the email telling him "bye bye", the felony information was signed. See

Exhibit ___He was probably pretty upset; to receive Ms. Butler's response to his birthday

wish. Normally, she would have thanked him and begged him to come see her. He would

show up to Ms. Butler's home and "kid" her about arresting her.

119.    On 9/1/2010 Ms. Butler was moving rocks around her pool and three large Sheriff's came

to arrest her for the felony. Ms. Butler went inside to make arrangements for her children

who were in 1st grade, half day kindergarten and 4 years old. Ms. Butler called her family

frantic. The officers didn't understand what was going on. Then Ms. Butler explained the

situation, showed them police reports that are contained herein., records David Brown gave her and explained what was going on. They told her to turn herself in on Tuesday because it was a holiday and she couldn't get to court until then. Then the Officers told her how to study the law online and explained that unless she could hire a lawyer she would probably go to prison.

120.    Then Fort Wayne police came to arrest Ms. Butler. She explained to them the same thing. They told her to turn herself in on Tuesday. She would go to court and wouldn't have to sit in jail.

121.    Although the Plaintiff could have turned herself in; and gone to court after the holiday weekend she was arrested in the middle of the night, taken to jail, forced to submit to a pregnancy test, jailed in lock up for five nights with no bond, without basic necessities; then she had her underwear taken and she was forced to wear jail clothes, and then she was chained, without underwear, to men who sexually harassed her in the back of an Allen County van with cages, she was forced to pay Defendant Donald Simpson $2500.00 to be released from jail.

122.    When the bailiff took Ms. Butler into the courtroom she saw none other that Defendant Donald Simpson's mother Sharon Simpson standing there. Ms. Butler had a flashback in the court and was uncontrollably crying. The Bailiff took her in the back and she asked for Sharon Simpson to be removed from the courtroom and explained why. That these people too her to their house when she was 14 years old. Kept her there and forced her to have sex with their son, She was beat daily, forced to clean a factory and prevented from going to school, then they stole her child from her and said she woes them $50,000 and she has never made that much money in her life and it was hard on her to see that women in the court.

**The public defenders join in the conspiracy and unconstitutional policy.**

123.    Stephen Miller and Mark Thoma were appointed as the Plaintiff's public defenders, to

defend the felony nonsupport case. But instead they joined in the unconstitutional policy and

conspired against the Plaintiff's rights to access the court and due process and equal

protection of the law.

A.  Ms. Butler gave Stephen Miller police reports showing she ran away from DS but was

arrested. She asked him to get the custody records because the clerk said there were none.

He told her that prior wrongs don't change her duty to support KS. Then he filed a

Motion To Dismiss that made the record look good but basically said Ms. Butler has an

inherent right to support S because she gave birth to her.

B.  Defendant Donald Simpson's mother would come to these felony hearings, talk to

Stephen Miller and harass Ms. Butler. One incident she grabbed Ms. Butler from behind

while Ms. Butler was walking through the hall of the courthouse. Ms. Butler spun around

and pushed her back and called her a trafficker and stated that she (Simpson) did not have

custody of her because there were not records of custody. At the next hearing Sharon

Simpson gave Mr. Miller the Order custody. When Miller tendered back Ms. Butler's

defense. She pulled the records contained herein. Thankfully, none of the prosecutors

took the file home for their dog to eat.

C.  Mr. Miller tendered back Ms. Butler entire defense, with a signed note. Exhibit ___. The

11/17/2010 Tr.p 6 of the Contempt hearing shows Ms. Butler took letters to the

prosecutor, and complained that she was a trafficking victim and Stephen Miller was not

listening to her or doing his job. Judge Sims told her to contact Randy Hammond, Chief

Public Defender.

D.  Ms. Butler tried to contact Mr. Hammond, Chief Public Defender, to no avail.

E.   Mr. Miller then prepared a jury trial for Ms. Butler to lose at, he did not enter any

evidence or interview one witness for her defense. The jury trial was vacated because

Motion Withdraw at pretrial conference. He would talk to DS's mother (The Plaintiff's

illegitimate legal guardian) at felony hearings. It turns out, he was hired by DS's mother

to represent her daughter in a case "many years ago". See Exhibit ___. The state did not

want Miller to withdraw and he wouldn't have if Ms. Butler had not spoken up. The

Motion to Withdraw was just to make the record look good.

F.   Judge felts asked Ms. Butler if she understood what was going on.

She replied, Yes, and approximately 5 weeks ago I sent Mr. Hammond a letter regarding

Mr. miller's ineffectiveness. In that, he has repeatedly refused to file a Motion To

Dismiss that raises my defenses and he refused to stay proceedings pending a Trial Rule

60(B) Motion For relief From Judgment, which he refused to assist with. Judge Felts'

mouth fell open; and the State, inferably Traci Smith replied "But your Honor,

depositions are complete and this case is ready for trail." The jury trial was vacated.

G.   Mr. Thoma was the second public defender that refused to raise Ms. Butler's defenses in

the felony court and tried to force her to take a plea bargain. When Ms. Butler he was

vulgar when Ms. Butler tried to explain KS was conceived from sex crimes, while Ms.

Butler was a child, held in DS's custody by his parents.

124.   Stephen Miller and Mark Thoma violated Ms. Butler's clearly established rights, in effort

to hold her in this condition of servitude and to generate money for Allen County through the

Public Defender Program and Community Corrections Programs, along with the Title IV-D

Money.

125.    It's worthy to note that the defendants often run poor noncustodial parents through felony Nonsupport court, where they are appointed public defenders and they concurrently run the parents though the contempt courts without counsel.

126.    Ms. Butler had to file her own appearance. When she did, the judge, prosecutors and Mr. Thoma all laughed at her. Mr. Thoma was kept on as standby counsel due to Ms. Butler's mental health and formal 8th grade education. Judge Felts wanted to know what the next order of business should be. Thoma said, she has been talking about this Motion To Dismiss so much, how about she file that. Ms. Butler explained she would have had it to file, that day, but she ran out of ink while printing it off.

127.    She filed a Motion to Dismiss on 8/31/2011. She incorporated a Motion For Relief From Judgment, that was filed in the contempt court, into the Motion To Dismiss.

128.    The judicial assistant, Rochel, in the Allen Superior Court refused to file the Plaintiff's Motion For Relief From Judgment. However, after arguing with the assistant about the law, and Rochel speaking to the judge or judges a couple of times, Ms. Butler explained, the Motion for Relief was already filed in the Allen Circuit Court by being incorporated into a Motion To Dismiss felony nonsupport, that is derived from this case. So, the judicial assistant talked to the judges again, and filed it, but refused to serve it and said, "it didn't matter, because it's up to the judges, what they want to do". Ms. Butler also filed a Petition For Declaration of Absolute Nullity of Marriage because the 1998 default is void and the forced marriage is void..

## B. The felony was dismissed.

129.    On 10/4/2012, the Chief Deputy Prosecuting Attorney dismissed the felony nonsupport case. The State's Motion To Dismiss shows that the default judgement accumulated almost

$40,000 in daycare expenses that should not have been included in the $50,000.00

arrearages; Ms. Butler has a questionable ability to pay due to her mental health and 3 other

children; and it is a concern, if she is to be believed, that she signed a document terminating

her parental rights and no enforcement was engaged against her, for numerous years, her

actions would be in conformity with that belief. See Exhibit ___.

130.   Remarkably out of the 17 contempt hearings, and a Motion For Relief From Judgment,

and appeal from the denial of that, the States Dismiss felony nonsupport charges is the only

finding in the record that shows the Plaintiff was tricked into believing that she terminated

her parental rights. It's the first finding, of two regarding Ms. Butler 3 other children.

## A. Title IV-D Beneficiary Defendants abuse the legal process to generate more financial participation payment from the violation of Ms. Butler's rights.

131.   Sixteen days after the state Dismissed the felony and while the Motion for Relief was

pending hearing, Defendant IV-D Prosecutor Andrew Schweller, (DPA Schweller) who

prosecuted the Ms. Butler for the felony, filed a Contempt citation and tried to jail her in the

Allen Superior Court. Thereby, DPA Schweller was unlawfully generating federal financial

participation payments, that otherwise would *not* have been paid to Allen County's general

fund.

132.   Ms. Butler's Motion For Relief From Judgment was voluminous as she requested the

court to vacate the 1998 default and all subsequent findings and grant her Petition For

Declaration of Absolute Nullity of Marriage, without an award for child support, under the

following provisions of Ind. Trial Rule 60 (B):

A.   TR 60 (B) (6): The default order is void ab inito as service of process was insufficient

AND Default judgment was issued against a known incompetent, who did not have a

representative, in violation of Ind. Trial Rules 55(B) and 4.2(B). TR 55(B) required the

court to determine the truth of the 1998 default judgment and service of process of the

default was insufficient because the trial court's 1998 findings create a genuine issue of material fact that Ms. Butler was incompetent and she was incompetent. Therefore, service had to comply with T.R. 4.2(B) and someone other than Ms. Butler had to be served. She was the only person served and service failed to comport with due process for service in general and TR 4.2(B). Therefore, the default is void and of no legal effect.

B.  TR 60(B) (8) and for fraud upon the court: The 1998 default had to be vacated as it holds Ms. Butler in a condition of involuntary servitude in violation of 18 USC §1584; and was used to continue a condition of involuntary servitude she was held in as a child; and she has immunity from the child support order under I.C. § 35-42-3.5-4. She has a right under Mullis v. Kinder, Pena v. Mattox and Indiana law to terminate her parental rights without DS's Consent and her rights were terminated.

C.  TR 60(B) (7) ) and for fraud upon the court: The default had to be superseded with a declaration of nullity of marriage, without an award for child support.  She was incompetent, and fraud and duress forced her into marriage. The marriage is void and voidable under Indiana law; and the marriage is criminalized under IC 35-42-3.5 and IC 35-42-3.5-4 provides Ms. Butler immunity from being jailed, fined or otherwise penalized for being a victim of the offenses and she has been grossly jailed, fined, and penalized for being a victim of the offense.

D.  T.R. 60(B) (8) and fraud upon the court: The order was otherwise void because the child support order did not track the laws governing the order. The Child Support Worksheet was incomplete and unsigned by both parties. DS perjured Ms. Butler's employment to obtain a higher amount of support and then daycare expenses and income were not verified. An incomplete, fill in the blank, sheet of paper, that accumulated for ten years without proper service or any enforcement, is not enough to comport with due process. The default violated the Rebuttable Presumption of the Family Support Act.

E.  T.R. 60(B) (8) and fraud upon the court: All findings of contempt and subsequent findings had to be vacated as Ms. Butler was denied her constitutional right to court appointed counsel, and the opportunity to be heard in a reasonable time, in a reasonable manner and to have particular findings of facts and conclusions of law made. She should have been acquitted and discharged from contempt; and DPA David Brown obstructed justice with fraudulent legal advice and forced her to have a relationship with him.

133.   Ms. Butler was denied equal access to the court and an opportunity to be heard. She raised all of those valid issues and filed undisputable evidence and the Motion For Relief From Judgment was scheduled for a measly one-hour hearing, on March 8, 2012, before Judge Charles Pratt, who issued the default when he was a magistrate.

134.   On 12/13/2011the Motion For Relief From Judgment was scheduled for a second hearing on 3/20/12, along with the Plaintiff's Motion To Acquit And Discharge From Contempt, and DPA Schweller's Contempt Citation. See the 12/13/2011 Order and transcript. See Exhibit B

135.   Temporary Judge Martin Hillary presided over the12/13/2011 Contempt hearing that resulted from DPA Schweller's Contempt Citation. Judge Hillary did not know a Motion For Relief From Judgment was pending hearing.   Ms. Butler told him about it and filed evidence that shows she is a trafficking victim: a statement from her father saying he did not sign the Consent to change custody or receive notice. She also filed a Motion To Acquit and Discharge From Contempt that included the State's Motion To Dismiss. The Motion To Acquit and Discharge From Contempt was removed from the record. Yet, the transcript shows she filed it and she has her date stamped copy. Ms. Butler's father's statement was removed from the record and transcript, but the CCS shows she filed it. Judge Hillary did not advise Ms. Butler of her right to counsel and the transcript was changed to show he did. See the 12/13/2011 Contempt hearing Transcript and order.

136.   Judge Pratt denied the Motion for Relief before the second hearing. This violated Ms. Butler's right to an opportunity to be heard. "A party is denied due process when he is denied the opportunity to argue his case to the trial court after that court has determined it would hear argument". *Chandler v. Dillon ex rel. Estate of Bennett,* 754 N.E.2d 1002, 1006

(Ind.Ct.App. 2001). Id. *Bruno v. Wells Fargo Bank, N.A.,* 850 N.E.2d 940, 948

(Ind.Ct.App.2006). Also, Indiana Trial Rule 60(D) required the court to "hear any pertinent

evidence, allow new parties to be served with summons, allow discovery, grant relief as

provided under Rule 59 or otherwise as permitted by subdivision (B) of this rule."

## B. Pauper counsel conspires against and violates Ms. Butler's rights when he joined in the unconstitutional policy.

137.   On 3/12/2012, retired Judge Steven Sims presided, and he informed Ms. Butler her

Motion for Relief was already denied. No findings were made on the issues raised in Ms.

Butler's Motion To Dismiss. See the 3.8.2012 Order of the court; the Transcript and Ms.

Butler's Motion For Relief From Judgment. The judge acted like he was going to send the

Plaintiff to jail for contempt. However, she said she would appeal it and then suffered a

psychological break down in the court and was hysterically crying and vomiting for over an

hour. When court resumed, Judge Stephen Sims performed a thorough history of the case.

Which contained numerous deferred commitments to jail; and generic findings of ability to

pay and willful failure to pay. See Exhibit ___.

138.   He made the first Contempt court finding regarding Ms. Butler's three children who were

all in elementary school and found Ms. Butler was indigent, has a formal 8th grade education

and did not have sufficient means to proceed. He appointed pauper counsel, Robert Gevers

(Gevers), a former Allen County United States Attorney and Allen County Prosecuting

Attorney, to perfect the appeal from the denial of the Ms. Butler's Motion For Relief From

Judgment.   Gevers was appointed under Trial Rule 60.5 and Indiana Code § 34-10-1-2

*Sholes v. Sholes*; 760 N.E.2d 156, 164 (Ind. 2001); and *Zimmerman v. Hanks,* 766 N.E.2d

752, 755,56 (Ind. Ct. App. 2002).

139.   Appointing the former elected prosecuting attorney in the context of Ms. Butler's case was a violation of Indiana Code § 33-40-7-12 which states:

A county public defender, a contract attorney, or counsel appointed by the court to provide legal defense services to indigent persons may not be a partner or an employee at the same law firm that employs the county's prosecuting attorney or a deputy prosecuting attorney in a private capacity. Although Gevers wasn't officially employed by the Prosecuting Attorney's office any more, he was still working for them.

140.   The 14th Amendment and Indiana law required Gevers to participate on appeal or refuse appointment so that Ms. Butler could be appointed other counsel. At the last-minute, Robert Gevers refused to participate on appeal and the Order still wasn't issued so Ms. Butler had to quickly proceed on appeal pro se.[4]

141.   Ms. Butler requested all transcripts since 2008 be printed and paid $1300.00 to the court reporters. In violation of Ind. Court Rules Administrative Rule 10, most of the transcripts were changed when printed. Important sections were deleted, and, or substituted

142.   It's such a flagrant violation of Ms. Butler's rights, the record proves the transcripts were changed. Also, the State's Motion to Dismiss and Ms. Butler's statement from her father, filed in the 12/13/2011 contempt hearing were removed from the record on appeal but the Transcripts shows she filed them. Her 12/13/2011 Motion To Acquit and Discharge From Contempt was removed from the record. The court reporters violated Ms. Butler clearly established rights, in order to unlawfully indebt her to DS for $50,000 in back child support, to force participation in the IV-D program.

---

[4] The Order was printed in May 2012 but shows Gevers was appointed for the sole purpose of contempt and the Plaintiff can talk to him about appeal. The transcript was changed but still shows Gevers was appointed to perfect the appeal. In July 2012, Gevers entered his appearance for the sole purpose of contempt.

143.   Ms. Butler filed a Motion To Correct the Record and Transcripts and a Statement of the Evidence which included the discrepancies in the transcripts and some of DPA David Brown's email correspondences.  However, the Motion was denied.

144.   Former Attorney General Greg Zoeller, who, headed up "the nations fight against trafficking", has personal knowledge of Ms. Butler's circumstances in this Complaint. In 2012, Mr. Zoeller had Deputy Attorney General (DAG) Steiner retrieved Ms. Butler's Appellant filings "for AG G. Zoeller" which included a Brief, Appendix and an Addendum to Brief that included human trafficking law, all of which showed by a preponderance that Ms. Butler is a trafficking victim and the trial court erred as a matter of law and abused its discretion when it denied her motion for relief before the second hearing, and by violating her right to an opportunity to be heard and by violating her right to due process and equal protection of the law. AG Zoeller had Ms. Butler's Appellant filings for one week and returned them. Then, DAG Francis Barrow entered her appearance to argue the validity of the 1998 default dissolution decree, and to defend the government's interest in a 13-year-old default divorce decree, which is astounding.  How could Ms. Butler, who was appointed counsel to perfect the appeal because she did not have sufficient means to proceed, argue against a Deputy Attorney General?

145.   Although DAG Barrow was arguing the government's interest in the 1998 default dissolution, the DAG's brief favored Ms. Butler's argument. DAG Barrow showed that Ms. Butler had been appointed counsel to perfect the appeal but Gevers instead entered his appearance on the sole purpose of contempt. DAG Barrow recanted some of Ms. Butler's arguments and stated on page 13 of her Appellee's Brief:

"Timeliness is especially relevant given the nature of Mother's claims and the long period of time that elapsed before she sought relief. A thorough review of her claims

would require testimony from her and Father, as well as Father's family, related to events that occurred more than thirteen years ago. Her argument regarding the failure to verify the parties' incomes in 1998, simply begs the question of how the parties could now, nearly 14 years later establish what their incomes were back then".

146.   On page 5 of her Appellee's Brief, DAG Barrow stated: "With regard to how the trial court arrived at the support amount of $83.00 per week, Father explained as follows:

Come time for support, she didn't show up. They asked what she did I said she was a dancer at a club. Since there was no way to track it and she wasn't there to give her side the judge said he figured $8.00 an hour at forty hours a week. That's how they broke down the support order. 3/18/09 Tr. 11-12."

147.   Ms. Butler argued, in part, that the court had to vacate the default according to Payton v. Payton, 847 N.E.2d 251, 253 (Ind. Ct. App. 2006) because the worksheet was not complete or signed by any party and there were no income or expense documents submitted to the court. Also, Ms. Butler had argued and proved the default was void for insufficient service because she is a known incompetent at the time of default and someone else had to be served, under TR 4.2B. The court refused to hear that argument and found she argued service was insufficient because she wasn't served notice.

148.   Due to the defendants' unconstitutional policy, she did not have the ability to pay for the home that her children were supposed to grow up in. She lost the home, most of her children's belongings, and her vehicle when she was forced to pay DS the $2500.00 to get out of jail, after she was arrested for the felony and continued to be prosecuted without effective legal counsel. So, after that, she and her children were living with her parents. They lived over five miles away from a bus stop. Ms. Butler didn't have a driver's license because the Title IV-D Beneficiaries suspended it, and her parents could not drive her back and forth to a job in Fort Wayne or anywhere for that matter and they could not provide daycare for her three children while she worked. So, she had to find a place to live with no money, that's not

possible, so she and her children were forced to live in a homeless shelter. If she had a driver's license she could have driven her parent's vehicles.

149.   Ms. Butler got a job at a dry cleaner and was making $9.00 an hour, at forty hours a week. She was also going to therapy for Post-Traumatic Stress Disorder and was receiving food stamps. She gave Gevers a letter from the homeless shelter, her past due bills, and asked him to file a Motion To Acquit and Discharge her from contempt because she did not have an ability to pay any child support. She needed all the money she earned to obtain a home for her three children who were in the 1st, 3rd and 4th grades and KS was 18 years old and not even living with DS. Ms. Butler's income was not enough to pay for her monthly rent, utilities and groceries, bus passes and daycare for her children, let alone enough to pay a child support order that she had no notice of until it accumulated $42,000.00 in back child support. Since Ms. Butler lost everything she owned she had to buy furniture, dishes, towels, everything for a home and pay over a thousand dollars in past due utility bills from when she lost her home, and she needed a deposit and first month's rent.

150.   Poor noncustodial parents being put in this position is part of the unconstitutional policy. See the Deputy Director of the Child Support Bureau Cynthia Longest's testimony showing the policy on page   paragraph   .

151.   At the 7/19/2013 contempt hearing Gevers acted in reckless disregard, and deliberate indifference to Ms. Butler's constitutional rights, and to her children's best interest when he refused to raise Ms. Butler's defenses and inability to pay at the contempt hearing. He let the IV-D Prosecutor say Ms. Butler was living in a place where she doesn't have to pay rent.

152.   Therefore, no record was made. Gevers violated Ms. Butler's right to counsel, her right to access the court and to an opportunity to be heard, and her right to seek redress from the

government. He fraudulently concealed Ms. Butler's inability to pay and thereby waived issues she would have had on appeal. Gevers, again, joined all the other defendants and violated Ms. Butler's clearly established rights, otherwise she would have been acquitted and discharged from contempt.

153.    Gevers did this to generate Title IV-D Federal Participation Payments for Allen County that otherwise would not have been paid to Allen County. He also violated Ms. Butler's clearly established rights to generate his own income. On 7/30/2013, Robert Gevers Petitioned the Court for Approval of Expenditure to pay for his "representation". Allen Superior Court Judge Heath, who oversees the Allen County Child Support Program, approved it.

154.    On 8/27/2013, Ms. Butler was forced to appear for another contempt hearing. Since Gevers refused to raise her defenses, she did it herself. She told the court that Robert Gevers refused to raise her defenses at the previous hearings. She provided the letter from the homeless shelter and other evidence of her inability to pay and told the court that she shouldn't even be there but she was denied access to the court on appeal. By the end of the hearing Gevers was slapping his hand on the desk requesting the contempt citation be dismissed. However, as Ms. Butler stated in court, if he really wanted it dismissed he would have filed the Motion To Acquit and Discharge or at least presented the evidence of her inability to pay.  No findings were made regarding the evidence Ms. Butler submitted for her ability to pay.

155.    Title IV-D Beneficiary Defendants are serious about generating those federal financial participations payments. They held a contempt hearing on 2/4/2014, five days before KS reached majority.

156. On 8/11/2015, Title IV-D Beneficiary Defendants held a child support arrears determination hearing and determined the child support arrearages to be $51,794.00. They reduced the child support order to a judgment and applied a compounding 8 percent per annum interest rate that is accumulating $4,000.00 a year. That's $1500.00 more than the court ordered child support payment order that was based on the state guidelines. This is NOT a lawful debt to begin with, however, if it were, Ms. Butler doesn't have the ability to pay the minimum $2500.00 yearly payment, so how can she pay the $4000.00 a year in interest. She can't and will be forced to participate in the IV-D program until she dies, and she doesn't owe child support but will always be a source of income for the Title IV-D Beneficiaries and DS.

**The Plaintiffs were targeted for this unconstitutional policy in 1982.**

157. The Plaintiffs Lawrence Butler (Mr. Butler) and his daughter, Ms. Butler Butler were targeted for the unconstitutional policy on October 18, 1982 when the Allen County court dissolved Mr. Butler's marriage, issued a custody order and an award for $135 per week in child support under 42 U.S.C. § 602(a)(26)(A) & § 656 (1982). Id. In Re: the Marriage of Cynthia S Butler and Larry E Burler (sic) Allen Superior Court, IN 02D07-8307-DR-002031 (1982)

158. Title IV-D at that time, required that custodial parents, in order to qualify for AFDC benefits, must first assign their support rights to the state. " Under this provision, the custodial parent on AFDC received assistance from the state only when the absent parent paid his or her financial obligation directly to the state. Child support orders/awards of that era were "often dangerously inadequate, and their adjudication is rife with delays and procedural complications." Id. Calistri, Brian L. (1990) "Child Support and Welfare Reform:

The Child Support Enforcement Provisions of the Family Support Act of 1988; Symposium on Poverty," Journal of Legislation: Vol. 16: Iss. 2, Article 6. Available at: http://scholarship.law.nd.edu/jleg/vol16/iss2/6.

159.    His support order was one of the high orders that Longest spoke of in ¶ 10. This order was the best way for the counties to generate income because the support rights were signed over to the state. Among many other unconstitutional issues regarding Mr. Butler's support order: on March 2, 1992 the Allen Superior Court broke the family apart. And denied the Plaintiffs equal access when the court transferred custody of the Plaintiff, Ms. Butler Butler (Ms. Butler) to a third party, Defendant Donald Simpson's parents, without any due process or equal protection of the law.  The deceased Honorable Judge Briggs, who is responsible for Allen County's policy today lied or used a false entry on the Order by finding Mr. Butler was served notice of hearing when there was no attempt, at all, to serve notice. Donald Simpsons parents filed a forged Consent To Change Custody that was purported to be signed by Lawrence Butler. The Consent was not notarized like the other documents requiring notary service and it waived an evidentiary hearing. See the Complaint p. ___ and the coinciding Exhibits ___.

160.    The court transferred custody of Ms. Butler, but left Mr. Butler's support order unchanged and Allen County collected child support for Ms. Butler, even though her mother was no longer receiving welfare benefits for Ms. Butler.

161.    Then, for years they enforced that order when there was no lawful authority to enforce that order because it expired. In 2015, Mr. Butler called the Allen County IV-D Prosecutor and explained the Statute ran for his oldest boy in 2005 and it expired for his youngest child in 2011...at the latest. The IV-D prosecutor quit garnishing Mr. Butler's meager Social

88

Security Retirement income, released the liens off his property and quit reporting to the credit agencies and stopped threatening to suspend his driver's license. I think he will always be labeled a dead beat instead of a peon, though.

162.     Mr. Butler is in a pot of thousands, perhaps hundreds of thousands of poor parents whose child support enforcement orders generate inferably, approximately four million dollars a year for the county general fund.

163.     Mr. Butler caught the Allen County IV-D prosecutors by surprise.   If Mr. Butler called them today he would not have obtained any relief. Now, IV-D prosecutors train to fraudulently conceal the statute of limitations law from parents and force them to go to court. It is concerning that "lost files" and dogs destroying these parent's files is associated with the child support prosecutors' training, especially after what Ms. Butler went through.

164.     "In a trafficking case – the victims themselves are the objects that are stolen." Id.   DOJ Model State Anti-Trafficking Criminal Statute p. 69-70 available at http://www.csg.org/knowledgecenter/docs/pubsafety/ModelStateAnti-TraffickingCriminalStatute.pdf  The notion that concubinage can be "service" for the purposes of involuntary servitude statutes is reflected in case law. Id. Page 67-68.

**165.**     In 1988, the United States Supreme Court held, "involuntary servitude" is "a condition induced by the use or threat of physical restraint or physical injury, or by the use or threat of coercion through law or the legal process. This definition encompasses those cases in which the defendant holds the victim in servitude by placing the victim in fear of such physical restraint or injury or legal coercion." *United States v. Kozminski,* 487 U.S. 931, 953 (1988)

166.     In 1989, Defendant Donald Simpson (DS) and his parents solicited Ms. Butler for sex. She was 12 years old. In 1991, they obtained sole custody of Ms. Butler. In 1992, DS 's

parents hired an Allen County Attorney to have Ms. Butler's mother Petition the Allen County Court to modify the court's existing custody Order by transferring sole custody of Ms. Butler to DS's parents, Sharon and Don Simpson.  See the Complaint p. __ and Exhibit 1 i.. -vi (Custody records)

167.    The Allen Superior Court, in accord to the unconstitutional policy, that is still practiced today, denied both Ms. Butler and her father Lawrence Butler equal access to the court and court services when the court transferred sole custody of Ms. Butler to DS 's parents without any due process or equal protection of the law; and that order was void.

168.    Beginning in 1993, police reports and juvenile delinquency records prove Ms. Butler tried to run away from DS and that she was a Child In Need Of Services. However, she was arrested, denied court services, including effective counsel and guardian ad litem . She was incarcerated for weeks and then months in the Allen County Wood Youth Center; and then Allen County forced Ms. Butler back into DS's parent's custody on probation when they had no lawful authority to have custody of her.

169.    Guardian Ad litem is a requirement for equal access to the court, court services and due process and equal protection of the law. In July 2005 the Allen County Council was made aware of the equal access and due process right to appointment of guardian ad litem in CHINS cases. "Judge Charles Pratt, Superior Court Family Division requested an additional allocation in Guardian ad Litem. The primary use of this is to pay for the appointment of attorneys, when ordered by the Court, to represent the interests of children who are in need of services (CHINS). Senate Bill 529, which was passed and signed by the Governor establishes the Department of Child Services (formerly the OFC), and requires the appointment of a GAL or CASA must be appointed in every CHINS case. Where this was done about 90% of

the time, it will now be done in every case starting July 1, 2005. The request is for $20,400

over the 2005 appropriation." Id. ALLEN COUNTY COUNCIL MEETING MINUTES

JUNE 1 & 2, 2005 available at:

http://webcache.googleusercontent.com/search?q=cache:KbRTrrFvigIJ:www.allencounty.us/inde
x.php%3Foption%3Dcom_content%26view%3Darticle%26id%3D42%26Itemid%3D536%2
6jsmallfib%3D1%26dir%3DJSROOT/council_minutes/2005%26download_file%3DJSROO
T/council_minutes/2005/06-1%2526amp%253B2-05.pdf+&cd=1&hl=en&ct=clnk&gl=us

170.    Guardian ad litem is also a right in numerous other types of cases and is mandated under

Indiana Trial Rule 17(C) and *Brewer v. Brewer,* 403 N.E. 2d 353, 354, 355 (Ind. Ct. App.

1980.)

171.    However, the September 19, 2013 Allen County Council Meeting minutes prove

Defendant Heath ordered his magistrates to violate the law and not appoint guardian ad litem

when mandated by law. He did that so they wouldn't be drawing down other parts of their

budget to feed that line item. He associated a mandate under the law, which is required for

equal access to the court and due process and equal protection of the law, to an opportunity

cost. [5] He said,

"Finally, the Guardian Ad litem was already overspent. I got with my Magistrates and said no
more Guardian Ad litem unless I approve them personally and only under difficult circumstances
would I do so.

As I have mentioned to some of you, there is an opportunity cost there and that is we will not
always get the full story in some of these cases involving children.

_____

[5] Opportunity cost is the cost of spending efforts or funds on one project or investment instead of
another. It involves an analysis of trading off one thing for another. It means the cost of
something as measured against a lost opportunity, or the most valuable alternative. Defendant
Heath is cutting Guardian ad litem after Ms. Butler filed her Motion For Relief From Judgment
that clearly shows the damage the Allen County Courts caused Ms. Butler when she was a child
by not tracking fundamental due process and by not appointing her a guardian ad litem. This is
same policy that caused her to be held in DS's parent's custody in a condition of involuntary
servitude. See paragraph ___ of this Complaint.

We will have to get it through evidentiary procedures at trial. That puts more of a burden on Magistrates and Judges to seek the truth as best we can.

We could have used the Guardian Ad litem's investigatory powers to talk to Grandma, talk to the neighbors and those things. We are going to miss some of that.

We have a budget of $50,000 for the next year and we will have to use it as prudently as we can. It was clear to me that if I didn't do something, we would really be drawing down other parts of our budget to feed that line item." Id. 9/13/2013 Allen County Meeting Minutes p. 73

172. Yet, Defendant Judge Heath was before the Allen County Council the same day requesting $90,000.00 to pay for two (2) additional armed security guards at the Allen County Juvenile Justice Center and inferably $14,000.00 to pay for a worker to run a pro se judicial website. The website is intended to assist people who should have had counsel and or a guardian ad litem appointed to represent them.

173. The same day, in support of his request for $90,000.00 to pay for the armed security guards and the website worker, Defendant Heath described Allen County's Title IV-D process of collecting child support as "squeezing" a parent for child support. He said,

**"Judge Heath**: We have a Judicial Assistance window as well. They are in my court for Title IV-D and we are trying to get child support out of them. The dad raises his hand after we have squeezed him for child support and wants to know why he can't get visitation. Well, that is a separate matter and if he wants to file a petition for visitation, there is the Judicial Assistance window right outside. That person gets bombarded all day long with those kinds of requests. Now there is a website where they can go and get the petition, *print it out and fill it out the best they can and file it*." Id. 9/19/13 Allen County Council Meeting Minutes p. 75.

174. It's important to note Defendant Heath said, "**we** have squeezed him for child support". He said "we" to include the other judges, the Allen County Council and Commissioners and the Allen County IV-D Prosecuting Attorney's office and the clerk. Keep in mind paragraph

___ where in 2016 the county auditor Nick Jordan said the Allen County's budget is down
$400,000.00 but the Prosecutor and Clerk are "dealing" with child support cases.

175.   To support his request for armed security guards Defendant Judge Heath described
violating unemployed parents' constitutional rights. He said:

**Judge Heath:** " […]Finally, as I mentioned, when I came onboard there was no armed
security at ACJC. Many of my employees were concerned about that. We have
tons of people that come into our center every day that are not happy to be there. I don't
say that lightly, they are very unhappy to be there. We are trying to take child support.
[…] But here is the point, I am in court and
collecting child support and a very large man comes into my courtroom. A lot of my
child support cases deal with felons. They come in and sit down. They are not paying
child support because they can't get a job and they can't get a job because they have a
felony conviction record. These are people who are not only unhappy but have dealt in
unruly matters in their past. I have one security guy, unarmed, sitting there."
Id. Pages 75, 76 of 105 September 19, 2013 Allen County Council Meeting Minutes
available at

176.   http://webcache.googleusercontent.com/search?q=cache:gX1MlZ3Jz0sJ:www.allencount
y.us/index.php%3Foption%3Dcom_content%26view%3Darticle%26id%3D42%26Itemid%3
D639%26jsmallfib%3D1%26dir%3DJSROOT/council_minutes/2013%26download_file%3
DJSROOT/council_minutes/2013/September%2B19%2B2013.pdf+&cd=1&hl=en&ct=clnk
&gl=us

177.   Among other things that constitute involuntary servitude, Ms. Butler was forced to sleep
in bed with and participate in sexual conduct with DS, her illegitimate foster brother, for the
remainder of her adolescents. Ms. Butler was repeatedly impregnated by him and suffered
medically untreated miscarriages like an animal. Two impregnation that occurred before Ms.
Butler reached majority; and immediately once Ms. Butler was forced back into DS's

custody are in the record. See the Complaint p.___. One impregnation resulted in miscarriage, the other resulted in the birthed of Kayla Simpson (KS).

### *DS and his parents abused the legal process to continue the condition of involuntary servitude into Ms. Butler adulthood.*

178.   Ms. Butler suffered years of severe sexual, physical and psychological abuse that caused her to be mentally ill and gravely disabled when she turned 18 years old. Shortly after turning 18 years old, she was forced to marry DS. She was seven months pregnant for Kayla Simpson at the time of the marriage. Ms. Butler should have been a senior in high school, but she was prevented from going to school and was left with a formal 8th grade education.

179.   DS, his parents, and Ms. Butler's mother told her the marriage was the joining of the families and she could see her older brother, grandparents, aunts, uncles and cousins, whom she had not seen since 1991 when DS's parents took Ms. Butler to their house. DS's parents arranged a wedding, drove Ms. Butler to a church, told her what to say and do and then drove her back to their home and she slept in the same bed with DS, that she shared with him since she was 14 years old.

180.   The marriage is void under Indiana law as Ms. Butler was incompetent and fraud and duress forced her into marriage. The forced marriage fraudulently concealed the crimes Ms. Butler suffered since she was 12 years old; defrauded Ms. Butler of her rights under *Mullis v. Kinder,* 568 N.E.2d 1087 (Ind.Ct.App.1991); the marriage is criminalized in  IC 35-42-3.5-1(a) (2)(B). and it was intended to continue the condition of involuntary servitude into Ms. Butler's adulthood, in violation of 18 U.S.C.§ 1584.

181.   In 1996 DS left Ms. Butler as they no longer lived with DS's parents and Ms. Butler fought him back. However, she still had no idea she was a crime victim. She was gravely disabled, an alcoholic and in danger of coming to harm; and she did come to harm. Among

other things, in 1997, Ms. Butler was incarcerated for 30 days for a DUI. DS's, mother Sharon Simpson came to visit Ms. Butler in jail. The Simpsons were the only people she had in her life since 1991. She wrote Sharon Simpson letters telling her she was going to get help when she got out of jail and she was going to get custody of KS. Ms. Butler also stated she didn't think she and DS ever loved each other, and that they stayed together out of habit. DS entered these letters in a 3/8/2012 Motion For Relief From Judgment hearing. See the Complaint p. ___ and Exhibit ___.

182.    Ms. Butler didn't get help when she got out of jail. She was homeless, had no driver's license or vehicle and she was an alcoholic. The Allen County Courts employed an unconstitutional bail practice at the time. Ms. Butler was forced to pay $1275.00 in fines and was forced to participate in a drug/alcohol program and pay high participation fees. Ms. Butler couldn't do the program or pay the fines and warrants issued for her arrest, her mother was taking her to stranger's house and hiding her in closets. Ms. Butler's father learned of her situation and hired her an attorney, paid the fines and she got the help she needed in the intensive outpatient drug and alcohol treatment.

183.    In 1998, DS obtained a default dissolution of marriage and award for $83.00 a week in child support against Ms. Butler, a known incompetent who was without a representative. Indiana Trial Rule 55(B) mandated the court to find out the truth of the default when the court carried the Order into effect. Among other issues that create a genuine issue of material fact that Ms. Butler was incompetent; the Decree states in finding ___ Ms. Butler was emotionally unstable, she had attempted to suicide two times in the past and would reasonable attempt to kill herself in the future.  See the Complaint p. ___

184.  DS refused all Title IV-D Child Support Enforcement Services so Ms. Butler would not know she had parental rights or that an order for child support was accumulating thousands of dollars in back support.

185.  In a court hearing on 10/16/2009 Tr.p. 22-27, 30-32. DS testified that KS did not know who Ms. Butler is; and that KS did not know she had a biological mother other than her stepmother and for all purposes KS viewed DS's wife as her mother. When the court asked why KS did not know who her mother is DS testified:

> "It's a bad analogy but let's say during childbirth she [Ms. Butler] would have died. I might have talked about your mother then, but that's not the case. She walked away. I'm not going to keep that memory alive in my child. Do you see what I'm saying?"
> 10/16/2009 Tr.p. 30-31

186.  On 10/16/2009 Tr.p. 34. This transcript was changed a bit but shows DS testified that he "contacted the prosecutors a couple of different times about the Title IV-D Program". He "never followed through with it." He got a letter and they said this was his "last shot for the IV-D program for 25 bucks". If he wanted to recoup support at a later date, he would have to hire a private attorney. So, he thought for 25 dollars he would give it a shot. DS said he "wasn't thinking monetarily". He "didn't care about the money". DS "was more interest in" … Ms. Butler cut him off and said revenge. He said "it's not even a revenge thing. It's just, if it was going to happen, why not let it happen for $25 instead of paying a private attorney".

187.  DS.

## II.  THE PLAINTIFF'S CIRCUMSTANCES THAT CAUSED THE 1998 DEFAULT ORDER VIOATE THE 13TH AMENDMENT OF THE U.S. CONSTITUTION; AND 18 USC § 1584; AND TRACK THE INDIANA TRAFFICKING STATUTE

188. The Plaintiff's circumstances that caused the 1998 default was a violation of 18 USC

§1584 and track *all* elements of the 2006 Indiana promotion of human trafficking statute,

Indiana Code 35-42-3.5-1 (2006), which states, "a person who knowingly or intentionally

recruits, harbors, or transports another person by force, threat of force, or fraud: (1) to engage

the other person in:

(A) forced labor; or (B) involuntary servitude; or (2) to force the other person into:

(A) marriage; commits promotion of human trafficking, a Class B felony.

189. 2006 Indiana House Bill 1414 available at,

http://www.in.gov/legislative/bills/2006/IN/IN1414.1.html required all law enforcement

officers be trained on the incidents of human trafficking. However, no one in Allen County,

or Indiana for that matter, was trained or they denied the Plaintiff protective services because

she is child support debtor.

A. Late 2007 Ms. Butler called 911 from outside of DS's mother's house with complaints

that constitute violation of the trafficking statute. Ms. Butler just ended up there after

receiving the Contempt Citation. Once inside DS's mother's house, Ms. Butler had

flashbacks, of living there when she was child and of the severe physical and sexual

abuse she suffered. She began screaming and hyperventilating and was thrown out of

DS's mother's home. She called 911 from the street. The police said they couldn't make

a report because the incident happened twenty years ago. She repeatedly called the police

back and eventually talked to Fort Wayne Detective Casey in person. He told her she

suffered no crimes, it must not have been that bad, she married the guy and she had a

duty to pay the support.

B. In May 2010, Ms. Butler was seeking mental health services for being suicidal, which was a result of the IV-D Defendants' actions. A mental health counselor went to a contempt hearing with Ms. Butler, and then to the Prosecutors office, but no one would talk to her. So, the counselor called the Sheriff to her, the counselor's, home to make a police report. The Sheriff made a police report that reflects *some* of Ms. Butler's statement.[6] The report shows Ms. Butler complaining of actions that constitute human trafficking. Ms. Butler should have been protected, but no one followed up on the report. Ms. Butler did not obtain any more mental health services until 2013 because the Sheriff said, he could and considered, involuntarily committing Ms. Butler into the hospital. See Exhibit A1.

C. All the evidence in this Complaint regarding the condition of servitude Ms. Butler was held in as a child has been submitted to Allen Superior Court, Allen County Prosecuting Attorney's Office, and the Indiana Court of Appeals via the Plaintiff's Motion For Relief From Judgment and her Appeal from the denial of her motion for relief.

190.    The amended 2012 promotion of human trafficking statute, IC 35-42-3.5-1(c), currently says:

"A person who is at least eighteen (18) years of age who knowingly or intentionally sells or transfers custody of a child less than eighteen (18) years of age for the purpose of prostitution, juvenile prostitution, or participating in sexual conduct (as defined by IC 35-42-4-4) commits sexual trafficking of a minor, a Level 2 felony."

---

[6] The Sherriff left all Ms. Butler's complaints about the court's actions out of the report. At that time, Ms. Butler had no knowledge of how DS's parents had custody of her, as the Allen Superior Court Clerk repeatedly told her there were no records of guardianship or a change of custody. The Plaintiff received the Order of custody, that included the information for her to get the records, from her public defender, Stephen Miller on 2/28/2011.

IC 35-42-3.5-1 (e)(2)(B) provides that NO sexual conduct, in the context of a family

relationship, was lawful regardless of the child's consent. Ms. Butler and DS lived in a

family relationship so NO sexual relationship was lawful. He was her foster brother.

A. **DS and his parents solicited and recruited Ms. Butler for sex and involuntary servitude and committed sex crimes against her beginning when Ms. Butler was 12 years old.**

121.    In 1989 when Ms. Butler was 12 years old she attended Defendant Donald Simpson's'

16th birthday party. Thereafter, Defendant Donald Simpson (DS) and his deceased parents,

Sharon and Donald Simpson (DS's / his parents) solicited or recruited Ms. Butler for sex and

committed sex crimes against her.

122.    Sharon Simpson would take Ms. Butler to the Simpson home, with permission from her

mother, and have Ms. Butler sleep in bed with DS and participate in sexual conduct with him.

See Indiana Code 35-42-4-6 Child solicitation

123.    DS's Parents not only solicited Ms. Butler for sex they also committed vicarious sexual

gratification against her in violation of Indiana Code 35-42-4-5 which states: "

     (a) A person eighteen (18) years of age or older who knowingly or intentionally directs, aids,
     induces, or causes a child under the age of sixteen (16) to touch or fondle himself or
     herself or another child under the age of sixteen (16) with intent to arouse or satisfy the
     sexual desires of a child or the older person commits vicarious sexual gratification, a
     Level 5 felony. However, the offense is: (1) a Level 4 felony if a child involved in the
     offense is under the age of fourteen (14)"

124.    Although DS's Parents caused Ms. Butler to participate in sexual conduct with DS, he

still sexually molested Ms. Butler. See *Mullis v. Kinder*, 568 N.E.2d 1087, (Ind. Ct. App.

1991) Fn 2. ("A person sixteen (16) years of age or older who, with a child of twelve (12) years of age or older but under sixteen (16) years of age, performs or *submits* to sexual intercourse or deviate sexual conduct commits child molesting") The 1991 sexual molestation statute, Indiana Code 35-42-4-3(c), says submits which means "accept or yield to a superior force or to the authority or will of another person".

**Slavery statutes:**

125.    18 U.S. Code § 1583 (1948) - Enticement into slavery states:

(a)Whoever— **(1)** kidnaps or carries away any other person, with the intent that such other person be sold into involuntary servitude, or held as a slave; **(2)** entices, persuades, or induces any other person to go on board any vessel or to any other place with the intent that he or she may be made or held as a slave, or sent out of the country to be so made or held; or **(3** )obstructs, or attempts to obstruct, or in any way interferes with or prevents the enforcement of this section, shall be fined under this title, imprisoned not more than 20 years, or both.

(b)Whoever violates this section shall be fined under this title, imprisoned for any term of years or for life, or both if— **(1)**the violation results in the death of the victim; or **(2)**the violation includes kidnaping, an attempt to kidnap, aggravated sexual abuse, an attempt to commit aggravated sexual abuse, or an attempt to kill.

**B. DS's parents abused the legal process to maintain custody of Ms. Butler and hold her in a condition of involuntary servitude in violation of 18 USC 1584; the 13th Amendment of the US Constitution and the Indiana Constitution Article 1 sec. 37.**

126.    In 1992 DS's parents violated 18 USC 1583, 1584 and IC 35-42-3.5(c) when they abused the legal process to maintain custody of Ms. Butler and to hold Ms. Butler in their custody for the remainder of her childhood. DS's parents hired an Allen County Attorney and had Ms. Butler's mother, Cynthia Butler, petition the Allen County Superior Court to transfer sole custody of Ms. Butler to DS's parents.  This was clear violation of IC § 35-42-3.5-1, See Exhibits:.A2- A5 See also In the Allen  Superior Court: In Re: The Marriage Of

Cynthia Butler and Larry Butler, Cause No S-83-2031 (1992)  1/1/1992 Petition To

Modify Custody and the supporting documents.

**C.  When the Allen County court transferred custody, Ms. Butler fell victim to the defendants' unconstitutional policy of denying juveniles, incompetents and the poor equal access to the court and due process and equal protection of the law in effort to generate and or save money for Allen County and its agencies.**

127.    According to Defendant Allen County's unconstitutional policy, Allen County Judge

William Briggs (Judge Briggs) denied Ms. Butler equal access to the court and transferred

sole custody of Ms. Butler to DS's Parents without out any due process or equal protection of

the law. Judge Briggs was not elected as required by the Indiana Constitution, but was

appointed by the Indiana Governor, after being nominated by nominating committee. He

violated Ms. Butler's right to access the court and due process and equal protection of the law:

A.  There was absolutely no attempt to serve notice of hearing to the parties as required by

the 14th Amendment of the US Constitution; the Ind. Constitution Art. 1 Sec. 12; and

Indiana's Rules of Civil Procedure.

"Ineffective service of process prohibits a trial court from having personal jurisdictive over a respondent. Volunteer of Am v. Premier Auto Acceptance Corp., 755 N.E. 2d 656, 659 (Ind. Ct. App. 2001). A judgment rendered without personal jurisdiction over a defendant violates due process and is void. See. Stidham v. Whelchel, 698 N.E. 2d 1152, 1154 (Ind. 1998). Because a void judgment is a complete nullity and without legal effect, it may be collaterally attacked at any time, and the "reasonable time" limitation under Indiana Trial Rule 60(B)(6) does not apply. *See id.* at 1154, 1156. The question as to whether process was sufficient to permit a trial court to exercise jurisdiction over a party involves two issues: whether there was compliance with the Indiana Trial Rules regarding service, and whether such attempts at service comported with the Due Process Clause of the Fourteenth Amendment. *Munster v. Groce*, 829 N.E.2d 52, 58 (Ind.Ct.App. 2005)" quoting *In Re R.C.,* 887 N.E.2d 950 (Ind. Ct. App. 2008). In *Hair v. Deutsche Bank,* 18 N.E.3d 1019 (Ind. Ct. App. 2014). Deutsche Bank's default judgment was void because it violated due process when it served process according to publication when the respondent's address was easily attainable. The court found Deutsche Bank's arguments disregard the importance of personal jurisdiction to a valid judgment, as well as approximately 150 years of Indiana precedent. We emphasize that a judgment entered without personal jurisdiction is void, not merely voidable. Stidham, 698 N.E.2d at 1154. Id at

B.  On the 1992 Order granting DS's parent's sole custody of Ms. Butler, Judge Briggs lied when he stated, "petitioner and respondent [Larry Butler] have each been duly served with notice of hearing".

C.  As demonstrated in this complaint, Allen County Judges out right lying or using <u>false entries</u> on their orders, to make the record look like the orders complied with law, is a practice of the defendant's unconstitutional policy. See page ___ , of this Complaint

D.   Allen County Judge Briggs further denied Ms. Butler equal access to the court and violated Ms. Butler's due process rights when he failed to reasonably hear evidence, which is also an unconstitutional policy that shows deliberate indifference and reckless disregard to the litigant's constitutional rights and to the law:

1.   There was no evidence that the petitioner attempted to serve notice.

2.   DS's parents committed fraud and forgery when they filed a forged Consent To Change Custody that was purported to be signed by Ms. Butler's father, Lawrence Butler, who lived in Florida and did not know custody proceedings were occurring in Indiana. See Exhibit A4 (Forged Consent To Change Custody). See also, Exhibit A18 Lawrence Butler's statement saying he did not sign the Forged Consent To Change Custody and he was not in or around Indiana when the Consent was signed and that he was not served notice of the hearing.

3.  The forged Consent was not notarized as required by the document.  However, all other documents requiring notary service or a witness were notarized.

E.  Judge Briggs accepted the forged Consent To Change Custody which waived an evidentiary hearing. Thereby, Judge Briggs denied Ms. Butler equal access to the court

and due process and equal protection of the law as Indiana law places a duty on the

judge to determine and protect the best interest of a child.

> "Although the wishes of the parents are entitled to great weight, ***it is the duty of the trial court to determine what is in the best interests of the child***. Stevenson v. Stevenson (1977), 173 Ind. App. 495, 503, 364 N.E.2d 161, 166. Thus, no agreement between parties that affects the custody of a child is automatically binding upon the trial court." When either custody or visitation rights of the parents are determined, the best interests of the child are the primary consideration. *Matter of Paternity of Joe* (1985), Ind. App., 486 N.E.2d 1052, 1055. To that end, both custody and visitation conflicts are left to the trial court to resolve. *Id.* For example, in *Beeson v. Beeson* (1989), Ind. App., 538 N.E.2d 293, the trial court altered the parents' visitation agreement (which was characterized as a "stipulation"). On review, this court — without discussing either the specific terms of the parents' visitation agreement, the reason the trial court altered the provision in its final decree, or in what manner the decree was changed — found that such a stipulation cannot place restrictions upon **a court's *duty to protect* the** best interests of the child. *Id.* at 298. *Keen v. Keen,* 629 N.E.2d 938 (1994).

128.   In 2017 a news article informed the public that Judge Briggs influenced Allen County's

unconstitutional policy that knowingly denies juveniles, incompetents and the poor equal

access to the court and due process and equal protection of the law. This is the same

unconstitutional policy that is holding Ms. Butler in a condition of involuntary servitude,

forced labor and peonage today.

A Journal Gazette April 4, 2017 article available at

http://www.journalgazette.net/20170404/ex-judge-devoted-to-family-court-dies-80

shows, in 1998 when Judge Briggs decided not to seek another term, Briggs encouraged

Allen County Superior Judge Charles Pratt to run for his seat. Pratt currently serves in the

family division and is one of the Defendants in this case. Id. In April 2017 Pratt said, "I

can't emphasize enough that I give great credit to (Briggs) for the career I've had." Pratt

said. "That would not have happened but for Judge Briggs' leadership, his confidence in

me and his continual support." "Beyond being known as Allen County's adoption

expert," Pratt said, "Briggs approached working with families and children in a way that was innovative for its time. Many of the practices in Allen County's juvenile court system have roots in Briggs' leadership", Pratt said."

**F.   Donald Simpson and his parents abused the legal process and used the void order of custody to hold Ms. Butler in their custody, by force.**

129.   DS and his parents had custody of the Plaintiff since May 8, 1991. She was 14 years old. The Allen Superior Court, unlawfully ordered her into the sole custody DS's parents in March 1992.

130.   Ms. Butler suffered severe sexual, physical and psychological abuse in DS's parent's custody. She was forced to sleep in bed with DS and perform a sexual ritual every night. She was regularly awakened by copulation and DS ejaculating on her. DS and his parents forced Ms. Butler to participate in sexual conduct with DS whenever he chose. Ms. Butler has flashback of DS engaging Ms. Butler in intercourse on the sofa while DS's father sat in the recliner watching.  She was made to watch porn videos and do what was on the videos. She does not know if she was recorded participating in sexual conduct.[7] DS often drug her around by her hair, spit on her, hit, kicked and pushed her. He called her slut, whore, piece shit, stupid and instilled into her that nobody wanted her or loved her and his family was helping her. DS and his parents also drove her to Tool Craft Inc. five days a week and forced her to work for their janitorial company, sweeping and shoveling metal shavings, and cleaning the office, and restroom, and they made her clean their home without pay. They took her clothing from her and forced her to wear DS's clothes and

---

[7] See the 3/8/2012 Tr.p.  where DS brought pictures of Ms. Butler to court from her uncle's 1989 wedding. Ms. Butler tried to tell the court these were pictures before she lived with him. DS said they have a thousand pictures of Ms. Butler. She has no recollection of having her picture taken but knows she was made to watch porn videos and do what was on the videos, before they got custody of her.

cut/died her hair. She was isolated from her family who could have helped her. And not permitted to go anywhere absent one of DS's family, not even to school. DS is a convicted burglar who often had guns and drugs. See Exhibit A DS and his parents gave Ms. Butler drugs and alcohol. She was an alcoholic by the time she reached majority.

131.  Beginning in March 1993 – April 1994, a timeline of police reports and juvenile delinquency records prove Ms. Butler tried to runaway but was arrested and the Allen Superior Court used the void custody order to repeatedly force Ms. Butler back into DS's parent's custody, when they had no lawful authority to have custody of her. See Exhibit A6-A13.

A. The first Indiana Missing Children's Clearinghouse report was issued in March 1993. It shows DS's mother, Sharon Simpson lied to the officer investigating her run-away by saying she was Ms. Butler's mother. See Exhibit A6.

B. The records prove Ms. Butler was immediately impregnated twice, by DS, upon her return to his parent's custody. One documented 12/23/1993 pregnancy resulted in medically untreated miscarriage and the other the resulted in the birth of KS, the child who the support order is for. See Exhibit A11. (10/12/1993 record of Ms. Butler being released to DS's parent's custody on probation.) Ms. Butler immediately impregnated by DS when forced back into DS's parent's custody. She was arrested November 1998 for a crime DS was convicted of. See Exhibit A12. Ms. Butler was detained in the Allen County Wood Youth Center until April 1994 when the Court forced Ms. Butler back into DS's parents' custody.  Exhibit A13 shows Ms. Butler Butler is pregnant and detained for 120 days. She did not birth that child but had a medically untreated miscarriage sometime

before being released back to DS's parent's custody in April 1994, when she immediately

impregnated for KS.

C. Ms. Butler spent most of the 1992/1993 school year in the Allen County Wood Youth

Center. She should have been a junior in high school. But she was denied her right to an

education. She was locked in the room at the Allen County Wood Youth Center and could

not go to school because DS's parents did not register her in school and the court didn't

even check to see if DS's parents should be Ms. Butler's guardian. This was a violation of

the compulsory school laws at the time, which required a child attend school until 18

years old. If the child was not in school, than there had to be an exit interview done, with

an alternative education provided to the child.

D.  Sharon Simpson DS's mother frequented the detention center brainwashing Ms.

Butler. The staff made Ms. Butler "visit" her. She brought Ms. Butler LCD and cigarettes.

She used the court order pregnancy to cause Ms. Butler to believe that everyone knew

about the sexual relationship she was forced into with DS and it was expected. DS's

mother had no lawful authority to see Ms. Butler as the custody order is void and was

never enforceable.

132.    DS and his parents prevented Ms. Butler from going to school, she has a formal eighth

(8th) grade education as result. DS's Parents got custody of Ms. Butler in the 8h grade, but

they never updated Ms. Butler's contact information with the school. Ms. Butler went to

Snider High School for two years but failed her freshman classes both years. She was

absent 19 days the first year. She was absent 43 days and tardy19 times the next year and

then she never returned to school. The school never had Ms. Butler's address or phone

number or the name of her "legal guardians". There was a fake address given to the school sometime in the two years Ms. Butler attended. See Exhibit __ (High School Transcript and 2009 letter from secretary explaining the address.)

133. When Ms. Butler was forced back into DS's parents' custody she was not permitted to go to school or anywhere absent one of them. She should have been going into her senior year of high school when she turned 18 years old. Instead, she was mentally ill and gravely disabled, and she was impregnated for KS. She had suffered a medically untreated miscarriage sometime in the previous four months she was detained in the juvenile center.

134. Once back in DS's parent's custody, Ms. Butler had no established relationships with anyone but DS and his family. She was not permitted to go anywhere absent DS or one of his family members. Since Ms. Butler was 12 years old she had been trained to believe that DS and his family were helping her but she had a bad attitude and made things hard on herself. By this time, she was gravely disabled, mentally ill and suicidal. Ms. Butler did not have clothing of her own, she had to wears DS's clothes. He was on house arrest for the same crime Ms. Butler was detained in the detention center for. She was immediately forced to sleep in bed with DS and perform the sexual ritual. She was immediately impregnated for KS.

135. For purposes of criminal prosecution under 241 or 1584, the term "involuntary servitude" necessarily means a condition of servitude in which the victim is forced to work for the defendant by the use or threat of physical restraint or physical injury or by the use or threat of coercion through law or the legal process. This definition encompasses cases in which the defendant holds the victim in servitude by placing him or her in fear of such physical restraint or injury or legal coercion. The victim's vulnerabilities are relevant in

determining whether the physical or legal coercion or threats thereof could plausibly have compelled the victim to serve. Moreover, a trial court could properly find that evidence of other means of coercion or of poor working conditions is relevant to corroborate disputed evidence regarding the use or threats of physical or legal coercion, the defendant's intent in using such means, or the causal effect of such conduct. **Kozminski,** at 952-953.

**G.    In 1994 DS, his parents and Ms. Butler's mother abused the legal process of marriage to continue the condition of involuntary servitude into Ms. Butler's adulthood.**

136.    On 11/18/1994 DS, his parents, and Ms. Butler's mother forced her to marry DS. KS was born 2/9/1995.  See Exhibit A14 (photos). They told her the marriage was the joining of the families and she could see her family: grandparents, aunts, uncles, and cousins at the wedding, whom she had not seen since 1991 when the DS's parents took her to their home.  DS's mother arranged a wedding, Ms. Butler did not have shoes and they rented her a dress. DS's parents drove Ms. Butler to the church, told her what to say and do, and then drove Ms. Butler back to their home where she slept in bed with DS, just as she had done since she was 14-years -old.

137.    The marriage is void under Indiana Code§ 31-11-8-4 and voidable under Indiana Code § 31-11-9-3, as Ms. Butler was incompetent and fraud and duress forced her into marriage. The marriage is criminalized by the trafficking statute, IC 35-42-2-3.5-1(2)(A).

138.    The forced marriage fraudulently concealed the years of crime Ms. Butler suffered, defrauded Ms. Butler of her rights under Indiana Code § 31-35-1-6(c) (2)(A)1 and Indiana Code§31-19-9-8-(a) 4 (A);(B);(C ); and Mullis v. Kinder, 568 N.E.2d 1087 (Ind.Ct.App.1991) ; Pena v. Mattox, 84 F. 3d 894 - Court of Appeals, 7th Circuit 1996; and Pena v. Mattox, 880 F. Supp. 567 - Dist. Court, ND Illinois 1995 ; and continued the

condition of servitude into Ms. Butler's adulthood. Given the Ms. Butler's psychological injuries, including repressed memories, for many years she had no idea she was a crime victim or that she lived in DS's home when she was a child. She knew she married him, she has his last name and that she terminated her parental rights. She repressed the majority of her childhood until having the flashbacks at DS's mother's house when she called 911 as shown in paragraph

139. How could the Ms. Butler know she was a victim of sex crimes when her mother, and "legal guardians" were committing vicarious sexual gratification against her since she was 12- years -old; and the defendants, who administer the law in Allen County, transferred custody of her to DS's parent's; and repeatedly forced her back into their custody; and now they are all still saying she suffered no crimes and she has to pay DS over $50,000.00? See Doe v. SHULTS-LEWIS CHILD & FAMILY SVCS., INC., 718 NE 2d 738 - Ind: Supreme Court 1999 and Fager v. Hundt, 610 NE 2d 246 - Ind: Supreme Court 1993 (Established the doctrine of fraudulent concealment in regard to childhood sex crimes.)

**H. DS admitted to holding Ms. Butler in a condition of servitude when she was a child and to violating Indiana's trafficking statute:**

140. On 3/18/2009, in the Allen Superior Court, DS admitted facts that show, DS, his parents and the Ms. Butler's own mother violated Indiana's trafficking statute and 18 USC 1584. DS admitted that his parents took Ms. Butler into their home, got custody of her and that his parents let him engage her in sexual conduct since she was 14 years old, but they were in a relationship and she consented just the same. Ms. Butler states that the legal age to consent to sex in Indiana is 16 years old. DS responded that is was funny that I knew the law now.  See the 3/18/2009 TR.p.12 and page   of this Complaint.

141.   However, DS, his parents, and the Plaintiff's own mother were all committing sex crimes against the Plaintiff. [8] Those sex crimes caused the birth of KS, and the evidence shows the Plaintiff did not consent to the sexual conduct, she tried to run away, but she was held in DS's parent's custody by a void, fraudulent, order of custody that was issued by the Allen County Superior Court without any due process.

142.   Mullis v. Kinder, 568 N.E.2d 1087 (Ind.Ct.App.1991) applies to this case. Although Kinder had not been convicted of child molesting he admitted to it through deposition testimony, and, therefore, his consent was not required for an adoption to occur. Id. at 1090

143.   Under Mullis, Indiana Code 31-35-1-6(c) (2)(A)1 and Indiana Code 31-19-9-8-(a) 4 (A);(B);(C ) (formerly, Ind. Code § 31-3-1-6(g)(2)(B)) Ms. Butler can terminate her parental rights without DS's consent because he admitted to committing sex crimes against the her, which included years of child molestation and sexual conduct with a minor. He also admitted that his parents, Ms. Butler's "legal guardians", and her mother committed sex crimes, including child solicitation and vicarious sexual gratification, against Ms. Butler, all of which caused the birth of KS. He also admitted to violating the trafficking statute which also criminalizes his sexual relationship with Ms. Butler and the marriage.

144.   Mullis and Indiana Code § 35-42-3.5-4 grants Ms. Butler immunity from the child support order. In that, Indiana's trafficking statute provides that an *alleged* trafficking victim can not be jailed, fined, or otherwise penalized for being a victim of the offense and the victim

---

[8] See Indiana 's sex crime statute, Indiana Code § 34-42-4, for vicarious sexual gratification, child solicitation, sexual misconduct with a minor and child molesting in 1989- 1993. Mullis v. Kinder includes the 1991 child molestation statute.

shall be provided protection if endanger of recapture or coming to harm from the perpetrators. DS admitted to violating the statute on 3/18/09, that and the other evidence proves by a preponderance of evidence that the Plaintiff is, at least, an *alleged* trafficking victim. Therefore, she can not be jailed, fined, or otherwise penalized for birthing KS. DS and the Plaintiff would not have had a continued relationship or child together if she were not held in his parent's custody by fraud and force and forced to sleep in bed with DS and participate in sexual conduct.

145.    However, instead of being provided protection, the defendants used the unconstitutional policy to unlawfully indebt the Plaintiff to DS for over $50,000.00 in back child support, forced to pay him thousands of dollars she does not owe; she was forced into a sexual relationship with a prosecuting attorney; and she almost went to prison for being a crime victim. Her three young children would have been forced into the foster care system.

## III.  IN 1998 DS AND ALLEN COUNTY IV-D BENEFICIARY DEFENDANTS ABUSED THE LEGAL PROCESS AND ATTEMPTED TO HOLD MS. BUTLER IN A CONDITION OF SERVITUDE SHE IS HELD IN TODAY.

**A. In 1998 DS and the Allen County Title IV-D Beneficiary Defendants abused the legal process and attempted to hold Ms. Butler in a condition of involuntary servitude, forced labor and peonage when they denied Ms. Butler equal access to the court and issued the default without any due process or equal protection of the law.**

191.

192.    Both Defendant Longest and Schweller stated they issued high child support orders parents could not pay and now they are changing that policy and issuing orders parents can pay 100 percent of, because if the parent can pay 100 percent of the child support payment order it generates more income for the state.

193.    Defendant DPA Schweller testified the change was "in part due to new federal incentive payment policies that base payments on five performance standards." However, the federal

performance based incentive payment regulations were enacted in 1998 and the defendants just didn't follow the law. See the Child Support Performance and Incentive Act of 1998 available at, https://www.acf.hhs.gov/css/resource/child-support-performance-and-incentive-act-of-1998.

194.    On 2/2/2001 the federal Office of Child Support Enforcement (OSCE) sent all state agencies administering child support enforcement plans under Title IV-D of the Social Security Act and other interested individuals a memorandum of how they were to reinvest Child Support Incentive Payments. This document included the law and how the money was to be spent and is available at https://www.acf.hhs.gov/css/resource/reinvestment-of-child-support-incentive-payments. It said:

"a State must reinvest incentives earned under the new incentive system, in the State's Child Support Enforcement (CSE) program or may use the funds for other activities, approved by the Secretary of the Department of Health and Human Services (HHS), that will improve the State's CSE program. In addition, State CSE expenditures may not be reduced as a result of the receipt and reinvestment of incentive payments."

(a) A State must expend the full amount of incentive payments received under this part to supplement, and not supplant, other funds used by the State to carry out IV-D program activities or funds for other activities approved by the Secretary which may contribute to improving the effectiveness or efficiency of the State's IV-D program, including cost-effective contracts with local agencies, whether or not the expenditures for the activity are eligible for reimbursement under this part.

(b) In those States in which incentive payments are passed through to political subdivisions or localities, such payments must be used in accordance with this section.

(c) State IV-D expenditures may not be reduced as a result of the receipt and reinvestment of incentive payments.

195.    The Association of Indiana Counties, 2007 edition, Guide to Indiana County Government page 34 available at,

http://www.allencountyrecorder.us/Files/GuidetoIndianaCountyGovernment.pdf has the Child Support Enforcement Program noted as an important source of federal money and shows that the incentive money is earned by the number of cases processed and simply goes

into the recipients' operating budget, which was wrong and not in compliance with federal law. It says:

"This "incentive" money is distributed to counties based on the number of child support cases processed. One third of the money is distributed to the operating budget of the prosecutor. The remaining two thirds is distributed evenly to the state, the operating budget of the county clerk's office and the county general fund."

[196.] In 2009, the Indiana Child Support Bureau Division of Child Services, Defendant Longest, received the following negative audit finding that shows the child support bureau and counties did not properly monitor the counties use of the federal incentive funds, about 12 million dollars a year, which was generated, in part, from the defendants' unconstitutional policy.

FINDING 2009-DCS(502)-1, SUBRECIPIENT MONITORING

Federal Agency: Department of Health and Human Services - ACF Federal Program: Child Support Enforcement Program (IV-D) CFDA Number: 93.563 Protecting our children, families and future Auditee Contact Person: Cynthia Longest Title of Contact Person: Deputy Director, Child Support Bureau Phone Number: 317-233-4482 Internal Control: Significant Deficiency -- Subrecipient Monitoring Finding:

"DCS Child Support Program, we noted that DCS does not adequately monitor the counties' use of Title IV-D Child Support incentive funds. [...]

31 USC 7502(f)(2)(B) states, "Each pass-through entity shall monitor the subrecipient's use of federal awards through site visits, limited scope audits, or other means; . . ."

Under its current system, DCS does not have adequate assurance as to the actual incentive funds expended for each county and consequently cannot attest to the completeness, existence, and propriety of the incentive funds transactions conducted by the counties."

Id. Page 86-87 of the SUPPLEMENTAL AUDIT OF FEDERAL AWARDS STATE OF INDIANA July 1, 2013 to June 30, 2014 on page 330-331 of the Indiana Comprehensive Annual Financial Report For Fiscal Year Ended June 30, 2014, available at http://www.in.gov/sboa/WebReports/B44954.pdf The negative audit finding was still open as of 6/30/14. No research has occurred to see if the audit is open or closed today.

197.    In response to the negative audit finding, at the May 27, 2010 Child Support Enforcement

Presentation County Auditors Spring State Called Conference, Cynthia Longest's handout

page 3,  available at,

http://www.ai.org/sboa/files/Child_Support_Enforcement_Presentation_Auditor_May_25_v2.pdf

Cynthia Longest had to tell the county auditors that all child support cases are not Title IV-D and reimbursement of 66 percent is only available for Title IV-D cases. That just begs the question, how many millions of dollars in non-IV-D child support expenditures were submitted for federal reimbursement and incentive payments? Also, Longest said, "CSB [child support bureau] is currently beginning a project to ensure that we can track incentive fund balances for each county at the Clerk, Prosecutor and county general fund level.

1. CSB received an audit finding this past December requiring tracking of this information.

2. Activities and findings to date:

a) We have hosted two calls with the leadership of the Clerk, Prosecutor and Auditor associations and AIC to discuss the best way to start tracking balances.

b) It appears that the CAR-1 annual reports will give Clerk and Prosecutor incentive balances, but County General Fund balances will be more difficult to determine.

c) DCS is hiring two field staff to work on this project. d) Will continue to work with SBOA and all stakeholders to collaboratively address the finding

198.    Apparently, due to the negative audit finding, Indiana county auditors and the Child Support Bureau had to go back ten years and fix the books to comply with federal law. A 4/13/2011 Madison Courier article regarding the negative audit finding and Jefferson County, Indiana available at, http://madisoncourier.com/Content/News/News/Article/County-must-repay-73-000-accounting-error/178/961/62273 explained:

"Late last year, the state Board of Accounts audited the Indiana Department of Child Services' Child Support Bureau and found that the bureau was not properly monitoring incentive funds given to the counties from the federal government. […] Two types of funding - reimbursement and incentive - were created by the federal government [...]

The two types of money were supposed to be put into separate accounts, but that did not happen. When the state Board of Accounts did the audit late last year, the auditor's office had to go back through all the receipts for 10 years to find out where the money went and how it was spent."

199.    A March 8, 2010 post on Northwest Indiana Discussion Northwest Indiana's Leading Discussion Forum states and discusses how: "Auditor's records show Philpot, now the county coroner, awarded $111,236 in annual, one-time supplemental payments to himself and his employees since 2004. In the waning days of his tenure as county clerk, Philpot awarded more than $39,000 in bonuses to 13 individuals whose roles in collecting child support are unclear. See

http://www.northwestindiana.com/discussionforum/viewtopic.php?f=15&t=8412 and scroll down.

200.    The May 27, 2011 Title IV-D Child Support Enforcement Presentation County Auditors Spring State Called Conference  handout available at

http://www.state.in.us/sboa/files/SBOA_May_2011_Conference_5-26-2011_-_Child_Support_Title_IV-D_Handout.pdf shows that the counties set up the six accounts for Incentive-related Funds and the Indiana Code  31-25-4-23 was amended. It now contains the language authorizing a separate "Title IV-D Incentive Fund," which takes the place of the former "county general" language and a new section was added. Indiana Code  31-25-4-23.5 which states:

> (a) Each county that receives payments under section 23(a)(1) of this chapter shall establish a Title IV-D incentive fund. (b) The incentive payments under section 23(a)(1) of this chapter shall be paid into the fund. (c) Money in the fund may be used only for child support enforcement purposes. (d) Money in the fund does not revert to any other fund. "

201.    Defendant Longest's May 16, 2012 Title IV-D Child Support Enforcement Presentation

County Auditors Spring State Called Conference handout available at,

http://www.in.gov/sboa/files/Longest_SBOA_May_2012_Conference_5_16_2012_Child_Su

pport_Title_IV_D_Handout.pdf shows issues the Child Support Bureau is having with the

counties use and tracking of incentive funds. These issues should have been worked out and

addressed between 1998 and 2001, not a decade after the law was enacted and after claiming

over 12 million dollars ($12,000,000.00)  a year from the federal government in incentive

payments. These issues include:

A.  Distributions Receipted into Incorrect Funds

Counties have been found to deposit reimbursement for monthly expenditures and
other funds, such as PCA reimbursements, into one or more incentive accounts. Non-
incentive reimbursements do not have the restrictions of incentive funds and should not
be inter-mingled with the incentive funds.

Incentive Funds have been deposited into the County General Account, leaving them
unavailable for the Title IV-D program and causing comingling and other problems (see
below)

B.  Incentive Funds Losing Their Identity

Title IV-D Incentive Funds were moved into the County General Fund to supplement a
Prosecutor and Title IV-D Court's expenditures. However, once deposited into the
County General Fund, the incentive funds have lost their 'incentive fund' identity.
Federal reimbursement was claimed on the overall expenditure, resulting in over
claiming from the Federal Government. (Reimbursement is not available for expenses
paid with incentive funds.) Since the expenses reported were claimed for 66%
reimbursement, it was required to make an adjustment to either the reported
reimbursable expenditures _or_ to replace the balance (34%) of incentive funds back into
the Title IV-D Incentive fund.

C.  Transferring of Incentive Funds

A County transfers Title IV-D Incentive Funds into the County General Fund to supplement;
however, the actual expenditures end up totaling less than the original transfer and
County fails to transfer the remaining amount back into the Title IV-D Incentive fund.

D.  Incentive Funds Being Used Inappropriately

We have seen a few instances of incentive funds being used for either expenditures that
are not Title IV-D related, or to supplant existing budgets. Both of these practices are
prohibited by federal and state law.

202.    Allen County Commissioner Therese Brown who is a former Allen County Clerk, and the President of the Association of Indiana Counties publications Indiana News 92 published on May/June 2012 page 17 of 24 available at,

http://www.indianacounties.org/egov/documents/1341259855_910278.pdf  shows:

"Title IV-D Compliance and Revenue Opportunities There have been significant changes in Title IV-D claiming over the past two years, and expenditures from incentive funds are facing a lot of scrutiny today. This workshop will review Title IV-D changes to monthly claims and the cost allocation plan, as well as property accounting procedures for monthly IV-D reimbursements. Workshop panelists will also discuss topics such as the proper use of incentive funds, and additional revenue opportunities that could help counties recover thousands of dollars they are entitled to receive."

203.    In 2009, Allen County generated almost $700,000.00 in incentive payments to be split between the Prosecutor who gets 33.4 % of incentive payments or $49,691.00 each quarter, the county general fund, and clerk each get 22.2 % or $33,028.00 each quarter. See Defendant Longest's 2011 Prospective Incentive Document available at file:///E:/1983%20-%20Copy/Longest_Prospective_IV_D_Incentives_FFY_2011_distributed_in_Calendar_Year_2012.pdf

Paragraph 322 shows us that the incentive were just deposited into the operating budgets of the clerk, prosecutor and county.

204.    Allen County Auditor Budget Books available at, http://www.allencounty.us/finance-budget-division/annual-budget show that from 2009 through 2013 Allen County did not have separate incentive fund accounts for the clerk or prosecutor. The incentive fund account

117

numbers are available in the May 2013 Auditor Conference handout available at,

http://www.ai.org/sboa/files/Longest_Child_Support_Auditor_Conference_Handout_May_2
013_final.pdf.

205.    The incentive fund accounts for the clerk and prosecutor appear, with coinciding account
        numbers with the child support bureau, in the 2014 Allen County Auditor Budget Book.
        However, Allen County's IV-D Incentive Fund does not appear in the budget books.

206.

207.    Not only are the defendants violating poor noncustodial parents' constitutional rights in
        effort to generate income for Allen County, it's agencies and the defendants' jobs and status
        in the community, they are not tracking and spending the money as required by law. They are
        allocating non-IV-D costs to the IV-D Budget, and charging 66 percent reimbursement from
        the federal government. 45 CFR 304.21 (b) precludes using IV-D Money to pay judges or
        their staff, Yet, Allen County pays 2/3rds of Title IV-D Judge's or (Magistrate's and hearing
        officer's) Salary, or $76,000.00 with IV-D Money. See page __ of this Complaint.

**Allen County abused federal financial participation payments by allocating non-IV-D costs to
the Title IV-D budget and then collecting 66 percent reimbursement on those costs.**

208.    The most egregious example of this is:

        45 CFR 304.21 - Federal financial participation in the costs of cooperative arrangements with
        courts and law enforcement officials section (b) limitations does not provide IV-D funding
        for judges.  45 CFR 304.21 (b) states:

        "**(b)Limitations.** Federal financial participation is not available in:

        **(2)** Costs of compensation (salary and fringe benefits) of judges;

        **(3)** Costs of travel and training related to the judicial determination process incurred by
            judges;

**(4)** Office-related costs, such as space, equipment, furnishings and supplies, incurred by judges;

**(5)** Compensation (salary and fringe benefits), travel and training, and office-related costs incurred by administrative and support staffs of judges"

209.    However, the June 2005 Allen County Council Meeting Minutes show, "Judge Tom Felts and Tim Miller, Circuit Court Administrator requested an allocation increase; four (4) Probation Officers should be moved back into County General due to a change in statute. They would move them into their IV-D Program budget and then be eligible for a 2/3rd reimbursement. The Magistrate/Hearing Officer falls under the judicial increase; that position is also in the IV-D Program budget so would be 2/3rd reimbursed. In the IV-D Program budget they also requested additional allocation in Translator Services and Per Diem Judges. Id. Allen County Council Meeting Minutes  6/1 & 6/2/05 p. 4, available at

http://webcache.googleusercontent.com/search?q=cache:KbRTrrFvigIJ:www.allencounty.us/index.php%3Foption%3Dcom_content%26view%3Darticle%26id%3D42%26Itemid%3D536%26jsmallfib%3D1%26dir%3DJSROOT/council_minutes/2005%26download_file%3DJSROOT/council_minutes/2005/06-1%252amp%253B2-05.pdf+&cd=2&hl=en&ct=clnk&gl=us

210.    See the Complaint p. ___ In 2011 were inferably four Allen County judges were paid with IV-D money.

211.    With this unconstitutional policy, Allen County and many other counties across Indiana, usurped the Indiana judiciary and have unlawfully shifted the judiciary's powers to counties and their agencies. The counties and their agencies committed fraud upon the court, by causing judges to violate classes of Hoosiers' clearly established rights. Thereby, the defendants created this modern-day system of peonage, involuntary servitude and forced labor.

## V. FACTS ABOUT THE LAW

212.    18 U.S.C.§ Sec. 1595 provides: "(a) An individual who is a victim of a violation of this

chapter may bring a civil action against the perpetrator (or whoever knowingly benefits,

financially or by receiving anything of value from participation in a venture which that

person knew or should have known has engaged in an act in violation of this chapter) in an

appropriate district court of the United States and may recover damages and reasonable

attorneys fees.

(C)No action may be maintained under this section unless it is commenced not later than

the later of— **(1)** 10 years after the cause of action arose.

213.    42 U.S.C.§ § 1983 and 85 create a civil remedy for deprivation of rights under the color

of law and for conspiracy against rights.

214.    The words involuntary servitude [in the 13th Amendment] have a larger meaning than

slavery. . .  The plain intention was to abolish slavery of whatever name and form and all its

badges and incidents; to render impossible any state of bondage; to make labor free, by

prohibiting that control by which the personal service of one man is disposed of or coerced

for another's benefit, which is the essence of involuntary servitude." *Id*. U.S. v. KAUFMAN,

546 F.3d 1242, 1262 (10th Cir. 2008)

215.    The forced labor statute, 18 U.S.C. Sec. 1589, makes it unlawful to (a) knowingly

*provide* or obtain *the labor or services of a person* by any one of, or by *any combination* of,

the following means—

(1) by means of force, threats of force, physical restraint, or threats of physical restraint to
that person or another person;

(2) by means of serious harm or threats of serious harm to that person or another person;

(3) by means of the abuse or threatened abuse of law or legal process; or

(4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint,

shall be punished as provided under subsection (d).

(b)Whoever knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection (a), knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means, shall be punished as provided in subsection (d).

(c)In this section:

(1)The term "abuse or threatened abuse of law or legal process" means the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action.

(2)The term "serious harm" means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

(d) Whoever violates this section shall be fined under this title, imprisoned not more than 20 years, or both. If death results from a violation of this section, or if the violation includes kidnaping, an attempt to kidnap, aggravated sexual abuse, or an attempt to kill, the defendant shall be fined under this title, imprisoned for any term of years or life, or both.

(Added Pub. L. 106–386, div. A, § 112(a)(2), Oct. 28, 2000, 114 Stat. 1486; amended Pub. L. 110–457, title II, § 222(b)(3), Dec. 23, 2008, 122 Stat. 5068. [9]

## VI.  FACTS SHOWING DEFENDANTS ABUSE THE LEGAL PROCESS BY UNCONSTITUTIONALLY POSISTIONG JUDGES TO CARRY OUT THE UNCONSTITUTIONAL POLICY [10]

**A. The Indiana and US Constitutions require judges to be neutral decision makers, to be elected by the voters of the circuit, and demand a separation of power between the legislatures, the executive and the judiciary.**

216.    "The powers of the Government are divided into three separate departments; the

Legislative, the Executive, including the Administrative, and the Judicial: and no person,

---

[9] IV-D Prosecutor David Brown's actions should be considered aggravated sexual abuse.

[10] The unconstitutional policy is denying juveniles, incompetents and the poor, especially poor noncustodial parents equal access to the court, court services and due process and equal protection of the lalaw inrder to generate income for Allen county; and generate the defendants' jobs and status in the community.

charged with official duties under one of these departments, shall exercise any of the functions of another, except as in this Constitution expressly provided." *Id.* Ind. Const. art. 3, § 1, commonly known as the "separation of powers" provision.

217.    The purpose of the separation of power, mandated by Ind. Const. art. 3, § 1, is "to rid each separate department of government from any influence or control by the other department." *A.B. v. State,* 949 N.E.2d 1204, 1212 (Ind.2011)

218.    Article 7. Section 1 of the Ind. Constitution provides '[t]he judicial power of the State shall be vested in one Supreme Court, one Court of Appeals, Circuit Courts, and such other courts as the General Assembly may establish.

219.    The Ind. Constitution Article 7 Section 7 (11/3/1970) guarantees that a Judge for each circuit shall be *elected by the voters* thereof."

**B.  Judicial selection processes in Indiana have been altered or created ad hoc to deny voters a meaningful opportunity to vote for the judge of their circuit and to unconstitutionally position judges to carry out Allen county's unconstitutional policy**

220.    The Indiana Strategic Planning Committee, which is comprised of judges, published the " New Way Forward: The Indiana Strategic Planning Committee's White Paper A Blueprint for Excellence and to Greater Accountability: Enhanced Access to Justice in Indiana's Judicial System" (White Paper) available at, https://www.in.gov/judiciary/center/files/strategic-white-paper.pdf . The White Paper shows that, "judicial selection processes in Indiana have been altered or created in an ad hoc fashion, particularly when individuals or *special interest* groups disapprove of a specific judicial decision or individual judicial philosophy." Id. Quoting the White Paper  p. 20

**C.  The Allen County judicial electoral scheme is unconstitutional.**

221. Allen County is one of four exceptions to state judicial election standards which are governed by Indiana Code Title 33 and Indiana Code 33-33-2. Judgeships are filled by election, like in other counties, although it is nonpartisan. However, the interim vacancies are chosen by a local nominating committee pursuant to Indiana Code § 33-33-2-39, rather than the state nominating committee. The Allen County Judicial Nomination Committee selects 3 names from interested candidates from which the governor appoints one as judge.

222. After interim judicial appointment, the public will have opportunity to elect or rather retain the judge during the next election cycle and most of the time they do – there is very little possibility of defeating a judge who is already in place.

223. In October 2014, the district court  found that Indiana's method of electing Marion County Superior Court judges was unconstitutional, which was affirmed by the 7th Circuit nearly a year later. See United States Court of Appeals, Seventh Circuit. COMMON CAUSE INDIANA, Plaintiff–Appellee, v. INDIVIDUAL MEMBERS OF THE INDIANA ELECTION COMMISSION, et al., Defendants–Appellants. No. 14– 3300. Decided: September 09, 2015

224. Instead of protecting the right to vote for a judge, Marion County remedied the unconstitutional election process by usurping the right to vote and going to judicial selection by the Marion County Judicial Nomination Committee.  A May 3, 2017, The Indiana Lawyer.com article available at, http://www.theindianalawyer.com/articles/43573-indy-judge-selection-procedure-approved explained,

"Judges in Indianapolis won't have to worry about running for election in the future, but they will face up-or-down retention votes under a bill signed by Gov. Eric Holcomb [former prosecutor for northern Indiana's Elkhart County]  April 27. The system to replace the current one ruled unconstitutional was adopted by lawmakers despite warnings that the new system also is spoiling for a fight in court.

Marion County will join Allen, Lake and St. Joseph as the only Indiana counties where appointed judicial-selection panels interview applicants to fill vacancies on the bench, then recommend the three most qualified for the governor's selection. [...]

Several Republican lawmakers joined Democrats who opposed the bill, including the entire Indiana Black Legislative Caucus, which had warned that depriving voters of the ability to elect judges in Marion County would set the stage for an equal protection or Voting Rights Act challenge.
"I'm very disappointed in terms of how it worked out," said Sen. Lonnie Randolph, D-East Chicago, an attorney, former city court judge and ranking minority member of the Senate Judiciary Committee. He called the bill's passage an abuse of authority and posed the question opponents have warned could form the basis of a future court challenge: "Why is it that merit selection exists only where you've got a high percentage of minorities?" [11]
"I think a legal challenge is likely," said Indiana University Robert H. McKinney School of Law professor and judicial selection expert Joel Schumm.

225.    The White Paper shows and published that it is a pervasive, unconstitutional policy that voters do not have a meaningful opportunity to vote for a judge. Page 20 sates: 'In reality, the public may not have a meaningful choice in counties where direct election of judges takes place. In approximately 70% of all recent judicial elections, a judge runs for a specific court with no opposition or runs in a multiple court selection process where the judge is guaranteed to win.'

226.    Allen County's long time sitting judges named as defendants in this Complaint run in elections with no opposition, so they are guaranteed to win. See the Allen County Election results website for each year available at, http://www.allencounty.us/election-results.

227.    In 1996 the Honorable Daniel Heath (Judge Heath), a former Allen County Councilman, defeated former Allen Superior Court Judge Norman Baker in a four-way race. Thereafter, in the 2002, 2008 and the 2014 elections Defendant Heath ran for reelection unopposed and was guaranteed to win.

---

[11]The senator has a valid concern for the minority population. See paragraph __ of this Complaint which shows Allen County Council and their judges recruit people from the southeast side of Fort Wayne, which is predominately minority and poor, to be subject to the unconstitutional policy of violating clearly established rights to generate income for Allen County, it's agencies and the defendants.

228.    The Honorable Charles Pratt (Judge Pratt) was elected as Judge in the 1998 election.

Thereafter, he ran in the 2004, 2010 and the 2016 elections unopposed and was guaranteed to

win.

229.    However, there are plenty of judicial candidates interested in becoming an Allen County

judge but they don't even run against these judges in elections.   In February 2013, the

Honorable Judge Sims, who ruled against the unconstitutional policy and under due course of

law in the Plaintiff's case, retired approximately 6 months before his term was complete.[12]

230.    A News Sentinel article available at: http://www.news-sentinel.com/news/local-

news/2013/02/20/process-begins-to-replace-sims-br-br-first-the-nominating-commission-

needs-to-fill-three-vacancies/. Last accessed 10/29/2017. Exhibit __made the public aware

that:

> "Edward E. Beck, a member of the Allen County Judicial Nomination Committee said,
> while Sims' departure is slightly out of the ordinary - Sims' current term on the bench
> didn't expire until 2014, he wasn't shocked by it. "(I was) surprised when I started hearing
> the rumblings (that Sims was considering retirement), so by the time the official
> announcement was made, I wasn't surprised then," Beck said. "We will do our best to
> select good candidates. Ideally, we would find someone like him." Sims was Allen
> County prosecutor from 1983 to 1994 and hearing/magistrate officer in Allen Circuit
> Court from 1995 to 1996. He took the bench in Allen Superior Court in 1997". Id.

231.    Defendant Judge Heath moved into Judge Sim's position in the Allen County Juvenile

Justice Center. The Allen County Judicial Nominating Committee received eight applications

for the upcoming judicial vacancy in the Allen Superior Court that was created by Judge

---

[12] From 2008 until 2012 Allen Superior Court Judges, including Judge Sims presided over numerous contempt hearings where Ms. Butler's right to court appointed counsel was fraudulently concealed and violated. Her Motion For Relief From Judgment was pending a second hearing, which was scheduled for 3/20/12, but Judge Pratt denied relief before the second hearing. On 3/20/12, Judge Sims went against Allen County's unconstitutional policy by appointing Pauper Counsel, Robert Gevers, to perfect the Plaintiff's appeal from Judge Pratts' denial of her Motion For Relief From Judgment. However, Robert Gevers, a former Allen County prosecutor, refused to participate on appeal. Instead he entered his appearance for the sole purpose of contempt. Ms. Butler was denied equal access to the court of Appeals and due process and equal protection of the law.

Heath's move to the Juvenile Justice Center. *Id.* News Sentinel .com article available at,
http://www.news-sentinel.com/news/local-news/2013/04/11/8-apply-for-civil-judicial-
vacancy-br-br-governor-to-choose-from-3-commission-finalists/.

232.   Although in 2013 the Allen County Judicial Nomination Committee received 8
applications for one seat in the Allen Superior Court the defendant judges ran unopposed in the
2014 and 2016 elections and were guaranteed to win the judicial election.

**233.**   The Allen County electoral scheme interferes with the marketplace by causing interested
judicial candidates to seek appointment to the bench from the Allen County Judicial
Nomination Committee, rather than the election process; and thus hinders electoral choice by
which voters would have the opportunity to choose between competing alternatives that would
have otherwise existed.

**234.**   Allen County has severely burdened the voter's ability to cast a meaningful and effective
vote for the judge of their circuit and Indiana Code § 33-33-2-32 et al' is unconstitutional.
(Judicial nominating commission; establishment and appointing a judge).

235.   Edward Beck, a member of the Allen County Judicial Nomination Committee stated that
the Allen County Judicial Nomination Committee would ideally select someone like Sims, a
former Allen County prosecutor and hearing magistrate. This mindset is paramount in
carrying out Allen County's unconstitutional policy being that the Allen County Prosecuting
Attorneys and hearing magistrates already join in the unconstitutional policy before they are
selected to become judge. Id. ¶

**D.   A practice of the unconstitutional policy is failure to train judges and the use of unelected Magistrates and Pro Tem Judges**

236.   The New Way Forward published and shows that "each individual judge usually operates
his or her own court and programs in the fashion he or she selects." There is little uniformity,

peer review, or guidelines to assist judges with programs to ensure consistency between counties. "Presently, there is no single, defined, measurable standard or policy to guide judge's other than to administer justice." Id. p. 9.

237.    The County's failure to train and supervise its employees in this respect constitutes a policy or custom if it "amount[s] to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" Connick v. Thompson, 563 U.S. 51, 61 (2011) (quoting Canton, 489 U.S. at 388).

238.    The New Way Forward shows trial court judges appoint their own magistrates and "often use "pro tem" judges to perform judicial functions." "To the casual observer/litigant, this can create the impression that an attorney acting as a "pro tem" has some special relationship with the regularly presiding judge. The outward appearance is problematic since the "pro tem" may act as a judge one day and a lawyer in the same court the next day." Id. NWF p.

## FACTS SHOWING FRAUD UPON THE COURT AND THE PERVASIVE UNCONSTITUTIONAL POLICY OF DENYING TARGETED HOOSIERS EQUAL ACCESS TO THE COURT, COURT SERVICES, AND DUE PROCESS AND EQUAL PROTECTION OF THE LAW

**A. Counties across Indiana usurped the Indiana judiciary and have unlawfully shifted the judiciary's powers to county councils and their agencies and thereby committed fraud upon the court.**

129.    Legal process in Indiana is governed by Art. 1 Sec. 12 of the Indiana Constitution [13] and the 14th Amendment of the US Constitution which requires "due course of law" and some form of hearing "before an individual is finally deprived of a property [or liberty] interest." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976).

---

[13] Section 12. All courts shall be open; and every person, for injury done to him in his person, property, or reputation, shall have remedy by due course of law. Justice shall be administered freely, and without purchase; completely, and without denial; speedily, and without delay.

239.    "An impartial decision maker is an essential right in civil proceedings". Goldberg v. Kelly, 397 U.S. 254, 271 (1970). "The neutrality requirement helps to guarantee that life, liberty, or property will not be taken on the basis of an erroneous or distorted conception of the facts or the law... At the same time, it preserves both the appearance and reality of fairness . . . by ensuring that no person will be deprived of his interests in the absence of a proceeding in which he may present his case with assurance that the arbiter is not predisposed to find against him." *Marshall v. Jerrico,* 446 U.S. 238, 242 (1980); *Schweiker v. McClure,* 456 U.S. 188, 195 (1982)."

240.    "If the separation of powers is to be maintained, it is essential that the judicial branch [of] government not be throttled by either the legislative or administrative branches, and that the courts be empowered to mandate what is reasonably necessary to discharge their duties." *McAfee v. State ex rel. Stodola,* 258 Ind. 677, 681, 284 N.E.2d 778, 782 (1972). Webster's defines "throttle" as "to choke or strangle." *Webster's II New College Dictionary* 1150 (2nd ed.1995)." Id. Quoting *A.B. v. State,* 949 N.E.2d 1204, (Ind.2011) Id at 1213.

241.    County governments across Indiana didn't just throttle the judiciary, by unconstitutionally electing and or selecting judges, who are not neutral decision makers, county governments completely usurped the Indiana judiciary and unlawfully shifted the judiciary's powers to county governments and their agencies.

242.    The trial court's, the counties and the county agencies, including the Title IV-D, and Public Defender Agencies' actions are fraud upon the court. "Fraud upon the court" has been defined by the 7th Circuit Court of Appeals to "embrace that species of fraud which does, or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial

machinery can not perform in the usual manner its impartial task of adjudging cases that are presented for adjudication." Kenner v. C.I.R., 387 F. 2d 689 (7th Cir1968), 7 Moore's Federal Practice, 2d ed., p. 512, paragraph 60.23. The 7th Circuit further stated, "a decision produced by fraud upon the court is not in essence a decision at all, and never becomes final."

243.   Indiana County governments usurping trial courts and committing fraud upon the court by causing judges to deny classes of Hoosiers equal access to the court, court services and due process and equal protection of the law is an unconstitutional policy that is so pervasive in 2007 the Indiana Commission on Government Reform (ICGR) recommended "the state assume funding for the state's trial court system, including probation officers and public defenders, so that the Indiana courts can meet the needs of the people they serve; conflicts with local government be eliminated; equal access can be assured". *Id.* Streamlining Local Government: We've got to stop governing like this". 2007 ICGR Report Recommendation #7 p.23 available at   https://indianalocalgovreform.iu.edu/assets/docs/Report_12-10-07.pdf. states in relevant part:

> "By state law, Indiana trial courts have responsibility for criminal, civil and
>     juvenile cases and for providing probation officers and public defenders.
>     But most funding for these courts and court personnel is provided by county
>     [property] taxes. This system of county funding for personnel and
>     programs, required by state law, has created inherent tensions between
>     county governments and the judiciary[.] In addition, inequities exist among
>     counties' caseloads, personnel and probation and public defender
>     programs."

> "This means that some Hoosiers are denied prompt access to courts and court
>     services [...]"

> "While trial court judges would continue to be responsible for local court personnel and
>
>     administration, state funding would improve the judiciary's ability to allocate

resources where they are needed most. This would help assure equal access to courts,

probation, services and public defenders."

"We recommend that the state assume funding for the state's trial court system, including probation officers and public defenders, so that the Indiana courts can meet the needs of the people they serve; *conflicts with local government be eliminated; equal access can be assured"*

244.    In response to the ICGR Recommendation #7 two Indiana judges said:

"The Indiana Judges Association has long supported, and continues to support, transferring the financing of Indiana trial courts to state government." -Judge Thomas J. Felts, President Indiana Judges Association Allen Circuit Court Ft. Wayne, Indiana

"There is a crying need to reduce the tensions that often arise between Indiana trial courts and county government over the funding courts and courts services." -Judge Peggy Quint Lohorn Montgomery Superior Court Crawfordsville, Indiana

Id. 2007 ICGR  Report Recommendation #7  p.24

245.    In 2010, three years after the 2007 ICGR Report was published, nothing was done to

heed the "crying need" to remedy this pervasive, unconstitutional policy that knowingly

denies classes of Hoosiers equal access to the court, court services and due process and equal

protection of the law and creates a danger for Hoosiers to suffer numerous inequities to

exist.[14] The Indiana Strategic Planning Committee, which is comprised of judges, two from

Defendant Allen County, including The Honorable Thomas J, Felts whose comment is cited

above, published The New Way Forward.

246.    The New Way Forward demonstrates and made aware to the public that the "status quo"

is Indiana county councils and other agencies usurping trial courts and committing fraud

upon the court by causing judges to deny some litigants equal access to the court, court

---

[14]  Had the unconstitutional policy been remedied in 2007, when it was published in the ICGR Report Recommendation #7, the Plaintiff would not have been denied equal access to the court, court services and due process and equal protection of the law from 2008 until today and thereby unlawfully indebted with the $50,000 in back child support and forced to participate in the IV-D Program

services, and due process and equal protection of the law by not using their mandate powers

as required by law. The New Way Forward states on page 16-17:

> "Although mandate powers exist, judges rarely use them because they create bad feelings with their county council and *other agencies*.
>
> The current system provides numerous opportunities for inequities [...]
>
> Why should we change?
>
> If we ignore unequal funding for trial courts across the State, the status quo will be maintained. Litigants in some counties will have access to superior, progressive programs, while litigants in other counties will not have access to the same programs[.]" emphasis added [15]

247.    "Constitutional requirements regarding indigent defense, treatment of juveniles and the

mentally incompetent create a set of large and volatile expenditures that can be imposed by

judicial mandate" and is required for equal access to the court, court services and due process

and equal protection of the law. "Lilia G. Judson, Executive Director of the Division of State

Court Administration, reported to the commission that, in the period from 2004-2006, the

vast majority of the mandated expenditures were for pauper and indigent defense expenses,

psychological and medical examinations and payment to special prosecutors." Id. November

2007, Indiana Court Times p.4 Issue 16.4 available at,

https://issuu.com/incourts/docs/news16-4.

*Allen County Council Meeting minutes demonstrate how Allen County Council and other agencies cause judges to not use their mandate powers.*

233.    Guardian Ad litem is a requirement for equal access to the court, court services and due

process and equal protection of the law. In July 2005 the Allen County Council was made

aware of the equal access and due process right to appointment of guardian ad litem in

CHINS cases. "Judge Charles Pratt, Superior Court Family Division requested an additional

---

[15] The New Way Forward is a true account of the Indiana judiciary. Page 2 shows the vast amount of people who participated in reviewing and preparing the document.

allocation in Guardian ad Litem. The primary use of this is to pay for the appointment of attorneys, when ordered by the Court, to represent the interests of children who are in need of services (CHINS). Senate Bill 529, which was passed and signed by the Governor establishes the Department of Child Services (formerly the OFC), and requires the appointment of a GAL or CASA must be appointed in every CHINS case. Where this was done about 90% of the time, it will now be done in every case starting July 1, 2005. The request is for $20,400 over the 2005 appropriation." Id. ALLEN COUNTY COUNCIL MEETING MINUTES JUNE 1 & 2, 2005 available at:

http://webcache.googleusercontent.com/search?q=cache:KbRTrrFviglJ:www.allencounty.us/index.php%3Foption%3Dcom_content%26view%3Darticle%26id%3D42%26Itemid%3D536%26jsmallfib%3D1%26dir%3DJSROOT/council_minutes/2005%26download_file%3DJSROOT/council_minutes/2005/06-1%2526amp%253B2-05.pdf+&cd=1&hl=en&ct=clnk&gl=us

234.    Guardian ad litem is also a right in numerous other types of cases and is mandated under Indiana Trial Rule 17(C) and *Brewer v. Brewer,* 403 N.E. 2d 353, 354, 355 (Ind. Ct. App. 1980.)

235.    However, the September 19, 2013 Allen County Council Meeting minutes prove Defendant Heath ordered his magistrates to violate the law and not appoint guardian ad litem when mandated by law. He did that so they wouldn't be drawing down other parts of their budget to feed that line item. He associated a mandate under the law, which is required for equal access to the court and due process and equal protection of the law, to an opportunity cost. [16] He said,

---

[16] Opportunity cost is the cost of spending efforts or funds on one project or investment instead of another. It involves an analysis of trading off one thing for another. It means the cost of something as measured against a lost opportunity, or the most valuable alternative. Defendant Heath is cutting Guardian ad litem after Ms. Butler filed her Motion For Relief From Judgment that clearly shows the damage the Allen County Courts caused Ms. Butler when she was a child by not tracking fundamental due process and by not appointing her a guardian ad litem. This is

"Finally, the Guardian Ad litem was already overspent. I got with my Magistrates and said no more Guardian Ad litem unless I approve them personally and only under difficult circumstances would I do so.

As I have mentioned to some of you, there is an opportunity cost there and that is we will not always get the full story in some of these cases involving children.

We will have to get it through evidentiary procedures at trial. That puts more of a burden on Magistrates and Judges to seek the truth as best we can.

We could have used the Guardian Ad litem's investigatory powers to talk to Grandma, talk to the neighbors and those things. We are going to miss some of that.

We have a budget of $50,000 for the next year and we will have to use it as prudently as we can. It was clear to me that if I didn't do something, we would really be drawing down other parts of our budget to feed that line item." Id. 9/13/2013 Allen County Meeting Minutes p. 73

236.    Yet, Defendant Judge Heath was before the Allen County Council the same day

requesting $90,000.00 to pay for two (2) additional armed security guards at the Allen County

Juvenile Justice Center and inferably $14,000.00 to pay for a worker to run a pro se judicial

website. The website is intended to assist people who should have had counsel and or a

guardian ad litem appointed to represent them.

237.    The same day, in support of his request for $90,000.00 to pay for the armed security

guards and the website worker, Defendant Heath described Allen County's Title IV-D process

of collecting child support as "squeezing" a parent for child support. He said,

**"Judge Heath**: We have a Judicial Assistance window as well. They are in my court for

Title IV-D and we are trying to get child support out of them. The dad raises his hand

after <u>we have squeezed him for child</u> support and wants to know why he can't get

visitation. Well, that is a separate matter and if he wants to file a petition for visitation,

there is the Judicial Assistance window right outside. That person gets bombarded all day

long with those kinds of requests. Now there is a website where they can go and get the

---

same policy that caused her to be held in DS's parent's custody in a condition of involuntary servitude. See paragraph ___ of this Complaint.

petition, *print it out and fill it out the best they can and file it.*" Id. 9/19/13 Allen County Council Meeting Minutes p. 75.

238.    It's important to note Defendant Heath said, "**we** have squeezed him for child support".

He said "we" to include the other judges, the Allen County Council and Commissioners and

the Allen County IV-D Prosecuting Attorney's office and the clerk.  Keep in mind paragraph

___ where in 2016 the county auditor Nick Jordan said the Allen County's budget is down

$400,000.00 but the Prosecutor and Clerk are "dealing" with child support cases.

239.    To support his request for armed security guards Defendant Judge Heath described

violating unemployed parents' constitutional rights. He said:

**Judge Heath:** " […]Finally, as I mentioned, when I came onboard there was no armed
security at ACJC. Many of my employees were concerned about that. We have
tons of people that come into our center every day that are not happy to be there. I don't
say that lightly, they are very unhappy to be there. We are trying to take child support.
[…] But here is the point, I am in court and
collecting child support and a very large man comes into my courtroom. A lot of my
child support cases deal with felons. They come in and sit down. They are not paying
child support because they can't get a job and they can't get a job because they have a
felony conviction record. These are people who are not only unhappy but have dealt in
unruly matters in their past. I have one security guy, unarmed, sitting there."
Id. Pages 75, 76 of 10available at

http://webcache.googleusercontent.com/search?q=cache:gX1MlZ3Jz0sJ:www.allencounty.us
/index.php%3Foption%3Dcom_content%26view%3Darticle%26id%3D42%26Itemid%3
D639%26jsmallfib%3D1%26dir%3DJSROOT/council_minutes/2013%26download_file
%3DJSROOT/council_minutes/2013/September%2B19%2B2013.pdf+&cd=1&hl=en&ct
=clnk&gl=us

**. DEFENDANTS' FRAUD UPON THE COURT AND UNCONSTITUTIONAL POLICY OF
DENYING POOR NONCUSTODIAL PARENTS EQUAL ACCESS TO THE COURT AND
DUE PROCESS AND EQUAL PROTECTION OF THE LAW WAS DEMONSTRATED IN**

.

240.    Those parents in Defendant Judge Heath's courtroom, referenced in the forgoing meeting

minutes, didn't have a job and couldn't get a job. Therefore, they were very likely indigent and

should have had counsel appointed to represent them prior to the judge "squeezing" them for

child support. Findings of facts and conclusions of law regarding appointed counsel, ability to

pay, and why they were not paying the ordered child support were required under the due

process rights to court appointed counsel and the opportunity to be heard. However, no

legitimate findings are ever made. The dad previously discussed by Judge Heath had a right to

see his children but was buried in these types of court proceedings which prevented him from

seeing his children.

241.    In response to Defendant Heath's forgoing statement explaining how he squeezes poor,

unemployed parents for child support in contempt proceedings and therefore needs armed

security and a pro se website worker, Allen County Councilman Kevin Howell stated the

following which proves the defendants target people from the southeast side of Fort Wayne

and southeast Allen County which is predominately minority and poor:

Kevin Howell said, "First of all, Judge, I am really excited about your concept there. Correct

me because **I am really speaking to the people in southeast Fort Wayne and**

**southeast Allen County. <u>Most of your folks come from that area, quite bluntly</u>**. Is

this one person that is going to be rotating among the various courts doing a number of

jobs

Judge Pratt: No, she is housed in my division. She would provide resources, materials

and reports that are generated and provided to various Judges and the pro se center that

we are talking about serves not just the Superior Court but also Circuit Court as well.

Kevin Howell: Correct me on the Latin part of it, I took Latin in college and got a D in it.

Judge Pratt: Pro se is self-represented.

Kevin Howell: Okay, I got it"

Judge Pratt: It is someone without the benefit of counsel. Many people, as the Chief

Justice said yesterday, there is a significant increase in divorces and in divorce related kinds of cases and people are coming in representing themselves. [Child support modification and child support contempt hearings are the most common post decree, divorce related litigation actions]

"Tom Harris: Judge Heath, just to make sure that I get the number right, you are looking

for the appeal amount of $227,315?

Judge Heath: If you took the two security officers and backed it, that would be correct.

Tom Harris: Okay, very good. I had two or three numbers bouncing around here.

Darren Vogt: Did that include FICA and PERF?

Chandra Reichert: Yes.

Judge Heath: Councilman Harris, if I may, **our security people asked for $90,000** which would give more armament and training to the rest of our security staff. I don't want to overdo this. We are asking a lot of you. We will work on this over time. *We are trying to sharpen our pencils as much as we can.* P. 77 [WOW]

## B. Pursuant to Indiana Rules of Judicial Conduct Rule 2:11j Judge Heath should be disqualified from hearing many cases in the Allen County Juvenile Justice Center or completely removed from the bench.

242.    Pursuant to Indiana Rules of Judicial Conduct Rule 2:11 Judge Heath should be

disqualified from hearing and having control of judges who hear CHINS cases and other cases

mandating appointment of Guardian Ad Litem and Pauper Defense under Indiana Trial Rules

17 (C) and T.R. 60.5 and *Brewer v. Brewer,* 403 N.E. 2d 353, 354, 355 (Ind. Ct. App. 1980.).

Perhaps he should be disqualified from the bench due to his comments in Allen County

Meeting Minutes, as set forth in the context of this Complaint.

243.    RULE 2.11: Disqualification states:

(A) A judge shall disqualify himself or herself in any proceeding in which the judge's impartiality* might reasonably be questioned, including but not limited to the following circumstances: (5) The judge, while a judge or a judicial candidate,* has made a public statement, other than in a court proceeding, judicial decision, or opinion, that commits or appears to commit the judge to reach a particular result or rule in a particular way in the proceeding or controversy.

Comment

[1] Under this Rule, a judge is disqualified whenever the judge's impartiality might reasonably be questioned, regardless of whether any of the specific provisions of paragraphs (A)(1) through (6) apply. In many jurisdictions, the term "recusal" is used interchangeably with the term "disqualification."

[2] A judge's obligation not to hear or decide matters in which disqualification is required applies regardless of whether a motion to disqualify is filed

**C.   Defendants squeezed Ms. Butler for child support, denied her equal access to the court and due process and equal protection of the law.**

244.    The 3/5/08 contempt transcript shows Ms. Butler was indigent, and qualified for appointed counsel. Ms. Butler was taking care of her children who were ages, 1, 3 and 4 years old when this nightmare began. She has a formal 8th grade education and had not been employed since 2003 because she was pregnant with and caring for her children. Their father supported them.

245.    Ms. Butler had no knowledge of the law, what constitutes service, due process or even that states have their own constitution. She still suffered repressed memories and had no idea how DS's parents had custody of her.

246.    Defendant Judge Heath colluded with Allen County Deputy Prosecuting Attorney David Brown (Brown) and the Allen County Council when he refused to use his mandate powers to appoint Ms. Butler pauper counsel as mandated by state law. Before the hearing began Judge Heath should have mandated funds under Ind. Trial rule 60.5 to appoint counsel for Ms. Butler. Instead, Defendant Heath fraudulently concealed Ms. Butler's right to court appointed counsel when he said that they don't appoint counsel in civil matters. Defendant Judge Heath stated it had something to do with budgets.

247.    Ms. Butler showed she thought she terminated her parental rights and never received notice of the default child support order and that DS tricked her into believing his current wife adopted KS. The 3/5/2008 transcript in the Allen Superior Court Donald J. Simpson v. Ms.

Butler Simpson cause Number 02D07-9707-DR-274 3/5/2008 transcript. The transcript excerpts show:

248.     She Page 10 -16 of 24 August 15, 2013 The Council, Judge Gull Superior Court. This is Trial Rule  60.5 Mandate for Pauper Attorney and Guardian Ad Litem. Fran Gull: Fran Gull, Allen Superior Court Jerry Noble Court Executive were arguing for

249.     See

250.     "Sexual coercion and subordination have been among the worst indicia of involuntary servitude." *United States v. Udeozor,* 515 F.3d 260 (4th Cir.2008) *id* at 266 (evidence of sexual abuse "is a badge and incident of servitude which is distressingly common, not just historically, but for young women who find themselves in coercive circumstances today".)

The County's failure to train and supervise its employees in this respect constitutes a policy or custom if it "amount[s] to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" Connick v. Thompson, 563 U.S. 51, 61 (2011) (quoting Canton, 489 U.S. at 388).

**IV-D BENEFICIARY DEFENDANTS ARE MODIFYING THE HIGH CHILD SUPPORT ORDERS THAT ACCUMULATED THOUSANDS OF DOLLARS IN BACK SUPPORT BUT THEY ARE NOT RETROACTIVELY MODIFYING THE ORDERS.**

306. However, these poor noncustodial parents are desperate to obtain a reasonable child support order they can pay 100 percent of, so they can stop the arrearages from accruing so they modify the order.

307.Defendants are pushing parents to modify the child support orders. Defendant Longest stated in the 9/14/2010 ICCSAC meeting 'counties and prosecutors are making efforts to reduce child support payment orders" and "modifying child support orders so poor parents can pay 100 percent of the orders generates income for the state because the federal government changed the federal

incentive payment policy'. In the 10/6/10 ICCSAC Meeting Prosecutors demonstrated they are lowering orders

308. Once the poor noncustodial parent modifies the original order, without raising their defenses, they are buried in the arrearages the original order unlawfully accrued and unlawfully indebted with the back child support they could never pay from the onset of the order.

309. Defendants use the aforementioned clauses of the ICSG to cause poor noncustodial parents to believe that their wage history and need of means-tested assistance programs that memorialize the poor noncustodial parents as financial resources. The say oh well that doesn't matter, it's *not* irrelevant to determine a child support payment order.  The only thing you can put on the record is "change of income". This is shown by DPA David Brown's email correspondences to Jennifer about the ICSG. Then they use the forced modification to unlawfully arrest you.

310. The CSW is the Title IV-D Beneficiary Defendants written finding used to issue the child support  payment order required by the Family Support Act of 1988 and it leaves the record void of all necessary information, to determine a child support payment amount, required by state and federal law.

311. The poor noncustodial parents are unlawfully indebted with the thousands of dollars in back child support and forced to IV-D participate in programs to identify their needs and barriers to paying child support that should have been identified when the orders were issued and resulted in lower child support payment orders.

312. Wanna talk about arbitrary enforcement? The unconstitutional ICSG and CSW create a significant danger for parents to suffer harm described in the DOJ Letter. Especially in light of Indiana Code § 31-16-12-6, which states:

If the court finds that a party is delinquent as a result of an intentional violation of an order for support, the court may find the party in contempt of court. If an action or request to enforce payment of a child support arrearage is commenced not later than ten (10) years after: (1) the child becomes eighteen (18) years of age; or (2) the emancipation of the child; whichever occurs first, the court may, upon a request by the person or agency entitled to receive child support arrearages, find a party in contempt of court

313. Then the defendants hit the poor noncustodial parents with the Interest on child support money judgments under Ind. Code § 24-4.6-1-101. See In Re: The Paternity of D.P.; T.P. v. C.P. No. 76A05-0909-JV-533 Indiana. Ct App. 2010. See also page 15 ¶ 36 and 43 ¶115. The orders were issued so that the poor noncustodial parents could not pay 100 percent from the onset of the orders. This interest rate accumulates more than the original yearly child support obligations and makes it impossible for poor noncustodial parents to get out of the Title IV-D Program. They will be a source of income for the Title IV-D Beneficiary Defendant's until they die.

### .XVII. TITLE IV-D DEFENDANTS VIOLATE POOR NONCUSTDIAL PARENTS CLEARLY ESTABLISHED RIGHTS TO GENRATE MILLIONS OF DOLLARS A YEAR FROM THE IV-D PROGRAM.

314. In 2010, Indiana received approximately 76 million dollars from the federal government for Indiana's child support enforcement and family support programs.  Id Payments to States for Child Support Enforcement and Family Support Programs, page 23 of the 24  page pdf, available at,  https://www.acf.hhs.gov/sites/default/files/olab/cse.pdf . Only 12 million of that was federal incentive payments leaving 64 million generated from federal financial participation payments. Id. See page 3 of Longest's 2012 Newly Elected Clerk Training available at,

https://www.in.gov/sboa/files/Longest_Newly_Elected_Clerk_Training_December_2012_final.p df for amount of incentive payments received in 2010.

315. On top of federal funding each noncustodial parent must pay an annual $55.00 user fee, per IV-D case.  This fee usually goes to the Indiana Child Support Bureau, unless collected locally. In 2012, Indiana had approximately 340,000 IV-D Cases. That's $18,700,000 generated from just the annual user fee. In 2012, only 3 percent of Active IV-D cases were TANF so someone paid $25.00 to initiate Title IV-D Services.  See page 2 of https://www.in.gov/sboa/files/Longest_Newly_Elected_Clerk_Training_December_2012_final.p df to see the number of TANF cases.

316. Allen County Council has "Child Support Expenditures" listed under "Major Revenue Sources for General Operating".  The 2017 Miscellaneous Revenue Projection has Child Support Expenditures as $1,245,000 at 3.14% of the misc. revenue, which is down about $400,000.00 from previous years.  See pages 14 and 16 of the 300-page 2017_Full_Budget_Book.pdf available at http://www.allencounty.us/images/auditors_office/pdfs/budget/2017_Full_Budget_Book.pdf

317. The Fiscal year 2013, the State Board of Accounts found, the Ind. Dept. of Child Services, passed $2,960,464.00 to Allen County for Child Support Enforcement. See page 142 of Financial Statements and Single Federal Audit Report Allen County, Indiana 1/1/2013 to 12/31/2013 available at http://www.govwiki.info/pdfs/General%20Purpose/IN%20Allen%20County%202013.pdf

318. In the 1/21/2016 Allen County Council Meeting Minutes, page 2 Nick Jordan, County Auditor explained. "The miscellaneous revenue was a little over $2 million higher than anticipated. […] The Public Defender also had an increase. That was due to taking on the CHINS cases." "There

are some ups and downs and on the downside, Child Support expenditures were down by $400,000. Some of that has to do with those expenses being moved to special funds. Because they are coming out of special funds, the reimbursement has to go back into that special fund. *It is not such that the Prosecutor or Clerk is not dealing with those child support cases, they are just being paid for from a different fund*" [See paragraph ___ and ___ to see how the prosecutor and clerk "deal" with child support cases] Id. Available at,

http://webcache.googleusercontent.com/search?q=cache:Zkl753YdefcJ:www.allencounty.us/index.php%3Foption%3Dcom_content%26view%3Darticle%26id%3D42%26Itemid%3D536%26jsmallfib%3D1%26dir%3DJSROOT/council_minutes/2016%26download_file%3DJSROOT/council_minutes/2016/January%2B21%252C%2B2016.pdf+&cd=4&hl=en&ct=clnk&gl=us

319. Allen County Commissioners' Legislative Session 10:00 a.m. Friday, January 21, 2011, meeting minutes, available at,

http://www.allencounty.us/index.php?option=com_content&view=article&id=36&Itemid=635&jsmallfib=1&dir=JSROOT/comm_minutes/2011&download_file=JSROOT/comm_minutes/2011/01-21-11.pdf

Show Maximus, Inc was contracted for IV-D Federal reporting on behalf of the Clerk of the Allen Circuit and Superior Courts: Agreement between the Board of Commissioners and Maximus, Inc for IV-D Federal reporting on behalf of the Clerk of the Allen Circuit and Superior Courts. Lisa Borgmann, County Clerk, presented this contract. She stated that she had used Maximus in the Auditor's office. In 2010 we received *227,000 Federal IV-D in reimbursement*.

**Allen County abused federal financial participation payments by allocating non-IV-D costs to the Title IV-D budget and then collecting 66 percent reimbursement on those costs.**

15

320. 45 CFR 304.21 - Federal financial participation in the costs of cooperative arrangements with courts and law enforcement officials section (b) limitations does not provide IV-D funding for judges.  45 CFR 304.21 (b) states:

> "(b) *Limitations.* Federal financial participation is not available in:
>
> (2) Costs of compensation (salary and fringe benefits) of judges;
>
> (3) Costs of travel and training related to the judicial determination process incurred by judges;
>
> (4) Office-related costs, such as space, equipment, furnishings and supplies, incurred by judges;
>
> (5) Compensation (salary and fringe benefits), travel and training, and office-related costs incurred by administrative and support staffs of judges"

321. However, the June 2005 Allen County Council Meeting Minutes show, "Judge Tom Felts and Tim Miller, Circuit Court Administrator requested an allocation increase; four (4) Probation Officers should be moved back into County General due to a change in statute. They would move them into their IV-D Program budget and then be eligible for a 2/3rd reimbursement. The Magistrate/Hearing Officer falls under the judicial increase; that position is also in the IV-D Program budget so would be 2/3rd reimbursed. In the IV-D Program budget they also requested additional allocation in Translator Services and Per Diem Judges. Id.  Allen County Council Meeting Minutes  6/1 & 6/2/05 p. 4, available at

http://webcache.googleusercontent.com/search?q=cache:KbRTrrFvigIJ:www.allencounty.us/index.php%3Foption%3Dcom_content%26view%3Darticle%26id%3D42%26Itemid%3D536%26jsmallfib%3D1%26dir%3DJSROOT/council_minutes/2005%26download_file%3DJSROOT/council_minutes/2005/06-1%2526amp%253B2-05.pdf+&cd=2&hl=en&ct=clnk&gl=us

322. Indiana Code § 31-25-4-15 authorizes and contracts all types of judicial staff who are likely paid with Title IV-D Money.

323. If an expenditure is made to support both a IV-D & a non IV-D activity, it should be properly allocated. A reasonable allocation method should be utilized and backup documentation maintained to support how costs are allocated between IV-D and non-IV-D. Were those probation officers and translators only doing IV-D cases? If so, then they will have a reasonable allocation method and backup documentation maintained to support how costs are allocated between IV-D and non-IV-D.

324. The 6/16/2005 Allen County Council meeting minutes p. 8 show "Tim Miller, Circuit Court Administrator requested an additional appropriation for an increase in salary for a Magistrate/Hearing Officer in the amount of $8,200. this is an increase in judicial pay passed in the Legislature effective July 1, 2005. The County will be reimbursed $5,466 through the Title IV-D program. There was some confusion regarding the title of Magistrate/Hearing Officer title of this position. In the eyes of Judge Felts this position is a Magistrate that is fulfilling that role. Council requested further clarification regarding this situation and also the statute that it falls under." Id. 6/16/2005 Allen County Council meeting minutes p. 8, available at

http://webcache.googleusercontent.com/search?q=cache:2g3JvvjrYXUJ:www.allencounty.us/index.php%3Foption%3Dcom_content%26view%3Darticle%26id%3D42%26Itemid%3D639%26jsmallfib%3D1%26dir%3DJSROOT/council_minutes/2005%26download_file%3DJSROOT/council_minutes/2005/06-16-05.pdf+&cd=3&hl=en&ct=clnk&gl=us

325. The August 24, 2011 COMMISSION ON COURTS meeting minutes show on page 5, available at,

http://www.in.gov/legislative/interim/committee/2011/committee/minutes/CRTSE8O.pdf show a

Title IV-D Hearing Officer was converted to a state paid magistrate, with a salary of

$114,000.00 a year. Two Thirds of that or $76,000.00 of that was paid for from the IV-D

Budget.  However, this is a violation of federal law. In support of violating federal law the

following testimony occurred from a Senator and Judge:

"(4) Request for new Allen Circuit Court magistrate to replace an Allen Circuit Court hearing
officer: The next person to testify was Sen. Dennis Kruse. Sen. Kruse stated he had made this
same request for several years and there was still a need to convert an Allen Circuit Court
Title IV-D child support hearing officer position to a state paid magistrate position. Sen.
Kruse then introduced Judge Thomas Felts of the Allen Circuit Court to testify. Judge Felts'
testimony was supported by a document that contained information concerning the hearing
officer's compensation and a summary of Juvenile Paternity and Domestic Relations State
Involvement cases filed in the Allen Circuit Court (Exhibit 3). Judge Felts stated the
following:
*This is not a request for a new judicial officer but only to convert a county paid Title IV-D
    hearing officer to a state paid magistrate.
*Because this magistrate would continue to handle Title IV-D child support cases, the federal
    government would continue to pay 66 2/3 % of the magistrate's salary.
*In accordance with the Indiana Supreme Court's strategic plan, he believed all 3 judicial
    officers should be compensated by the state.
*This hearing officer performs the same duties as a magistrate and should be treated the same
    as a magistrate.
*Converting this hearing officer position to a magistrate position would allow him to retain a
    good employee. In response to questions from Commission members, Judge Felts stated
    he would have to determine how the conversion of the position from a county paid
    hearing officer to a state paid magistrate would affect public employee pension plans."

Allen Circuit Court Hearing Officer Information

| | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|
| Base Salary | 94,183 | 98,537 | 100,518 | 100,518 | 102,438 |
| $4,000.00 County Supplement | 4,000 | 4,000 | 4,000 | 4,000 | 4000 |
| Sub Total | 98,183 | 102,537 | 104,518 | 104,518 | 106,438 |
| FICA | 7,511 | 7,844 | 7,996 | 7,996 | 8,143 |
| PERF | 8,346 | 8,459 | 9,407 | 9,668 | 10,378 |
| Total | 114,040 | 118,840 | 121,920 | 122,182 | 124,958 |
| IV-D Reimbursement 66 2/3% | 76,019 | 79,219 | 81,272 | 81,446 | 83,297 |
| County's Share after Reimbursement | 38,021 | 39,621 | 40,648 | 40,735 | 41,661 |

| | | New Filings Summary Circuit Court | | | | | | Projected | |
|---|---|---|---|---|---|---|---|---|---|
| | | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | Totals |
| Juvenile Paternity | JP | 147 | 166 | 334 | 773 | 503 | 925 | 950 | 2,848 |
| Domestic Relations State Involvement | DR | 210 | 193 | 181 | 192 | 236 | 187 | 176 | 1,375 |

326. As shown, 45 CFR 304.21 (b) makes it unlawful for judges and, or: "[co]mpensation (salary and fringe benefits), travel and training, and office-related costs incurred by administrative and support staffs of judges", to be paid for with IV-D funding. Yet, the Allen County meeting minutes and Commission of Courts meeting minutes show Allen County IV-D judges and or their staff have received IV-D funds, even two thirds of their salary, for over a decade, since at least 2005. This is another unconstitutional practice in the unconstitutional policy from the Allen County and the Allen Superior Court Board of Judges. The judge's salary was generated form the violation of poor noncustodial parents clearly established constitutional rights.

306.    The Allen Superior Court Board of Judges'

http://webcache.googleusercontent.com/search?q=cache:gX1MlZ3Jz0sJ:www.allencounty.us/index.php%3Foption%3Dcom_content%26view%3Darticle%26id%3D42%26Itemid%3D639%26jsm

allfib%3D1%26dir%3DJSROOT/council_minutes/2013%26download_file%3DJSROOT/council_mi

nutes/2013/September%2B19%2B2013.pdf+&cd=1&hl=en&ct=clnk&gl=us

## COUNTS

### I

*Against all defendants.*

251.  Violation of the 13th Amendment of the U.S. Constitution; and

Art. 1 §& 37 of the Indiana Constitution; and violations of federal, and state statutory law

including:

   A.  human trafficking in violation of (18 U.S.C. § 1595); and Indiana Code §

   35-42-3.5-4; and

   B.  benefitting financially from peonage, slavery and human trafficking in

   violation of (18 U.S.C.§1593A); and Indiana Code § 35-42-3.5-4; and

   C.  peonage in violation of (18 U.S.C. § 1581); and

   D.  involuntary servitude in violation of (18 U.S.C. § 1584); and

   E.  forced labor and forced participation in court and community corrections

   programs to generate income for Allen County, it's agencies and the

   defendants' jobs and status in the community in violation of (18 U.S.C. §

   1589).

### II

*Against all defendants.*

. In their official and individual capacities.

252.  For violation of the 14th Amendment of the U.S. Constitution; and

Violation of Article 1 §12 of the Ind. Const.; and federal; and state statutory laws.

### III

*Against all defendants*.

. In their official and individual capacities.

253. For Violation 18 U.S.C. §§ 1595,93A; 42 U.S.C. §§ 1985 & 1983; Indiana Code § 35-42-3.5-4.

### IV

*Against all defendants*.

254. In their official and individual capacities. Intentional Infliction of emotional distress.

### RELIEF

255. WHEREFORE, The Plaintiff prays this honorable Court will declare her rights as a trafficking victim. In that, she is an alleged trafficking victim. KS is the product of trafficking and pursuant to Indiana Code § 35-42-.5 (2006), Ms. Butler cannot be jailed, fined, or otherwise penalized for being a victim of the offense compelled to participate in sexual conduct with her illegitimate foster brother, Defendant Donald Simpson

256. Issue an Temporary Restraining Order enjoining the defendants from the following:

    i. Arresting Ms. Butler for anything related to Defendant Donald Simpson, Ms. Butler's illegitimate foster brother.

    ii. Restrain Defendant Donald Simpson from contacting Ms. Butler.

    iii. Enjoin the defendants from suspending Ms. Butler's Driver's License; Garnishing her meager wages; placing liens on her property

    iv. Declare the following unconstitutional:

        1. percent per annum interest rate and the child support arrearages accrue, under Ind. Code § 24-4.6-1-101 (Interest on Money

Judgments Statute). Post-judgment interest is statutorily mandated for money judgments, including back child support. See *Caldwell v. Black,* 727 N.E.2d 1097, 1100 (Ind. Ct. App. 2000). There have never even been any income documents submitted to the court or an ability to pay determination as required by law; and

2. Indiana Child Support Guidelines and Child Support Work Sheet; and

3. The Allen County Public Defense System; and

4. Order the ability to pay casements and all contempt cases be reviewed' and

5. Order Defendants compose a form to elicit, and memorialize. a parent's ability to pay child support that is comparable to Ms. Butler's Antecedent Ability To Pay Acescent. (AATPA) and the Court can choose the best.

6. Use the Office of Child Support Enforcement Training Transmittals as required by law.

7. Order a debt compromise as the court deems necessary. Use the AATPA to determine child support payment amounts.

8. Let contracts and payment remain but use of the AATPA to determine child support payment amounts, going forward and backwards;

9. And for such other and further relief as the court may deem just and proper.

Jennifer Butler a/k/a Jennifer Simpson

Pro Se.

7704 Aboite Center Road, Fort Wayne, IN 46804

260.498-0533

js.simpsonlive.com